















SWD    9/27/05    14:30

3:05-CV-01853    FEDERAL INSURANCE CO V. GOLDEN EAGLE INS

*1*

*CMP.*

Gerald L. McMahon, Esq. (SBN 036050)
Michael G. Nardi, Esq. (SBN 190587)
SELTZER CAPLAN MCMAHON VITEK
A Law Corporation
750 B Street, 2100 Symphony Towers
San Diego, California 92101-8177
Telephone:    (619) 685-3003
Facsimile:    (619) 685-3100



FILED

SEP 2 7 2005

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____DEPUTY

Attorneys for Plaintiff, FEDERAL INSURANCE COMPANY

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL INSURANCE COMPANY, an Indiana corporation,<br><br>                    Plaintiff,<br><br>    vs.<br><br>GOLDEN EAGLE INSURANCE CORPORATION, a California corporation,<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CASE NO. **05 CV 1853 L** **(LSP)**

COMPLAINT FOR EQUITABLE CONTRIBUTION; AND EQUITABLE SUBROGATION/INDEMNITY

[DEMAND FOR TRIAL BY JURY]

## JURISDICTION

1.     Plaintiff, Federal Insurance Company ("Federal"), is, and at all times relevant herein was, a corporation duly organized under the laws of the State of Indiana.  Federal maintains its headquarters and principal place of business in New Jersey.  Federal is in the business of providing insurance to members of the public in California and in other States.

2.     Upon information and belief, defendant Golden Eagle Insurance Corporation ("Golden Eagle") is, and at all times relevant herein was, a publicly traded corporation

Case No. _____

# ORIGINAL



organized and existing under the laws of the State of California, with its headquarters and principal place of business in San Diego, California.  Golden Eagle is in the business of providing insurance to members of the public in the State of California.

3.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. section 1332, as the parties are residents of different states and the amount in controversy, exclusive of interest and costs, exceeds seventy-five thousand dollars.

**VENUE**

4.     The United States District Court for the Southern District of California is the appropriate venue for the adjudication of the matters alleged herein because Golden Eagle resides in San Diego, California and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in the Southern District of California.  (See 28 U.S.C. § 1391(a)(1) and (2).)

**EVENTS LEADING TO THIS SUIT**

**The Golden Eagle Policy**

5.     Golden Eagle issued a series of liability insurance policies to Emerald Bay Community Association, including Commercial General Liability Policy No. CCP-527406-00, effective October 8, 1997 (the "Golden Eagle Policy").  Federal is informed and believes that Emerald Bay Community Association is a California non-profit mutual benefit corporation, with its principal place of business in Laguna Beach, California.

6.     Subject to its terms, conditions and exclusions, the Golden Eagle Policy provided Emerald Bay Community Association and other insureds identified therein (collectively, "Emerald Bay" or the "Association") with coverage for, among other things, "property damage" and "personal injury," as defined therein, and Golden Eagle promised to defend Emerald Bay against any "suit" seeking damages because of such "property damage" and/or "personal injury."  (A true and correct copy of the Golden Eagle Policy is attached hereto as Exhibit "1.")

7.     "Property damage" is defined in the Golden Eagle Policy to mean:

2

Case No. _____

"a.     Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or,

b.     Loss of use of tangible property that is not physically injured.  All such loss shall be deemed to occur at the time of the 'occurrence' that caused it."

8.     "Personal injury" is defined in the Golden Eagle Policy to mean "injury, other than 'bodily injury,' arising out of one or more of the following offenses:

. . .

c.     The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d.     Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or,

e.     Oral or written publication of material that violates a person's right of privacy."

9.     The Golden Eagle Policy included an "other insurance" clause, which stated in part:

"This insurance is primary except when b. below applies.  [b. is inapplicable here.]  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then, we will share with all that other insurance by the method described in c. below.  [c. provides for contribution by 'equal shares' or, if not by equal shares, then by 'limits of insurance'.]"

## The Federal Policies

10.     Federal also issued liability insurance policies to Emerald Bay, including (a) Association Liability Insurance Policy No. 80198293-F (the "Federal Association Liability Policy"), effective during the period October 7, 1997 to October 7, 1998; and (b) Commercial Umbrella Policy No. 7941-25-73 (the "Federal Excess Policy"), effective during the period October 8, 1997 to October 8, 1998.

11.     Subject to its terms, conditions, exclusions, definitions, limits of liability and endorsements, the Federal Association Liability Policy covered Emerald Bay for "**Wrongful**

3

Case No. _____

Act(s)" and **PERSONAL INJURY**," as defined therein.  Federal's Association Liability Policy did not provide coverage for "**Property Damage**."  (A true and correct copy of the Federal Association Liability Policy is attached hereto as Exhibit "2.")

12.    By its terms, the Federal Association Liability Policy was "self-liquidating." Thus, any amount Federal paid for defense costs and/or fees reduced, by the same amount, the available indemnity limits of the policy.  (In contrast, Golden Eagle's duty to defend was independent of its duty to indemnify, i.e., Golden Eagle's payment of defense costs and/or fees did not reduce the indemnity limits of its policy.)

13.    The Federal Association Liability Policy included an "excess" other insurance clause, which stated:

> "If any **Loss** arising from any claim made against the **Insured** is insured under any other valid policy(ies), prior or current, then this policy shall cover such **Loss**, subject to its limitations, conditions, provisions, and other terms, only to the extent that the amount of such **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the limits provided in this policy."

14.    Subject to its terms, conditions, exclusions, definitions, limits of liability and endorsements, the Federal Excess Policy provided Excess Follow Form coverage, adding excess limits over scheduled underlying coverage (including Golden Eagle's coverage and the Federal Association Liability Policy), as well as specified Umbrella Liability coverage.  (A true and correct copy of the Federal Excess Policy is attached hereto as Exhibit "3.")

### The Underlying Lopez Action

15.    In or about May 1998, Diana and George Lopez, residents of the Emerald Bay community, filed a lawsuit, captioned <u>Diana K. Lopez et al. v. Emerald Bay Community Association et al.</u>, Orange County Superior Court Case No. 794878 (the "Lopez Action").  The Lopez Action alleged a dispute between the Lopezes and the Association concerning the Lopezes' efforts to construct improvements to their residence.  The Lopezes sought injunctive relief and damages.

4

16.     The Lopezes alleged, in their complaint and/or amendments thereto, that Emerald Bay, among other things, had "deprived [the Lopezes] of the use and enjoyment of their property," caused "ongoing damage to the Lopezes' property" and unlawfully discriminated against the Lopezes.  The Lopezes alleged that Emerald Bay publicly had referred to the Lopezes in a derogatory manner, suggesting to others in the Emerald Bay community that the Lopezes were "dishonest" and "suspicious," and Emerald Bay had "falsely accus[ed] the Lopezes of failing to comply with the Association's approval process" and of "intentionally withholding information from the Association."  The Lopezes also alleged that they had been denied the use of common area beach access owned by the Association.  (A true and correct copy of the Lopezes' Second Amended Complaint [exhibits omitted] is attached hereto as Exhibit "4.")

17.     The Lopez Action was a suit seeking damages because of "property damage" -- within the meaning of the Golden Eagle Policy -- and "personal injury," within the meaning of the Golden Eagle Policy and the Federal Association Liability Policy.  The facts alleged in the Lopezes' pleadings, together with other facts known to Golden Eagle and Federal, created a potential for liability under the Golden Eagle Policy and the Federal Association Liability Policy such that Golden Eagle and Federal each had an independent duty to provide Emerald Bay with an immediate and complete defense against the Lopez Action.  Under the terms of their respective policies, however, Golden Eagle's obligations under the Golden Eagle Policy were primary to those of Federal.

18.     In June 1998, the Lopez Action was tendered to Golden Eagle and to Federal.

19.     In response to the tender, Federal agreed to defend the Lopez Action under the Federal Association Liability Policy, subject to reservations of rights.  Federal notified Emerald Bay that Federal's limits of liability were inclusive of, and not in addition to, the total amount available for defense and/or settlement expenses.  Federal also advised Emerald Bay that its policy was excess to any defense and/or indemnity available under other policies.

20.     Golden Eagle, after stating that it had completed its investigation, initially acknowledged both property damage and personal injury coverage for the Lopez Action.

5

Case No. _____

Golden Eagle, however, reserved the right to assert any appropriate exclusion or defense to coverage should facts arise showing the applicability of such exclusion or coverage defense.

21.     Despite (a) the commitment Golden Eagle made when it accepted Emerald Bay's tender, and (b) the independent duty Golden Eagle owed to provide an immediate and complete defense against the Lopez Action, Golden Eagle breached the duties it owed Emerald Bay by failing to participate in the defense to the extent due and promised. Eventually, in a letter dated September 15, 2000, Golden Eagle reversed its coverage position and disclaimed altogether any duty to defend or indemnify Emerald Bay. Golden Eagle's reversal of position was erroneous and constituted a further breach and repudiation of its obligations under the Golden Eagle Policy.

22.     As a proximate result of Golden Eagle's unlawful actions, Federal was compelled to fund the entire remaining defense of the Lopez Action and pay defense costs and fees that should have been paid by Golden Eagle. Federal paid more than $1.3 million to defend against the Lopez Action, completely exhausting the limits of the Federal Association Liability Policy.

23.     Federal is informed and believes that Golden Eagle, after prolonged delay, and under threat of litigation (see ¶ 26, infra), eventually paid a total of approximately $245,000 in Lopez Action defense fees and/or costs, a fraction of the amount Federal paid and far less than Golden Eagle's appropriate share. Indeed, as alleged herein, the terms of the parties' respective insurance policies made Golden Eagle's obligations primary to those of Federal. Thus, Golden Eagle, whose defense obligation was not affected by its policy limits, should have paid all of the Lopez Action defense fees and costs.

24.     The Lopez Action was settled, effective November 2, 2001. Although the payment of defense costs and fees exhausted the limits of the Federal Association Liability Policy, and Federal had no duty to indemnify Emerald Bay against aspects of the Lopez Action (e.g., the **"Property Damage"** claims), Federal paid $2,000,000 (under the Federal Excess Policy) to settle the Lopez Action in full. The settlement constituted a reasonable and good faith resolution of the claims alleged in the Lopez Action.

Case No. _____

25.   By funding the Lopez Action settlement in full, Federal paid to settle claims Golden Eagle had an exclusive or primary duty to pay.  Golden Eagle, however, refused to participate in or contribute to the settlement.

### The Emerald Bay Action

26.   In or about February 2001, Emerald Bay commenced an action against Golden Eagle, as Orange County Superior Court Case No. 01CC02227 (the "Emerald Bay Action"). Emerald Bay alleged, among other things, that Golden Eagle had breached the Golden Eagle Policy by promising to provide coverage for defense and indemnity and then failing and refusing to do so.

27.   In conjunction with the Lopez Action settlement, Federal and Emerald Bay entered into an agreement under which Federal conditionally assigned to Emerald Bay Federal's rights against Golden Eagle, including rights to contribution and/or legal or equitable subrogation.  Federal's assignment was conditioned upon, among other things, Emerald Bay having the right and standing to assert the assigned rights against Golden Eagle in the Emerald Bay Action.  Emerald Bay and Federal agreed that, in the event it was ever determined (by final decision, without any further right(s) of appeal by any party) that Emerald Bay lacked such right or standing, the assigned rights would immediately revert to Federal.

28.   After Federal had paid to settle the Lopez Action, Golden Eagle filed a motion for summary judgment or summary adjudication of issues in the Emerald Bay Action.  Golden Eagle argued that: (a) there was no potential for coverage under the Golden Eagle Policy, and thus no duty to defend Emerald Bay against the Lopez Action; and, in all events (b) Emerald Bay (i) had suffered no damages as a result of Golden Eagle's alleged breach because Federal and Golden Eagle had paid to defend, and Federal had paid to settle, the Lopez Action, and (ii) had no right to sue for payments made by Federal.

29.   In an order dated October 15, 2002, the court in the Emerald Bay Action denied Golden Eagle's motion for summary judgment or summary adjudication of issues, finding the existence of material issues of fact as to whether (a) Golden Eagle had a duty to defend against the Lopez Action, and (b) Emerald Bay had standing to pursue Federal's assigned rights of

7

contribution and/or subrogation.   (A true and correct copy of the court's October 15, 2002 order is attached hereto as Exhibit "5.")

30.   Thereafter, the duty to defend and standing issues were brought to trial in the Emerald Bay Action, in a bifurcated proceeding.  The trial court did not find it necessary to decide the duty-to-defend issue because it ruled that Emerald Bay (a) had suffered no cognizable damages of its own, and (b) lacked standing to pursue the rights Federal had conditionally assigned.  The trial court entered judgment in the Emerald Bay Action on these grounds on June 19, 2003.

31.   On July 23, 2003, Emerald Bay filed a notice of appeal from the June 19, 2003 judgment entered in the Emerald Bay Action.  The Court of Appeal, in a decision filed June 29, 2005, affirmed the trial court's judgment.  The parties' rights of further appeal in the Emerald Bay Action expired on August 29, 2005, and the Court of Appeal issued its remittitur on September 2, 2005.  Accordingly, the rights Federal conditionally assigned to Emerald Bay have reverted to Federal.

32.   In the meantime, Federal and Golden Eagle had agreed, in writing, effective September 22, 2003, to "toll" all statutes of limitations, contractual time defenses, equitable defenses, claims or obligations based upon the passage of time (including but not limited to laches), affirmative defenses to breach of contract based on the passage of time and other time-related rules, doctrines, claims or defenses (collectively, "Time Defenses") with respect to any action or claim that Federal may bring against Golden Eagle, or Golden Eagle may bring against Federal, arising out of or relating to the defense and/or indemnification of Emerald Bay in the Lopez Action, whether sounding in contribution, legal or equitable subrogation or otherwise.  Federal and Golden Eagle agreed that such Time Defenses would be tolled from September 22, 2003 until the final adjudication, without any further right(s) of appeal in any party, of the Emerald Bay Action.  Under the tolling agreement, any action taken by Federal no later than sixty (60) days after the expiration of the tolling period is deemed to have been taken, for purposes of the Time Defenses, as of September 22, 2003.  The present action is being timely filed.

8

Case No. _____

## FIRST CLAIM

### (Equitable Contribution, Defense Fees/Costs)

33.   Federal incorporates by reference the allegations of paragraphs 1 through 32 above, as if set forth in full herein.

34.   Golden Eagle had a duty to defend the Lopez Action from the date of the tender through the settlement thereof.  Golden Eagle, however, has not paid its share of defense fees and costs.

35.   Federal, on the other hand, has paid more than its share of the Lopez Action defense fees and costs.  Golden Eagle is obligated, under the doctrine of equitable contribution, to reimburse Federal for Golden Eagle's share of the defense fees and costs Federal paid.  Under the circumstances alleged herein, Golden Eagle's appropriate share is the full amount of the more than $1.3 million Federal paid.

## SECOND CLAIM

### (Equitable Contribution, Settlement)

36.   Federal incorporates by reference the allegations of paragraphs 1 through 32 above, as if set forth in full herein.

37.   Golden Eagle had a duty to settle the Lopez Action.  Golden Eagle, however, has not paid any amount toward the Lopez Action settlement.

38.   Federal, on the other hand, has paid more than its share of the Lopez Action settlement (indeed, the full amount thereof).  Golden Eagle is obligated, under the doctrine of equitable contribution, to reimburse Federal for Golden Eagle's share of the settlement payment Federal made.  Under the circumstances alleged herein, Golden Eagle's appropriate share is the full $2 million Federal paid.

## THIRD CLAIM

### (Equitable Subrogation/Indemnity, Defense Fees and Costs)

39.   Federal incorporates by reference the allegations set forth in paragraphs 1 through 32 above, as if set forth in full herein.

Case No. _____

40.   Golden Eagle was primarily responsible for the defense of the Lopez Action, and Golden Eagle, under the doctrine(s) of equitable subrogation/indemnity, is liable to Federal for the amounts Federal paid to defend that action.

41.   Enforcement of the rights of equitable subrogation/indemnity pleaded herein will not work an injustice to the rights of others.  Indeed, the equities support Federal's right to recover from Golden Eagle amounts for which Golden Eagle is primarily responsible.  Federal was not acting as a volunteer in funding the defense of the Lopez Action.

## FOURTH CLAIM

### (Equitable Subrogation/Indemnity, Settlement)

42.   Federal incorporates by reference the allegations set forth in paragraphs 1 through 32 above, as if set forth in full herein.

43.   Golden Eagle was primarily responsible for the settlement of the Lopez Action, and Golden Eagle, under the doctrine(s) of equitable subrogation/indemnity, is liable to Federal for the amount Federal paid to settle that action.

44.   Enforcement of the rights of equitable subrogation/indemnity pleaded herein will not work an injustice to the rights of others.  Indeed, the equities support Federal's right to recover from Golden Eagle amounts for which Golden Eagle is primarily responsible.  Federal was not acting as a volunteer in funding the settlement of the Lopez Action.

## PRAYER

**WHEREFORE**, Federal prays for judgment against Golden Eagle as follows:

a.   On the First Cause of Action, for equitable contribution, requiring Golden Eagle to reimburse Federal for the more than $1.3 million Federal paid to defend the Lopez Action;

b.   On the Second Cause of Action, for equitable contribution, requiring Golden Eagle to reimburse Federal for the $2 million Federal paid to settle the Lopez Action;

c.   On the Third Cause of Action, for equitable subrogation/indemnity, requiring Golden Eagle to reimburse Federal in full for the Lopez Action defense fees and/or costs Federal paid and for which Golden Eagle was primarily responsible;

10

Case No. _____

1    d.    On the Fourth Cause of Action, for equitable subrogation/indemnity, requiring

2 Golden Eagle to reimburse Federal for the Lopez Action settlement Federal paid and for which

3 Golden Eagle was primarily responsible;

4    e.    On all causes of action, for interest at the appropriate rate on the defense and

5 settlement payments Federal made, but which should have been made by Golden Eagle;

6    f.    On all causes of action, for Federal's attorneys' fees, to the extent permitted by

7 law, and costs incurred in connection with this action; and

8    g.    On all causes of action, for such other and further relief as the Court may deem

9 just, equitable and proper.

10

11 Dated: September 27, 2005          SELTZER CAPLAN McMAHON VITEK
                                     A Law Corporation
12

13                                   By: _____

14                                        Gerald L. McMahon, Esq.
                                          Michael G. Nardi, Esq.
15                                   Attorneys for Plaintiff FEDERAL INSURANCE
                                     COMPANY
16

17

18                          **DEMAND FOR JURY TRIAL**

19         Federal Insurance Company hereby demands a jury trial of any and all claims and/or

20 issues triable by jury.

21

22 Dated: September 27, 2005          SELTZER CAPLAN McMAHON VITEK
                                     A Law Corporation
23

24

25                                   By: _____

26                                        Gerald L. McMahon, Esq.
                                          Michael G. Nardi, Esq.
27                                   Attorneys for Plaintiff FEDERAL INSURANCE
                                     COMPANY
28

                                        11

                                                        Case No. _____

# INDEX TO EXHIBITS

| Exhibit No. | Description | Page |
|---|---|---|
| 1 | Golden Eagle Commercial General Liability Policy No. CCP-527406-00, effective October 8, 1997 | 1 |
| 2 | Federal Insurance Company Association Liability Insurance Policy No. 80198293-F, effective October 7, 1997 to October 7, 1998 | 29 |
| 3 | Federal Insurance Company Commercial Umbrella Policy No. 7941-25-73, effective October 8, 1997 to October 8, 1998 | 45 |
| 4 | Second Amended Complaint, *Diana K. Lopez, et al. v. Emerald Bay Community Association, et al.*, filed June 18, 1999 | 82 |
| 5 | October 15, 2002 Order Denying Motion for Summary Judgment and Summary Adjudication | 122 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case No. _____



# GOLDEN EAGLE INSURANCE CORPORATION
## P.O. BOX 85826 - SAN DIEGO, CA 92186-5826

COMMERCIAL GENERAL LIABILITY COVERAGE PART
DECLARATIONS - OCCURRENCE FORM                    Policy No: CCP-527406-00

Named Insured: EMERALD BAY COMM ASSOC

Effective Date:  8 OCT 97                          Agent or Broker Code: 60-02775/150
            (At 12:01 A.M. Standard Time)

## LIMITS OF INSURANCE

| | |
|---|---|
| General Aggregate Limit (Other Than Products - Completed Operations) | 2,000,000 |
| Products - Completed Operations Aggregate Limit | 1,000,000 |
| Personal and Advertising Injury Limit | 1,000,000 |
| Each Occurrence Limit | 1,000,000 |
| Fire Damage Limit | 100,000 Any One Fire |
| Medical Expense Limit | EXCLUDED Any One Person |

## LOCATION OF PREMISES

Location of All Premises You Own, Rent, or Occupy:

PER GEIL100

FORMS AND ENDORSEMENTS (other than applicable Forms and Endorsements shown elsewhere in the policy)
Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:

PER GEL1000

These Declarations when combined with the common policy declarations, the common policy conditions, coverage form(s)
and endorsements, if any, issued to form a part thereof, complete the contract of insurance.

## PREMIUM   (See Classification and Premium Basis Legend for Description of Codes)

| Code No. | | Premium Basis and Exposure | Rate Pr/Co | All Other | Advance Premium Pr/Co | All Other |
|---|---|---|---|---|---|---|
| | LOC# | 1 | | | | |
| 41669 | T) | 526 | INCL | .908 | INCL | $478 |
| 48925 | T) | 2 | INCL | 1356.504 | INCL | $2,713 |
| 48727 | T) | 2 | INCL | 101.378 | INCL | $203 |
| 40072 | T) | 1 | INCL | 2238.004 | INCL | $2,238 |
| 91581 | C) | IF ANY | 2.615 | .363 | AT AUDIT | AT AUDIT |

PREMIUM ENDORSEMENTS:                                                  $70

            TOTAL ADVANCE PREMIUM:              INCL      $5,702

GECG201 (06/93) (GECP0897)



## GOLDEN EAGLE INSURANCE CORPORATION
### P.O. BOX 85826 - SAN DIEGO, CA 92186-5826

---

FORMS LIST                                          Policy No: CCP-527406-00

---

Forms and Endorsements applying to this coverage part and made part of this policy at time of issue:

| FORM NO. | EDITION DATE | DESCRIPTION |
|---|---|---|
| GECG301A | 06/96 | Premium Basis Legend |
| CG0001 | 01/96 | General Liability Coverage Form - Occur. |
| CG0055 | 03/97 | Amendment of Other Insurance Condition |
| CG2147 | 10/93 | Exclusion-Employment-Related Practices |
| GECG824 | 08/96 | Total Pollution Exclusion |
| GECG825 | 01/89 | Asbestos Exclusion |
| GECG828 | 10/94 | Subsidence of Land or Soil Exclusion |
| GECG860 | 07/93 | Premium Audit |
| GECG960 | 09/95 | Deductible Liability Insurance |
| CG2002 | 11/85 | Additional Insured-Club Members |
| CG2018 | 11/85 | Additional Insured-Mortgagee, Assignee |
| CG2024 | 11/85 | Additional Insured-Owners Land Leased |
| GECG951 | 08/96 | Additional Insured-Designated Person |
| CG2135 | 10/93 | Exclusion-Coverage C Medical Payments |

Ex. 1
2

240



# GOLDEN EAGLE INSURANCE CORPORATION
## P.O. BOX 85826 - SAN DIEGO, CA 92186-5826

---

**COMMERCIAL GENERAL LIABILITY - CLASSIFICATION AND PREMIUM BASIS LEGEND**     Policy No: CCP-527406-00

---

PREMIUM BASIS LEGEND –

| | | | | | |
|---|---|---|---|---|---|
| M = | ADMISSIONS | PER 1,000 | P = PAYROLL | PER $1,000 |
| A = | AREA | PER 1,000 | C = COST | PER $1,000 |
| T = | EACH | PER EACH | U = UNITS | PER UNIT |
| S = | GROSS SALES | PER $1,000 | R = GROSS RECEIPTS | PER $1,000 |
| G = | GALLONS | PER 1,000 | | |

RATE LEGEND -
ALL OTHER = PREMISES AND OPERATIONS
PR/CO = PRODUCTS AND COMPLETED OPERATIONS

MP = MINIMUM PREMIUM

---

| Code Number | Classification Description |
|---|---|
| 41669 | CLUBS - CIVIC, SERVICE OR SOCIAL - NO BUILDINGS OR PREMISES OWNED OR LEASED EXCEPT FOR OFFICE PURPOSES - OTHER THAN NOT-FOR-PROFIT - INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS |
| 48925 | SWIMMING POOLS - NOC - INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS |
| 48727 | STREETS, ROADS, HIGHWAYS OR BRIDGES - EXISTENCE AND MAINTENANCE HAZARD ONLY - INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS |
| 40072 | BEACHES - BATHING - NOT COMMERCIALLY OPERATED - INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS |
| 91581 | CONTRACTORS - SUBCONTRACTED WORK - IN CONNECTION WITH CONSTRUCTION, RECONSTRUCTION, ERECTION OR REPAIR - NOT BUILDINGS - NOC |

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II—Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V—Definitions.

SECTION I—COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.  Insuring Agreement

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        (1) The amount we will pay for damages is limited as described in Section III—Limits Of Insurance; and

        (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

        No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments—Coverage A and B.

    b.  This insurance applies to "bodily injury" and "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

        (2) The "bodily injury" or "property damage" occurs during the policy period.

    c.  Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2.  Exclusions

    This insurance does not apply to:

    a.  Expected Or Intended Injury

        "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

    b.  Contractual Liability

        "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

        (1) That the insured would have in the absence of the contract or agreement; or

        (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

            (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

            (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

    c.  Liquor Liability

        "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

        (1) Causing or contributing to the intoxication of any person;

        (2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

        (3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

CG0001 (01/96)

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d.   **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e.   **Employer's Liability**

"Bodily injury" to:

(1)   An "employee" of the insured arising out of and in the course of:

(a)   Employment by the insured; or

(b)   Performing duties related to the conduct of the insured's business; or

(2)   The spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph (1) above.

This exclusion applies:

(1)   Whether the insured may be liable as an employer or in any other capacity; and

(2)   To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

f.   **Pollution**

(1)   "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a)   At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i)   "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

(ii)   "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii)   "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b)   At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c)   Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

(d)   At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i)   "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii)   "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii)   "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e)   At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2)   Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a government authority.

g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

　(a) Less than 26 feet long; and

　(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph f.(2) or f.(3) of the definition of "mobile equipment".

h. Mobile Equipment

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. War

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

j. Damage To Property

"Property damage" to:

(1) Property you own, rent, or occupy;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III—Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k. Damage To Your Product

"Property damage" to "your product" arising out of it or any part of it.

l.  **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m.  **Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1)  A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2)  A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n.  **Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1)  "Your product";

(2)  "Your work"; or

(3)  "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

o.  **Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III—Limits Of Insurance.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

1.  **Insuring Agreement**

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1)  The amount we will pay for damages is limited as described in Section III—Limits Of Insurance; and

(2)  Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments—Coverages A and B.

b.  This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2.  **Exclusions**

This insurance does not apply to:

a.  "Personal and advertising injury":

(1)  Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

(2)  Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(3)  Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(4)  Arising out of a criminal act committed by or at the direction of any insured;

(5)  For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

(6)  Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

(7)  Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

(8)  Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

245

    (9)  Committed by an insured whose business is advertising, broadcasting, publishing or telecasting. However, this exclusion does not apply to paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions section; or

    (10)Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

b.   Any loss, cost or expense arising out of any:

    (1)  Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

    (2)  Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

## COVERAGE C MEDICAL PAYMENTS

1.   Insuring Agreement

a.   We will pay medical expenses as described below for "bodily injury" caused by an accident:

    (1)  On premises you own or rent;

    (2)  On ways next to premises you own or rent; or

    (3)  Because of your operations;

    provided that:

    (1)  The accident takes place in the "coverage territory" and during the policy period;

    (2)  The expenses are incurred and reported to us within one year of the date of the accident; and

    (3)  The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b.   We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

    (1)  First aid administered at the time of an accident;

    (2)  Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

    (3)  Necessary ambulance, hospital, professional nursing and funeral services.

2.   Exclusions

We will not pay expenses for "bodily injury":

a.   To any insured.

b.   To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c.   To a person injured on that part of premises you own or rent that the person normally occupies.

d.   To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e.   To a person injured while taking part in athletics.

f.   Included within the "products-completed operations hazard".

g.   Excluded under Coverage A.

h.   Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS—COVERAGES A AND B

1.   We will pay, with respect to any claim we investigate or settle or any "suit" against an insured we defend:

a.   All expenses we incur.

b.   Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c.   The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d.   All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e.   All costs taxed against the insured in the "suit".

f.   Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g.  All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2.  If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a.  The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b.  This insurance applies to such liability assumed by the insured;

c.  The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d.  The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e.  The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f.  The indemnitee:

(1)  Agrees in writing to:

(a)  Cooperate with us in the investigation, settlement or defense of the "suit";

(b)  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c)  Notify any other insurer whose coverage is available to the indemnitee; and

(d)  Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2)  Provides us with written authorization to:

(a)  Obtain records and other information related to the "suit"; and

(b)  Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of paragraph 2.b.(2) of Section I—Coverage A—Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damages" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a.  We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b.  The conditions set forth above, or the terms of the agreement described in paragraph f. above, are no longer met.

SECTION II—WHO IS AN INSURED

1.  If you are designated in the Declarations as:

a.  An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b.  A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c.  A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d.  An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2.  Each of the following is also an insured:

a.  Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

(1)  "Bodily injury" or "personal and advertising injury":

(a)  To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

Ex. 1  247
9

    (b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of paragraph (1)(a) above;

    (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1)(a) or (b) above; or

    (d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

    (a) Owned, occupied or used by,

    (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b. Any person (other than your "employee"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

    (1) With respect to liability arising out of the maintenance or use of that property; and

    (2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

SECTION III—LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

CG0001 (01/96)

    a.   Damages under Coverage A; and

    b.   Medical expenses under Coverage C

    because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6.   Subject to 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7.   Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV—COMMERCIAL GENERAL LIABILITY CONDITIONS

1.   **Bankruptcy**

    Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2.   **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

    a.   You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

        (1)  How, when and where the "occurrence" or offense took place;

        (2)  The names and addresses of any injured persons and witnesses; and

        (3)  The nature and location of any injury or damage arising out of the "occurrence" or offense.

    b.   If a claim is made or "suit" is brought against any insured, you must:

        (1)  Immediately record the specifics of the claim or "suit" and the date received; and

        (2)  Notify us as soon as practicable.

        You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

    c.   You and any other involved insured must:

        (1)  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

        (2)  Authorize us to obtain records and other information;

        (3)  Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

        (4)  Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

    d.   No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3.   **Legal Action Against Us**

    No person or organization has a right under this Coverage Part:

    a.   To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

    b.   To sue us on this Coverage Part unless all of its terms have been fully complied with.

    A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4.   **Other Insurance**

    If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

    a.   **Primary Insurance**

        This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

    b.   **Excess Insurance**

        This insurance is excess over:

        (1)  Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(b) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(d) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to exclusion g. of Section I — Coverage A—Bodily Injury And Property Damage Liability.

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c.   Method Of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5.   Premium Audit

a.   We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b.   Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c.   The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6.   Representations

By accepting this policy, you agree:

a.   The statements in the Declarations are accurate and complete;

b.   Those statements are based upon representations you made to us; and

c.   We have issued this policy in reliance upon your representations.

7.   Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a.   As if each Named Insured were the only Named Insured; and

b.   Separately to each insured against whom claim is made or "suit" is brought.

8.   Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9.   When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

SECTION V—DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

   c. All parts of the world if:

      (1) The injury or damage arises out of:

         (a) Goods or products made or sold by you in the territory described in a. above; or

         (b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

      (2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f. does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a) Preparing, approving or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

         (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

Ex. 1
13

251

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

    a.    After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b.    While it is in or on an aircraft, watercraft or "auto"; or

    c.    While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a.    Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    b.    Vehicles maintained for use solely on or next to premises you own or rent;

    c.    Vehicles that travel on crawler treads;

    d.    Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        (1)    Power cranes, shovels, loaders, diggers or drills; or

        (2)    Road construction or resurfacing equipment such as graders, scrapers or rollers;

    e.    Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        (1)    Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

        (2)    Cherry pickers and similar devices used to raise or lower workers;

    f.    Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

        (1)    Equipment designed primarily for:

            (a)    Snow removal;

            (b)    Road maintenance, but not construction or resurfacing; or

            (c)    Street cleaning;

        (2)    Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

        (3)    Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    a.    False arrest, detention or imprisonment;

    b.    Malicious prosecution;

    c.    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    d.    Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    e.    Oral or written publication of material that violates a person's right of privacy;

    f.    The use of another's advertising idea in your "advertisement"; or

    g.    Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

    a.    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

        (1)    Products that are still in your physical possession; or

    (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

        (a) When all of the work called for in your contract has been completed.

        (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

        (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same proj??ect.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    b.  Does not include "bodily injury" or "property damage" arising out of:

      (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

      (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

      (3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

    a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

    a.  An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    b.  Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Your product" means:

    a.  Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      (1) You;

      (2) Others trading under your name; or

      (3) A person or organization whose business or assets you have acquired; and

    b.  Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

    a.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    b.  The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

21. "Your work" means:

    a.  Work or operations performed by you or on your behalf; and

    b.  Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

    a.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    b.  The providing of or failure to provide warnings or instructions.

# GOLDEN EAGLE INSURANCE CORPORATION
## P.O. BOX 85826 - SAN DIEGO, CA 92186-5826

## AMENDMENT OF OTHER INSURANCE CONDITION
## (OCCURRENCE VERSION)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART (OCCURRENCE VERSION)

Paragraph 4.b. of the Other Insurance Condition -
(Section IV - Commercial General Liability Conditions) is replaced by the following:

4. Other Insurance
   b. Excess Insurance

  This insurance is excess over:

1) Any of the other insurance, whether primary, excess, contingent or on any other basis:
   a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";
   b) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner, or
   c) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to
      Exclusion g. of COVERAGE A (SECTION I).

2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations
   for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under COVERAGES A or B to defend the insured against any
"suit" if any other insurer has a duty to defend the insured against that "suit".  If no other insurer defends, we will
undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that
exceeds the sum of:
1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and
2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision
and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage
Part.

## GOLDEN EAGLE INSURANCE CORPORATION
### P.O. BOX 85826 - SAN DIEGO, CA 92186-5826

## EMPLOYMENT - RELATED PRACTICES EXCLUSION

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to paragraph 2., Exclusions of COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I - Coverages):

This insurance does not apply to:

"Bodily injury" to:

1) A person arising out of any:
   a) Refusal to employ that person;
   b) Termination of that person's employment; or
   c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs a), b) or c) above is directed.

This exclusion applies:

1) Whether the Insured may be liable as an employer or in any other capacity; and

2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

B. The following exclusion is added to paragraph 2., Exclusions of COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY (Section I - Coverages):

This insurance does not apply to:

"Personal injury" to:

1) A person arising out of any:
   a) Refusal to employ that person;
   b) Termination of that person's employment; or
   c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

2) The spouse, child, parent, brother or sister of that person as a consequence of "personal injury" to that person at whom any of the employment-related practices described in paragraphs a), b) or c) above is directed.

This exclusion applies:

1) Whether the Insured may be liable as an employer or in any other capacity; and

2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

## TOTAL POLLUTION EXCLUSION ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE FORM
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

Exclusion f. under Coverage A (Section I) is replaced by the following, and this exclusion is added to Coverage B (Section I) as exclusion 2.c:

1)  "Bodily injury," "property damage," or "personal injury" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

2)  Any loss, cost or expense arising out of any:
    a.  Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of pollutants; or
    b.  Claim or suit by or on behalf of any authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants; or
    c.  Payment related to the investigation or defense of any loss, injury or damage, or any cost, fine or penalty, or for any expense or claim or suit related to 1) and 2) a. and b. above.

Paragraph 1) of this exclusion  does not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire:

> a.  At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.
> Except any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal,  processing or treatment of waste.
> b.  At or from  any  premises,  site  or  location  on  which  any  insured  or  any  contractors  or subcontractors  working  directly  or  indirectly  on  any  insured's  behalf  are  performing operations if the pollutants are brought on or to the premises, site or location in connection with  such operations by such insured, contractor or subcontractor.   Unless the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or  assess the effects of pollutants.

Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste.  Waste includes material to be recycled, reconditioned or reclaimed.

As used in this endorsement, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

GE CG #24 (08/98)

Ex. 1
18
256

ASBESTOS EXCLUSION

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

      COMMERCIAL GENERAL LIABILITY COVERAGE FORM
      OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
      PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The coverage afforded by this policy does not apply to "bodily injury", "personal injury" or "property damage" arising out of:

    1)    Inhaling, ingesting or prolonged physical exposure to asbestos or, goods or products containing asbestos; or

    2)    The use of asbestos in constructing or manufacturing any goods, product or structure; or

    3)    The removal of asbestos from any goods, product or structure; or

    4)    The manufacture, transportation, storage or disposal of asbestos or goods or products containing asbestos.

The coverage afforded by the policy does not apply to payment for the investigation or defense of any loss, injury or damage or any cost, fine or penalty or for any expense or claim or suit related to any of the above.

GECG 825 (01-89)(GECP0897)

25

## GOLDEN EAGLE INSURANCE CORPORATION
## P.O. BOX 85826 - SAN DIEGO, CA 92186-5826

## SUBSIDENCE OF LAND OR SOIL EXCLUSION

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE FORM
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

EXCLUSION

The exclusions listed are in addition to those contained in the policy to which this endorsement is being attached.

SUBSIDENCE OF LAND OR SOIL EXCLUSION

This insurance does not apply to any claim for bodily injury or property damage caused directly or indirectly, based on or attributed to, arising out of, resulting from, or in any manner related to the subsidence of land or soil. Such claim for loss is excluded regardless of any other cause or event contributing concurrently or in any sequence or manner to the loss including, but not limited to, the following causes:

1. Earth movement, including, but not limited to, earthquake, landslide, mudflow, earth sinking, earth rising or shifting;

2. Flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not;

3. Water which backs up through sewers or drains;

4. Water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through sidewalks, driveways, foundations, walls, basement or other floors. or through doors, windows, or any other openings in such sidewalks, driveways, foundations, walls or floors;

5. Leakage or overflow from plumbing, heating, air conditioning or other equipment or appliances;

6. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body;

7. Faulty, inadequate or defective:

    A. Planning, zoning, development, surveying, siting;

    B. Design specifications, workmanship, repair, constructions, renovations, remodeling, grading, compaction;

    C. Materials used in repair, construction, renovation or remodeling; or

    D. Maintenance;
    of part or all of any property wherever located.

As used herein "subsidence of land or soil" shall mean earth or soil movement including, but not limited to, landslide, mudflow, or sinking, rising, settling, cracking, shifting, expansion or contraction of the earth or soil.

The Company shall not have any duty to defend such claim, proceeding, or suit based on or attributable to, arising out of, resulting from, or in any manner related to any such claim related to the subsidence of land or soil.

## GOLDEN EAGLE INSURANCE CORPORATION
### P.O. BOX 85826 – SAN DIEGO, CA 92186-5826

AMENDMENT – PARAGRAPH 5. PREMIUM AUDIT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

      COMMERCIAL GENERAL LIABILITY COVERAGE FORM
      PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
      OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM

The Commercial General Liability Coverage Form, CG0001, is modified as follows:

SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS; "Paragraph 5. Premium Audit" is amended to read:

a.     We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b.     Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

c.     Policies with an advance auditable premium of $5,000.00 or less generally will not be subject to audit. Policies which are cancelled mid-term will not be subject to audit. The return premium will be calculated based on the exposures and premiums indicated on the policy. At the written request of the Insured, the Company will audit any policy.

d.     The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

GECG 860 (07-93)(GECP0897)     Includes copyrighted material of Insurance Services Office, Inc. 1982, with its permission.

Ex. 1
21

259

## GOLDEN EAGLE INSURANCE CORPORATION
## P.O. BOX 85826 - SAN DIEGO, CA 92186-5826

---

### DEDUCTIBLE LIABILITY INSURANCE

Policy No: CCP-527406-00

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

---

SCHEDULE

| Coverage | Amount and Basis of Deductible | |
| --- | --- | --- |
| | PER CLAIM | MAXIMUM PER OCCURRENCE |
| Bodily Injury Liability | | |
| or | | |
| Property Damage Liability | | |
| or | | |
| Bodily Injury Liability and/or Property Damage Liability Combined | $2,500 | $12,500 |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

---

APPLICATION OF ENDORSEMENT: The Bodily Injury Liability and/or Property Damage Liability Deductible per claim is subject to the maximum deductible stated in the Schedule above for all damages because of Bodily Injury and/or Property Damage as the result of any one occurrence regardless of the number of persons or organizations who sustain damages because of that occurrence.

1. Our obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

2. Your selected deductible applies to the coverage option indicated by the placement of the deductible amount in the Schedule above. The deductible amount stated in the Schedule above applies as follows:

   PER CLAIM BASIS.
   The deductible applies as follows:

   1) Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of "bodily injury";

   2) Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage"; or

   3) Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person because of:
      a) "Bodily injury";
      b) "Property damage"; or
      c) "Bodily injury" and "property damage" combined

   as the result of any one "occurrence."

GECG960 (09/95) (GECP0897) Includes copyrighted material of Insurance Services Office, Inc with its permission.
Copyright Insurance Services Office, Inc., 1992

*File Copy*

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

CG 20 02 11 85

## ADDITIONAL INSURED—CLUB MEMBERS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

WHO IS AN INSURED (Section II) is amended to include as an insured any of your members, but only with respect to their liability for your activities or activities they perform on your behalf.

Copyright, Insurance Services Office, Inc., 1984

Ex. 1   261
23

## GOLDEN EAGLE INSURANCE CORPORATION
### P.O. BOX 85826 - SAN DIEGO, CA 92186-5826

**ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE, OR RECEIVER**

Policy No: CCP-527406-00

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

   COMMERCIAL GENERAL LIABILITY COVERAGE PART

1. WHO IS AN INSURED (Section II) is amended to include as an Insured the person(s) or organization(s) shown in the Schedule but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

2. This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

(If no entry appears below, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

### SCHEDULE

Designation of Premises:    600 EMERALD BAY DRIVE
                           LAGUNA BEACH, CA 92651


Name of Person or Organization:
    G.E. CAPITAL MODULAR SPACE
    C/O  GENERAL ELECTRIC CAPITAL CORP.
    18010 SOUTH FIGUEROA
    GARDENA, CA 90248-4295

CG2018 (11/85) (GECP0897) Copyright Insurance Services, Inc., 1984

## GOLDEN EAGLE INSURANCE CORPORATION
### P.O. BOX 85826 - SAN DIEGO, CA 92186-5826

| | |
|---|---|
| **ADDITIONAL INSUREDS - OWNERS OR OTHER INTERESTS FROM WHOM LAND HAS BEEN LEASED** | Policy No: CCP-527406-00 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

WHO IS AN INSURED (Section II) is amended to include as an Insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the land leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

1. Any "occurrence" which takes place after you cease to lease that land;

2. Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the Schedule.

(If no entry appears below, information required to complete this endorsement will be shown in the Declarations as appliable to this endorsement.)

### SCHEDULE

Designation of Premises (Part Leased to You):  600 EMERALD BAY DRIVE
                                               LAGUNA BEACH, CA 92651


Name of Person or Organization:
  THE IRVINE COMPANY
  550 NEWPORT CENTER DRIVE
  PO BOX I
  NEWPORT BEACH, CA 92658-8904

## GOLDEN EAGLE INSURANCE CORPORATION
### P.O. BOX 85826 - SAN DIEGO, CA 92186-5826

---

## ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION

Policy No: CCP-527406-00

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of your ongoing (as opposed to completed) operations, or premises owned by or rented to you.

(If no entry appears below, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

### SCHEDULE

Additional Premium:          $35

Name of Person or Organization:
    CITY OF LAGUNA BEACH
    RECREATION
    505 FOREST AVENUE
    LAGUNA BEACH, CA 92651

File Copy

## GOLDEN EAGLE INSURANCE CORPORATION
### P.O. BOX 85826 - SAN DIEGO, CA 92186-5826

## ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION

Policy No: CCP-527406-00

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of your ongoing (as opposed to completed) operations, or premises owned by or rented to you.

(If no entry appears below, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

---

### SCHEDULE

Additional Premium:          $35

Name of Person or Organization:
    STATE OF CALIFORNIA
    DEPARTMENT OF PARKS & REC
    ORANGE COAST DISTRICT
    3030 AVENIDA DE
    PRESIDENTE
    SAN CLEMENTE, CA 92672

GECG951 (08/96) (GECP0897)

## GOLDEN EAGLE INSURANCE CORPORATION
## P.O. BOX 85826 - SAN DIEGO, CA 92186-5826

---

## EXCLUSION - COVERAGE  C - MEDICAL PAYMENTS          Policy No: CCP-527406-00

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

With respect to any premises or classification shown in the Schedule, coverage  C.  MEDICAL PAYMENTS (Section I) does not apply and none of the references to it in the Coverage Part apply.

The following is added to SUPPLEMENTARY PAYMENTS (Section I):

  8. Expenses incurred by the Insured for first aid administered to others at the time of an accident for "bodily injury" to which this insurance applies.

(If no entry appears below, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

---

### SCHEDULE

Description and Location of Premises or Classification:
    ALL PREMISES YOU OWN, RENT, LEASE OR OCCUPY.





Chubb Group   Insurance Companies

15 Mountain View Road, Warren, New Jersey 07060

**DECLARATIONS**
**ASSOCIATION LIABILITY INSURANCE**

CHUBB

Policy Number   81098293-F

**FEDERAL INSURANCE COMPANY**
Incorporated under the laws of Indiana
a stock Insurance company, herein called the Company

**THIS IS A CLAIMS MADE POLICY.** Except as otherwise provided herein, this policy covers only **Wrongful Acts** reported to the Company during the **Policy Period.** Please read carefully.

Item 1.   Association:   EMERALD BAY COMMUNITY ASSOCIATION

Item 2.   Address:   600 EMERALD BAY
                     LAGUNA BEACH, CA 92651

Item 3.   Limits of Liability       (A) Each Loss                $   5,000,000.
                                     (B) Each Policy Year        $   5,000,000.

Item 4.   Deductible Amount:                                     $.       5,000.

Item 5.   **Policy Period:**   From   October  7, 1997
                               To     October  7, 1998

Item 6.   Extended Reporting Period:   (A) Additional Premium:   50% of the Annual Premium
                                       (B) Additional Period:    90 Calendar Days

Item 7.   Endorsement(s) Effective at Inception: 1,2,3,4,5,6,7

Item 8.   Termination of Prior Policy(ies):   81098293-E

IN WITNESS WHEREOF, the Company issuing this policy has caused this policy to be signed by its Authorized Officers, but it shall not be valid unless also signed by a duly authorized representative of the Company.

FEDERAL INSURANCE COMPANY

*Henry A Aulich*

Secretary

*[signature]*

President

*[signature]*

Authorized Employee

November 26, 1997

Date

Program Administrator:
   Ian H. Graham
   Ian H. Graham, Inc. Insurance
   16130 Ventura Blvd., Suite 100
   P.O. Box 20084
   Encino, CA 91416-0084

## INSURING CLAUSES

In consideration of payment of the required premium and subject to the Declarations made a part hereof and the limitations, conditions, provisions and other terms of this policy, the Company agrees with the Named Insured as follows:

### ERRORS AND OMISSIONS INSURANCE

1.1 The Company shall pay on behalf of the **Insured** all **Loss** which such **Insured** shall become legally obligated to pay on account of any claim made against him during or after the **Policy Period** for a **Wrongful Act**:

    (A) committed, attempted, or allegedly committed or attempted by such **Insured** before or during the **Policy Period** and,

    (B) reported to the Company, in accordance with Section 4, during the **Policy Period** or, if exercised, the Extended Reporting Period.

### PERSONAL INJURY AND PUBLISHERS LIABILITY

1.2 The Company shall pay on behalf of the **Insured**, all **Loss** which the **Insured** shall become obligated to pay on account of any claim made against him alleging:

    (A) false arrest, wrongful detention or imprisonment, or malicious prosecution;

    (B) libel, slander, defamation of character, or invasion of privacy;

    (C) wrongful entry, eviction or other invasion of the right of privacy;

    (D) infringement of copyright or trademark or unauthorized use of title;

    (E) plagiarism or misappropriation of ideas

Provided such offenses were:

    (A) committed, attempted or allegedly committed or attempted by such **Insured** before or during the **Policy Period** and

    (B) reported to the Company, in accordance with Section 4, during the **Policy Period** or, if exercised, the Extended Reporting Period.

### DEFENSE AND SETTLEMENT

1.3 The Company shall have the right and duty to defend any suit to which this insurance applies alleging a claim against an **Insured** even if any of the allegations are groundless, false or fraudulent, or alternatively may, at the option of the Company, give its written consent to the defense of any such suit by the **Insured**.

No **Defense Costs** shall be incurred or settlements made without the Company's consent, which shall not be unreasonably withheld. The Company shall not be liable hereunder with respect to any settlements or **Defense Costs** to which it has not consented.

The **Insured** shall not be required to contest any legal proceedings unless counsel (to be mutually agreed upon by such **Insured** and the Company) shall advise that such proceedings should be contested by the **Insured** and the **Insured** consents thereto, which consent shall not be unreasonably withheld.

### ESTATES AND LEGAL REPRESENTATIVES

2.1 Subject otherwise to all the terms and conditions of this policy, coverage hereunder shall extend to claims for the **Wrongful Acts** of **Insureds** who are deceased or against the legal representatives or assigns of such **Insureds** who are incompetent, insolvent or bankrupt.



**CHUBB**

## TERRITORY

2.2   Subject otherwise to all the terms and conditions of this policy, coverage hereunder shall extend to ( made anywhere in the world against Insureds for the Wrongful Acts of such Insureds, wherever committed, attempted or allegedly committed or attempted.

## EXTENDED REPORTING PERIOD

2.3   If the Company terminates or refuses to renew this policy, the **Insured** shall have the right, upon pay of the additional premium set forth in Item 6(A) of the Declarations, to elect an extension of the cove granted by this policy for the period set forth in Item 6(B) of the Declarations following the effective d such termination, but only with respect to any **Wrongful Act** committed, attempted or allegedly comm or attempted prior to the effective date of such termination. This right of extension shall lapse unless notice of such election is given to the Company prior to the effective date of termination of this policy Company or within 10 days following the effective date of nonrenewal. If the **Insured** terminates or d to accept renewal, the Company may, if requested, at its sole option, grant an Extended Reporting P The Company's liability under the Extended Reporting Period for **Loss** shall be specifically excess of reduced by the amount of any payments on account of such **Loss** received by the **Insureds** under a insurance replacing the coverage granted by this policy in whole or in part.

## EXCLUSIONS

3.1   The Company shall not be liable under this policy to make any payment for Loss in connection with a claim(s) made against any **Insured**:

(A)   arising from any circumstance if written notice of such circumstance has been given under any p the term of which has expired prior to or upon the inception of this policy, and if such prior policy a coverage (or would afford such coverage except for the exhaustion of its limits of liability) for such in whole or in part, as a result of such notice;

(B)   based upon an actual or alleged violation of the responsibilities, obligations or duties imposed up fiduciaries by the Employee Retirement Income Security Act of 1974 and amendments thereto or s provisions of Federal, State or local statutory law or common law;

(C)   for bodily injury, sickness, disease or death of any person, or for damage to or destruction of any tangible property including loss of use thereof;

(D)   arising from charges of seepage, pollution or contamination and based upon or attributable to vio or alleged violation of any Federal, State, municipal or other governmental statute, regulation or ordinance prohibiting or providing for the control or regulation of emissions or effluents of any kin the atmosphere or any body of land, water, waterway or watercourse, or arising from any action o proceeding brought for enforcement purposes by any public official, agency, commission, board o pollution control administration pursuant to any such statutes, regulations or ordinances or arising any claims alleging seepage, pollution or contamination based upon common law nuisance or tresp

(E)   for the return by any such **Insured** of any remuneration paid in fact to him without the previous app of the Association if it shall be determined by a judgement or other final adjudication that such remuneration is in violation of law or if such remuneration is to be repaid to the Association under settlement agreement;

(F)   brought about or contributed to by the dishonesty of such **Insured** if a judgement or other final adjudication adverse to such **Insured** establishes that acts of active and deliberate dishonesty wei committed or attempted by such **Insured** with actual dishonest purpose and intent and were mate to the cause of action so adjudicated; or

(G)   based upon or attributable to such **Insured** having gained any personal profit or advantage to whic he was not legally entitled regardless of whether or not (1) a judgement or other final adjudication adverse to such **Insured** establishes that such **Insured** in fact gained such personal profit or othe advantage to which he was not entitled, or (2) the **Insured** has entered into a settlement agreemer repay such unentitled personal profit or advantage to the Association.

3.2 The Company shall not be liable under Insuring Clause 1.2 to make any payment for Loss in connection with any claim made against the Insured for:

   (A) liability assumed by the Insured under any contract;

   (B) personal injury arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of any Insured;

   (C) personal injury arising out of a publication or utterance concerning any organization or business enterprise or its products or services made by or at the direction of the Insured with knowledge of falsity thereof;

   (D) the printing of periodicals, advertising matter, or any and all jobs taken by the Insured to be printed a third party, when the periodical, advertising matter, or other printing is not a regular part of the Insured's own publication.

3.3 No Loss which, except for the operation of an exclusion, would have been payable under Insuring Clause 1.2 shall be payable under Insuring Clause 1.1.

## REPORTING AND NOTICE

4.1 A specific Wrongful Act shall be considered to have been first reported to the Company:

   (A) at the time that any Insured first gives written notice to the Company that a claim has been made against the Insured for such Wrongful Act; or

   (B) at the time that any Insured first gives written notice to the Company (1) of the material facts or circumstances relating to such Wrongful Act as facts or circumstances having the potential of giving rise to a claim being made against the Insured or (2) of the receipt of written or oral notice from any party that it is the intention of such party to hold the Insured responsible for such Wrongful Act;

   whichever occurs first.

4.2 The Insured shall, as a condition precedent to their rights under this policy, give to the Company written notice as soon as practicable of any claim made against any of them for a Wrongful Act and shall give the Company such information and cooperation as it may reasonably require.

4.3 Notice hereunder shall be given to the Company at 15 Mountain View Road, Warren, New Jersey 07060.

## LIMIT OF LIABILITY AND DEDUCTIBLE

5.1 For the purposes of this policy, all Loss arising out of all interrelated Wrongful Acts of the Insured shall be deemed one Loss, and such Loss shall be deemed to have originated in the earliest Policy Year in which any of such Wrongful Acts is first reported to the Company.

5.2 The total limit of the Company's liability to pay any Loss hereunder, whether covered under Insuring Clause 1.1, 1.2 or 1.3 or any combination of them, shall not exceed the amount(s) set forth in Item 3 of the Declarations.

5.3 The Company's liability hereunder shall apply only to that part of each Loss which is excess of the Deductible Amount specified in Item 4 of the Declarations, and such Deductible Amount shall be borne by the Insured uninsured and at its own risk.

## REPRESENTATIONS AND SEVERABILITY

6.1 In granting coverage under this policy to any one of the Insureds, the Company has relied upon the declarations and statements in the written application for coverage. All such declarations and statements are the basis of such coverage and shall be considered as incorporated in and constituting part of the policy.



**CHUBB**

6.2    The written application for coverage shall be construed as a separate application for coverage by each **Insured**. With respect to the declarations and statements contained in such written application for coverage, no statement in the application or knowledge possessed by any **Insured** shall be imputed to other **Insured** for the purpose of determining the availability of coverage with respect to claims made against any **Insured** whether or not the Association grants indemnification.

## OTHER INSURANCE

7.1    If any **Loss** arising from any claim made against the **Insured** is insured under any other valid policy(ies), or current, then this policy shall cover such **Loss**, subject to its limitations, conditions, provisions, and terms, only to the extent that the amount of such **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the limits provided in this policy.

## NEWLY CREATED OR ACQUIRED SUBSIDIARIES

7.2    If any **Subsidiary** created or acquired by the **Insured** after the inception of this policy, which qualifies not for profit organization under the provisions of Internal Revenue code, would have been included within the meaning of **Insured** as a result of the definition of **Insured**, such **Subsidiary** shall be included subject to:

    (A)    the giving of written notice of such creation or acquisition to the Company as soon as practicable, in no event more than 120 days following such creation or acquisition, and

    (B)    the giving of any underwriting information and the payment of any additional premium required by the Company.

If any **Subsidiary** created or acquired by the **Insured** after the inception of this policy, does not qualify a not for profit organization under the provisions of the Internal Revenue Code, such **Subsidiary** shall not be included until the **Insured** has

    (A)    given written notice of such creation or acquisition together with any underwriting information which may be required; and

    (B)    received written approval from the Company and paid any additional premium required.

## CONSOLIDATION OR MERGER

7.3    In the event that the **Insured** acquires by merger, or consolidates with, or is merged into or acquired by another organization after the inception of this policy, immediate written notice thereof shall be given to the Company together with such information as the Company may require. The **Insured** shall pay any additional premium required by the Company.

## ALTERATION AND ASSIGNMENT

7.4    No change in modification of, or assignment of interest under this policy shall be effective except when made by written endorsement to this policy signed by an authorized employee of Chubb and Son, Inc.

## SUBROGATION

7.5    In the event of any payment under this policy, the Company shall be subrogated to the extent of such payment to all the **Insured's** rights of recovery. In such case the **Insured** shall execute all papers required and shall do everything necessary to secure and preserve such right including the execution of such documents necessary to enable the Company effectively to bring suit in the name of the **Insured**.

## TERMINATION OF POLICY

7.6    This policy shall terminate in its entirety at the earliest of the following times:

Form 14-02-234 (Ed. 1-87)

(A)  30 days after receipt by the Insured at the address designated in Item 2 of the Declarations of a written notice of termination from the Company or, if a later time is specified in such notice, at such later time

(B)  upon receipt by the Company of written notice of termination from the Insured or, if a later time is specified in such notice, at such later time.

(C)  at such other time as may be agreed upon by the Company and the Insured, or

(D)  upon expiration as set forth in Item 5 of the Declarations.

The Company shall refund any unearned premium computed at customary short rates if the policy is terminated in its entirety by the Insured. Under any other circumstances the refund shall be computed pro-rata.

## TERMINATION OF PRIOR POLICY(IES)

7.7   The taking effect of this policy shall terminate, if not already terminated, any policy(ies) of the Chubb Group of Insurance Companies specified in Item 8 of the Declarations.

## AUTHORIZATION CLAUSE

7.8   By acceptance of this policy, the Association agrees to act on behalf of all Insureds with respect to the giving and receiving of notice of claim or termination, the payment of premiums and the receiving of any return premiums that may become due under this policy, the acceptance of endorsements, and the giving or receiving of any other notice provided for in this policy and the Insureds agree that the Association shall act on their behalf.

## DEFINITIONS

8.1   When used in this policy:

Defense Costs means that part of Loss consisting of costs, charges and expenses (other than regular or overtime wages, salaries or fees of the trustees, directors, officers or employees of the Association) incurred in the defense of legal actions, claims, or proceedings and appeals therefrom and the cost of appeal, attachment or similar bonds.

Insured means the Association named in Item 1 of the Declarations and any person who has been, now is, or shall become a duly elected director or trustee, a duly elected or appointed officer, an employee, or committee member, whether or not they are salaried, and any other person acting on behalf of the Association or at the direction of an officer or board of directors of the Association.

Loss means the total amount which the Insured becomes legally obligated to pay on account of all claims made against it for Wrongful Acts with respect to which coverage hereunder applies, including, but not limited to, damages, judgements, settlements, costs and Defense Costs. Loss does not include fines or penalties imposed by law or matters uninsurable under the law pursuant to which this policy is construed.

Policy Period means the period from the inception of this policy, as set forth in Item 5 of the Declarations, until its termination, in accordance with Section 7.6.

Policy Year means the period of one year following the inception of this policy or any anniversary thereof, or if the time between such inception or any anniversary and the termination of the policy is less than one year, such lesser period. If the Extended Reporting Period is exercised then such Extended Reporting Period shall be part of the last Policy Year and not an additional period.

Subsidiary(ies) means any organization that is controlled by any entity included in the Association through ownership of more than 50% of the outstanding voting stock.



**CHUBB**

Wrongful Act means any error, misstatement or misleading statement, act or omission, or neglect or b: of duty committed, attempted or allegedly committed or attempted by any **Insured** individually or other in the discharge of his duties to the Association, or any matter claimed against him solely by reason or serving in such capacity. All such causally connected errors, statements, acts, omissions, neglects or breaches of duty or other such matters committed or attempted by, allegedly committed or attempted I claimed against one or more of the **Insureds** shall be deemed interelated **Wrongful Acts.**

Ex. 2
35



**Chubb Group Insurance Companies**

CHUBB    15 Mountain View Road, Warren, New Jersey 07060

**ENDORSEMENT**

Effective date of
this endorsement: October  7, 1997

Company: Federal Insurance Company

Endorsement No:      1

To be attached to and form part of
Policy No. 81098293-F

Issued to:  EMERALD BAY COMMUNITY ASSOCIATION

### CALIFORNIA PREMIUM ENDORSEMENT

It is agreed that in compliance with the ruling of the Commissioner of Insurance of the State of California and the opinion of the Attorney-General of that state requiring that the premium for all bonds or policies be endorsed thereon, the basic premium charged for the attached bond/policy for the period

FROM      October  7,.1997

TO        October  7, 1998

IS

Four Thousand Five Hundred Ten And 00/100 Dollars

( $  4,510.00 )

CALIFORNIA SURCHARGE------------ (                    )

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Employee

November 26, 1997
Date

14-02-0442 (Ed. 4-84)

Ex. 2
36



## Chubb Group of Insurance Companies

15 Mountain View Road, Warren, New Jersey 07059

## ENDORSEMENT

Effective date of
this endorsement:  OCTOBER 7, 1997

Company:  FEDERAL INSURANCE COMPANY

Endorsement No:  1 REVISION

To be attached to and form part of
Policy No.  81699791F

Issued to:  EMERALD BAY COMMUNITY ASSOCIATION

### PREMIUM ENDORSEMENT

It is agreed that the basic premium charged for the attached

policy for the period

from: OCTOBER 7, 1997

to:   OCTOBER 7, 1998

is:   $1,672.88.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

------------------------------------
Ian H. Graham
Authorized Representative

02/18/1998
------------------------------------
Date

Form 14-02-0496-4 PT (Ed. 2-85)

Ex. 2
37



**Chubb Group Insurance Companies**

15 Mountain View Road, Warren, New Jersey 07060

**ENDORSEMENT**

Effective date of
this endorsement: October 7, 1997

Company: Federal Insurance Company

Endorsement No: 2

To be attached to and form part of
Policy No. 81098293-F

Issued to: EMERALD BAY COMMUNITY ASSOCIATION

It is agreed that:

Section 3.1, "EXCLUSIONS," shall be amended by adding the following:

(H)    1. arising from any litigation, claims, demands, causes or action, legal or quasi-legal proceedings, decrees or judgments against any **Insured(s)**, occurring prior to, or pending as of OCTOBER 7, 1986   of which any **Insured(s)** had received notice or otherwise had knowledge as of such date.

2. arising from any subsequent litigation, claims, demands, causes of action, legal or quasi-legal proceedings, decrees or judgments against any **Insured(s)** arising from, or based on substantially the same matters as alleged in the pleadings of such prior or pending litigation, claims, demands, causes or action, legal or quasi-legal proceedings, decrees or judgment against any **Insured(s)**; or

3. arising from any act of any **Insured(s)** which gave rise to such prior or pending litigation, claims, demands, causes of action, legal or quasi-legal proceedings, decrees or judgments against any **Insured(s)**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Employee

_____
November 26, 1997
Date

Form 14-02-0654 (Ed. 5-89)

Ex. 2
38



**Chubb Group** **Insurance Companies**

**CHUBB**   15 Mountain View Road, Warren, New Jersey 07060

**ENDORSEMENT**

Effective date of
this endorsement: October 7, 1997

Company: Federal Insurance Company

Endorsement No: 3

To be attached to and form part of
Policy No. 81098293-F

Issued to: EMERALD BAY COMMUNITY ASSOCIATION

It is agreed that Section 8.1 of this policy, DEFINITIONS, is amended by deleting the definition of Insured in its entirety, and substituting the following in lieu thereof:

Insured means the Association named in Item 1. of the Declarations and any person who has been, now is or shall become a duly elected director or trustee, a duly elected or appointed officer, an employee or committee member, whether or not they are salaried, and any members of the Association acting at the direction of the board of directors on behalf of the Association in a voluntary capacity.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Employee

_____
November 26, 1997
Date

Form 14-02-0603 (Ed. 1-98)

Ex. 2
39



Chubb Group   Insurance Companies

**ENDORSEMENT**

CHUBB   15 Mountain View Road, Warren, New Jersey 07060



Effective date of
this endorsement: October  7, 1997

Company:  Federal Insurance Company

Endorsement No:    4

To be attached to and form part of
Policy No. 81098293-F

Issued to:   EMERALD BAY COMMUNITY ASSOCIATION

It is agreed that:

Item 3.1, "EXCLUSIONS", shall be amended by adding the following:

(i)         Where all or part of such claim is, directly or indirectly, based on, attributable to, arising out of,
            resulting from or in any manner related to the failure or omission on the part of the **Insured** to obtain,
            effect, maintain or adhere to insurance; provided, however, that this exclusion shall only apply to
            claims related to the perils of flood and earthquake shock.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
John S. Bain
Authorized Employee

_____
November 26, 1997
Date

Form 14-02-0799 (Ed. 9-90)

Ex. 2
40

Company: Federal Insurance Company

Effective date of
this endorsement: October 7, 1997

Endorsement No: 5

To be attached to and form part of
Policy No. 81098293-F

issued to: EMERALD BAY COMMUNITY ASSOCIATION

It is agreed that Section 1.3 of this policy, DEFENSE AND SETTLEMENT, is deleted in its entirety, and the following is substituted in lieu thereof:

## DEFENSE AND SETTLEMENT

1.3     The Company shall have the right and duty to defend and the right to settle any claim for damages to which this insurance applies seeking pecuniary or nonpecuniary relief even if any of the allegations are groundless, false or fraudulent, or alternatively may, at the option of the Company, give its written consent to the defense of any such claim by the Insured.

No Defense Costs shall be incurred or settlements made without the Company's consent, which shall not be unreasonably withheld. The Company shall not be liable hereunder with respect to any settlements or Defense Costs to which it has not consented.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_John S. Bain_
Authorized Employee

November 26, 1997
Date

Form 14-02-0656 (Ed. 10-92)



Ex. 2
41



CHUBB     15 Mountain    ad, Warren, New Jersey 07060

Company: Federal Insurance Company

Effective date of
this endorsement October 7, 1997

Endorsement No:     6

To be attached to and form part of
Policy No. 81098293-F

Issued to:   EMERALD BAY COMMUNITY ASSOCIATION

It is understood and agreed that paragraph 3.1(C) is deleted in its entirety and the following is substituted in lieu thereof:

(C)   Where all or part of such claim is, directly or indirectly, based on or attributable to, arising out of, resulting from or in any manner related to (including but not limited to cross-complaints for contribution or indemnity) bodily injury, sickness, disease or death of any person or for **Property Damage** including loss of use thereof;

It is further understood and agreed that Section 8.1 is amended by adding the following:

**Property Damage** means any damage, destruction, or deterioration of any tangible property including without limitation, construction defects, whether or not as a result of faulty or incorrect design or architectural plans, improper soil testing, inadequate or insufficient protection from soil and/or ground water movement, soil subsidence, or as a result of the supervision or actual construction, manufacturing or assembly of any tangible property.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Employee

November 26, 1997
_____
Date

Form 14-02-0646 (Ed. 1-89)



Ex. 2
42



**Chubb Group** ⁝ **Insurance Companies**

CHUBB    15 Mountain View Road, Warren, New Jersey 07060

**ENDORSEMENT**

Effective date of
this endorsement: October 7, 1997

Company: Federal Insurance Company

Endorsement No:    7

To be attached to and form part of
Policy No. 81098293-F

Issued to:  EMERALD BAY COMMUNITY ASSOCIATION

It is agreed that Section 3.1, **EXCLUSIONS**, is amended by adding the following:

(J)    who was appointed or elected to serve on the Board of Directors of the Association by the builder,
developer or sponsor of the Association, and who was both a director or officer of the Association
and a director, officer, employee or agent of such builder, developer, or sponsor of the Association;
provided this exclusion applies only to the Claims first made after such Insured ceases to serve on
the Board of Directors of the Association;

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_John S. Bain_
Authorized Employee

November 26, 1997
Date



## Chubb Group of Insurance Companies

15 Mountain View Road, Warren, New Jersey 07059

**ENDORSEMENT**

Company: **FEDERAL INSURANCE COMPANY**

Effective date of this endorsement: **OCTOBER 7, 1997**

Endorsement No: 9

To be attached to and form part of Policy No. 81038293F

Issued to: EMERALD BAY COMMUNITY ASSOCIATION

IT IS HEREBY AGREED THAT ITEM 3 OF THE DECLARATIONS PAGE IS AMENDED TO READ AS FOLLOWS:

LIMITS OF LIABILITY: (A)  EACH LOSS               $ 1,000,000.
                     (B)  EACH POLICY YEAR        $ 1,000,000.

ACCEPTED BY:

----------------------------------------

SIGNATURE'S OFFICIAL TITLE.
TO BE SIGNED BY INSURED & RETURNED TO THE COMPANY.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

----------------------------------------

Ian H. Smith

Authorized Representative

Date

Form 14-02-0495-A PT (Ed. 2-90)

RECYCLED



# THE CHUBB COMMERCIAL UMBRELLA

## Declarations

Chubb Group of Insurance Companies
15 Mountain View Road
Warren, NJ 07059

*Named Insured and Mailing Address (Item 1)*

EMERALD BAY COMMUNITY ASSOCIATION
600 EMERALD BAY
LAGUNA BEACH, CA 92651

| | |
|---|---|
| *Policy Number* | 7941-25-73 |
| *Previous Policy No.* | NEW |

Issued by the stock insurance company indicated below, herein called the company.

**FEDERAL INSURANCE COMPANY**

*Producer No.* 0006624

*Producer*   IAN H. GRAHAM/D AND O CONDO PROGRAM
16130 VENTURA BLVD.
ENCINO, CA 91436-0000

Incorporated under the laws of
Indiana

### Policy Period *(Item 2)*

From:   OCTOBER 8, 1997          To:   OCTOBER 8, 1998
12:01 A.M. standard time at the address of the insured as stated.

### Premium *(Item 3)*

| | Amount |
|---|---|
| | $   3,500.00 |

### Limits of Insurance *(Item 4)*

| | | Amount |
|---|---|---|
| a. | Each Occurrence | $   10,000,000. |
| b. | Products/Completed Operations Aggregate | $   10,000,000. |
| c. | Other Aggregate (where applicable) | $   10,000,000. |
| d. | Retained Limit Aggregate | $   10,000. |

### Authorization

In Witness Whereof, the company issuing this policy has caused this policy to be signed by its authorized officers, but this policy shall not be valid unless also signed by a duly authorized representative of the company.

**FEDERAL INSURANCE COMPANY**

*Secretary*

*President*

*Authorized Representative*

*Date* November 1, 1997

1721

267

Ex. 3
45

Case 3:05-cv-01853-MMA-LSP   Document 1   Filed 09/27/05   Page 62 of 148



# THE CHUBB COMMERCIAL UMBRELLA

## Schedule of Forms

| | | |
|---|---|---|
| *Policy Period* | OCTOBER 8, 1997 | to OCTOBER 8, 1998 |
| *Effective Date* | October 8, 1997 | |
| *Policy Number* | 7941-25-73 | |
| *Insured* | EMERALD BAY COMMUNITY ASSOCIATION | |
| *Name of Company* | FEDERAL INSURANCE COMPANY | |
| *Date Issued* | November 6, 1997 | |

*Form number*

As of the effective date printed above, this is the Schedule of Forms applicable to this policy:

| | |
|---|---|
| '92 UMBRELLA DECLARATIONS - FEDERAL INS. CO. | 07-02-1261   (08/97) |
| THE CHUBB COMMERCIAL UMBRELLA | 07-02-1248   (08/97) |
| EMPLOYERS' LIABILITY EXCL - A | 07-02-1255   (08/97) |
| CARE, CUSTODY OR CONTROL EXCL. - A AND B | 07-02-1251   (08/97) |
| CLAIMS MADE ENDORSEMENT - COVERAGE A | 07-02-1254   (08/97) |
| LEAD EXCLUSION COVERAGE A - HOSTILE FIRE | 07-02-1250   (08/97) |
| GENERAL PROFESSIONAL EXCL - COV A & B | 07-02-1252   (08/97) |
| GENERAL PROFESSIONAL EXCL - COV A & B | 07-02-1253   (08/97) |
| GENERAL PROFESSIONAL EXCL - COVERAGE B | 07-02-1258   (08/97) |
| GENERAL PROFESSIONAL EXCL - COV A & B | 07-02-1260   (08/97) |
| POLL EXCL - A - HOSTILE FIRE    (G,) | 07-02-1249   (08/97) |
| SCHEDULE OF UNDERLYING INSURANCE | 07-02-1275   (08/97) |

09/22/99 WED 14:03 FAX 818 95 3948     IAN.H.GRAHAM INC. 005



CHUBB

## *THE CHUBB COMMERCIAL UMBRELLA*

### *Schedule of Underlying Insurance*

| | |
|---|---|
| *Effective date* | OCTOBER 8, 1997 |
| *Policy Number* | 7941-25-73 |
| *Insured* | EMERALD BAY COMMUNITY ASSOCIATION |

### *Commercial General Liability*

| | | | | |
|---|---|---|---|---|
| *Name* | GOLDEN EAGLE | $ | 1,000,000. | *each Occurrence* |
| | | $ | 2,000,000. | *General Aggregate* |
| *Policy No.* | CPP 329932-02 | | | *(other than Products* |
| *Term* | OCTOBER 8, 1997 | | | *Completed Operations)* |
| *to* | OCTOBER 8, 1998 | $ | 1,000,000. | *Products Completed* |
| | | | | *Operations Aggregate* |
| *Occurrence* | | $ | 1,000,000. | *Personal and Advertising* |
| | | | | *Injury* |

Includes all Premises and Operations of the Insured

### *Automobile Liability*

| | | | | |
|---|---|---|---|---|
| *Name* | GOLDEN EAGLE | *Bodily Injury Liability* | | |
| | | | | *each Person* |
| *Policy No.* | CPP 329932-02 | | | *each Occurrence* |
| *Term* | OCTOBER 8, 1997 | *Property Damage Liability* | | |
| *to* | OCTOBER 6, 1998 | | | *each Occurrence* |
| | | *or* | | |
| | | $ | 1,000,000. | *Combined Single Limit* |

NON-OWNED & HIRED AUTO ONLY

### *Directors And Officers Liability*

| | | | | |
|---|---|---|---|---|
| *Name* | FEDERAL INSURANCE COMPANY | $ | 1,000,000. | *EACH LOSS* |
| *Policy No.* | 8109-82-93E | $ | 1,000,000. | *EACH POLICY* |
| *Term* | OCTOBER 8, 1997 | | | *PERIOD* |
| *to* | OCTOBER 8, 1998 | | | |

Occurrence

---

*Authorization*     *All other terms and conditions remain unchanged.*

Authorized Representative

Date    November 6, 1997

Ex. 3
47



CHUBB

# THE CHUBB COMMERCIAL UMBRELLA

## Introduction

This liability insurance policy features two insuring agreements:

A.    Excess Follow Form Liability coverage; and

B.    Umbrella Liability coverage.

Excess Follow Form Liability adds excess limits over scheduled underlying coverages.

Umbrella Liability adds a broadening measure of coverage against many of the gaps in and between the underlying coverages.

Together, these separate coverages share the Limits of Insurance.

01/15/1999  01:08   &   2948          IAN H G      INC                    PAGE  86



**CHUBB**

## *THE CHUBB COMMERCIAL UMBRELLA*

### *Contract*

Please read your policy carefully. It explains your rights and duties and what is and what is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured. The words "we", "us", and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such in the Definitions of this policy.

Other words and phrases that are printed in bold-face type are defined in the policy. These definitions are found in the Definitions section or in the specific policy provision where they appear.

---

### *Insuring Agreements*

**Coverage A - Excess Follow Form Liability Insurance**

Under Coverage A, we will pay on behalf of the **insured**, that part of loss covered by this insurance in excess of the total applicable limits of **underlying insurance**, provided the injury or offense takes place during the Policy Period of this policy. The terms and conditions of **underlying insurance** are with respect to Coverage A made a part of this policy, except with respect to:

A.    any contrary provision contained in this policy; or

B.    any provision in this policy for which a similar provision is not contained in **underlying insurance**.

With respect to the exceptions stated above, the provisions of this policy will apply.

The amount we will pay is limited as described in Limits of Insurance.

Notwithstanding anything to the contrary contained above, if underlying insurance does not cover loss, for reasons other than exhaustion of an aggregate limit of insurance by payment of claims, then we will not cover such loss.

We have no obligation under this insurance with respect to any claim or suit settled without our consent.

If we are prevented by law from paying on behalf of the **insured** for coverage provided under this insurance, then we will indemnify the **insured**.

---

Ex. 3
49

## Insuring Agreements
(continued)

### Coverage B - Umbrella Liability Insurance

Under Coverage B, we will pay on behalf of the insured, damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of bodily injury, property damage, personal injury, or advertising injury covered by this insurance which takes place during the Policy Period of this policy and is caused by an occurrence. We will pay such damages in excess of the Retained Limit Aggregate specified in Item 4 d. of the Declarations or the amount payable by other insurance, whichever is greater.

Damages because of bodily injury include damages claimed by any person or organization for care or loss of services resulting at any time from the bodily injury.

This coverage applies anywhere.

The amount we will pay is limited as described in Limits of Insurance.

Coverage B will not apply to any loss, claim or suit for which insurance is afforded under underlying insurance or would have been afforded except for the exhaustion of the limits of insurance of underlying insurance.

We have no obligation under this insurance with respect to any claim or suit settled without our consent.

If we are prevented by law from paying on behalf of the insured for coverage provided under this insurance, then we will indemnify the insured.

## Defense and Supplementary Payments

### Applicable to Coverage A and Coverage B

A.  We have the right and the duty to assume control of the investigation, settlement or defense of any claim or suit against the insured for damages covered by this policy:

    1.  under Coverage A, when the applicable limit of underlying insurance has been exhausted by payment of claims; or

    2.  under Coverage B, when damages are sought for bodily injury, property damage, personal injury or advertising injury to which no underlying insurance or other insurance applies.

B.  In those circumstances where paragraph A. above applies, in addition to the applicable Limits of Insurance, we will pay our expenses and the following to the extent that they are not included in underlying insurance:

    1.  up to $2,000 for the cost of bail bonds. We do not have to furnish these bonds:

Ex. 3
50





**CHUBB**

## THE CHUBB COMMERCIAL UMBRELLA

**Defense and Supplementary Payments**

**Applicable to Coverage A and Coverage B (continued)**

2.  the cost of bonds to release attachments, but only for bond amounts within the amount of insurance available. We do not have to furnish these bonds;

3.  reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or suit: including actual loss of earnings up to $300 per day because of time off from work;

4.  costs taxed against the insured in the suit;

5.  pre-judgment interest awarded against the insured on that part of the judgment we pay. However, if we make an offer to pay the applicable Limit of Insurance, we will not pay any pre-judgment interest based on that period of time after the offer; and

6.  all interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court that part of the judgment that is within the applicable Limits of Insurance.

C.  In those circumstances where paragraph A. above does not apply, we do not have the duty to assume control of the investigation, settlement or defense of any claim or suit against the insured. We do, however, have the right to participate in the investigation, settlement or defense of any claim or suit that we feel may create liability on our part under the terms of this policy. If we exercise this right, we will do so at our expense.

We will not defend any suit after we have exhausted the applicable Limit of Insurance as stated in Item 4 of the Declarations.

If we are prevented by law from carrying out this provision, we will pay any expense incurred with our consent.

## Limits of Insurance

**Applicable to Coverage A and Coverage B**

A.  With respect to Coverage A and Coverage B, the Limits of Insurance shown in Item 4 of the Declarations and the rules below determine the most we will pay, regardless of the number of:

1.  insureds;

2.  claims made or suits brought against any or all insureds;

3.  coverages provided under this policy; or

4.  persons or organizations making claims or bringing suits.

## Limits of Insurance

**Applicable to**
**Coverage A and**
**Coverage B**
*(continued)*

B.   The Limits of Insurance of this policy will apply as follows:

1.   The limit for Each Occurrence stated in Item 4 a. of the Declarations is the most we will pay for all damages arising out of any one occurrence, even if such damages are covered, in whole or in part, under both Coverage A and Coverage B.

Any amount paid for damages arising out of an occurrence will reduce the amount of the applicable aggregate limit of insurance available for payment of damages arising out of any other occurrence.

If the applicable aggregate limit of insurance has been reduced by payment of damages to an amount that is less than the limit for Each Occurrence stated in Item 4 a. of the Declarations, the remaining aggregate limit of insurance is the most that will be available for payment of damages arising out of any other occurrence.

2.   Subject to paragraph B.1. above, the limit stated in Item 4 b. of the Declarations for the Products Completed Operations Aggregate is the most we will pay for all damages under the products-completed operations hazard.

3.   Subject to paragraph B.1. above, the limit stated in Item 4 c. of the Declarations for the Other Aggregate is the most we will pay for all damages under Coverage A, and separately under Coverage B, except for: a) damage covered under the products-completed operations hazard or, b) damage covered in **underlying insurance** to which no underlying aggregate limit applies.

However, with respect to Coverage A only, the Other Aggregate will apply in the same manner as the aggregate in each policy listed in the Schedule of Underlying insurance.

C.   The Limits of Insurance of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the Policy Period shown in the Declarations, unless the Policy Period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**Applicable to**
**Coverage A Only**

A.   With respect to Coverage A and subject to paragraphs B.1., B.2. and B.3. above:

1.   if the limits of **underlying insurance** have been reduced by payment of loss, this policy will drop down to become immediately excess of the reduced underlying limit; or

2.   if the limits of **underlying insurance** have been exhausted by payment of loss, this policy will continue in force as **underlying insurance**.

01/15/1999  01:08    B    32948                    IAN H G        INC                    PAGE  18



CHUBB

# THE CHUBB COMMERCIAL UMBRELLA

## Limits of Insurance

**Applicable to
Coverage A Only
(continued)**

The provisions of A.1. and A.2. above apply to injury or offense which takes place before
the expiration of this policy or the underlying policy, whichever comes first.

---

## Exclusions

**Applicable to
Coverage A and
Coverage B**

A.    Under Coverage A and Coverage B, this insurance does not apply to:

Asbestos Liability

any liability based on, attributable to, related to or in any manner arising out of:

1.    the mining, processing, manufacturing, use, testing, ownership, sale or removal
of asbestos, asbestos fibers or material containing asbestos;

2.    exposure to asbestos, asbestos fibers or material containing asbestos; or

3.    any error or omission in supervision, instructions, recommendations, notices,
warnings, or advice given, or which should have been given, in connection with
asbestos, asbestos fibers or material containing asbestos.

Employment Practices

any liability based on, attributable to, related to or in any manner arising out of any
actual or alleged:

1.    termination of any employee;

2.    failure to promote or advance any employee; or

3.    failure to hire any prospective employee or any applicant for employment.

Laws, Various

any liability or obligation imposed on the insured under any of the following:

1.    any uninsured/underinsured motorist or automobile no fault or first party
personal injury law;

2.    any workers' compensation, unemployment compensation, or disability benefits
law or any similar law; or

3.    the United States' Employees' Retirement Income Security Act (E.R.I.S.A.) of
1974 as now or hereafter amended.

*Nuclear Energy Liability*

any liability excluded by the Nuclear Energy Liability Exclusion on Page 19 of this
policy.

---

## *Exclusions*
(continued)

*Applicable to*          B.    Under Coverage A, this insurance does not apply to:
*Coverage A Only*
                                Pollution Liability

1.    any liability arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants**:

    a.    that are, or that are contained in any property that is:

        (1)    being moved from the place where such property or **pollutants** are accepted by an **insured** for movement into or onto the covered auto;

        (2)    being transported or towed by the covered auto:

        (3)    otherwise in the course of transit by or on behalf of an **insured**;

        (4)    being stored, disposed of, treated or processed in or upon the covered auto; or

        (5)    being moved from the covered auto to the place where such property or **pollutants** are finally delivered, disposed of or abandoned by an insured;

    b.    at or from any premises, site or location which is or was at any time, owned or occupied by, or rented or loaned to, any insured:

    c.    at or from any premises, site or location which is or was at any time used by or for any **insured** or others for the handling, storage, disposal, processing or treatment of waste;

    d.    which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any **insured** or any person or organization for whom any **insured** may be legally responsible; or

    e.    at or from any premises, site or location on which any **insured** or any contractors or subcontractors working directly or indirectly on any **insured's** behalf are performing operations:

        (1)    if the **pollutants** are brought on or to the premises, site or location in connection with such operations by such **insured**, contractor or subcontractor; or

        (2)    if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess the effects of **pollutants**.

01/15/1999  01:08   87  59948        IAN H GR   NC             PAGE  12



**CHUBB**

## THE CHUBB COMMERCIAL UMBRELLA

### Exclusions

*Applicable to
Coverage A Only
(continued)*

Paragraphs 1.a.(4) and 1.b. through 1.e. above do not apply to fuels, lubricants, fluids, exhaust gases or other similar pollutants that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered auto or its parts, if the pollutants escape, seep or migrate or are discharged, dispersed or released directly from an auto part designed by its manufacturer to hold, store, receive or dispose of such pollutants.

Paragraphs 1.b. through 1.e. above do not apply to pollutants not in or upon the covered auto if:

a.   the **pollutants** or any property in which the **pollutants** are contained are upset, overturned or damaged as a result of the maintenance or use of the covered auto;

b.   the discharge, dispersal, seepage, migration, release or escape of the pollutants is caused directly by such upset, overturn or damage; and

c.   the bodily injury or property damage is not otherwise excluded under paragraph 1.a. of this exclusion.

Paragraphs 1.b. and 1.e.(1) above do not apply to bodily injury or property damage arising out of heat, smoke or fumes from a hostile fire.

2.   any loss, cost or expense arising out of any:

a.   request, demand or order that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of **pollutants**; or

b.   claim or **suit** by or on behalf of any governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to, or assessing the effects of **pollutants**.

As used in this exclusion:

1.   **hostile fire** means one which becomes uncontrollable or breaks out from where it was intended to be; and

2.   **pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned, reclaimed or disposed of.

#### Underlying Insurance Exclusions

any liability excluded by **underlying insurance.**

## Exclusions
*(continued)*

*Applicable to*          C.    Under Coverage B. this insurance does not apply to:
*Coverage B Only*
Aircraft. Owned or Chartered Without Crew

> any liability arising out of the ownership. maintenance. use, loading or unloading or entrustment to others of any aircraft owned by you or rented, loaned, or chartered by or on behalf of you without crew.

Autos: USA, Puerto Rico and Canada

> any liability arising out of the ownership. maintenance. use, loading or unloading or entrustment to others of autos within the United States of America. including its possessions and territories, Puerto Rico, Canada or while autos are being transported between these places.

Breach of Contract. Failure to Perform, Wrong Description

> **advertising injury** arising out of:

1.  breach of contract;

2.  the failure of goods, products or services to conform with advertised quality or performance; or

3.  the wrong description of the price of goods, products or services.

Damage to Impaired Property

> **property damage to impaired property** or property that has not been physically injured arising out of:

1.  a defect, deficiency, inadequacy or dangerous condition in **your product** or **your work**; or

2.  a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **your product** or **your work** after it has been put to its intended use.

Damage to Your Product

> **property damage to your product** arising out of it or any part of it.

Damage to Your Work

> **property damage to your work** arising out of it or any part of it and included in the **products-completed operations hazard.**

01/15/1999  01:08   8    7948        IAN H    NC                     PAGE  14



**CHUBB**

## THE CHUBB COMMERCIAL UMBRELLA

### Exclusions

*Applicable to*
*Coverage B Only*
*(continued)*

Employee Injury

1.   any injury to an employee of the insured arising out of and in the course of employment by the insured; or

2.   any injury to the spouse, child, parent, brother, or sister of that employee as a consequence of 1. above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, or to any obligation to share damages with or repay someone else who must pay damages because of an injury.

Falsity, Prior Publication, Willful Violation

**personal injury** or **advertising injury** arising out of:

1.   oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

2.   oral or written publication of material whose first publication took place before the beginning of the policy period; or

3.   willful violation of a penal statute or ordinance committed by or with the consent of the insured.

Intentional Acts

**bodily injury** or **property damage** which results from an act that is intended by the **insured** or can be expected from the standpoint of a reasonable person to cause **bodily injury** or **property damage**, even if the injury or damage is of a different degree or type than actually intended or expected.

This exclusion does not apply to **bodily injury** caused by the use of reasonable force to protect people or property.

Owned Watercraft

any liability arising out of the ownership, maintenance, use, loading or unloading or entrustment to others of any watercraft owned by you. This exclusion does not apply to watercraft while ashore on premises you own or rent.

Pollution Liability

1.   any liability arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants**; or

---

## Exclusions

**Applicable to
Coverage B Only**
*(continued)*

2.   any loss. cost or expense arising out of any:

    a.   request. demand or order that any **insured** or others test for. monitor, clean up. remove. contain. treat. detoxify, or neutralize. or in any way respond to, or assess the effects of **pollutants**: or

    b.   claim or suit by or on behalf of any governmental authority or others for damages because of testing for. monitoring. cleaning up. removing. containing. treating, detoxifying, or neutralizing, or in any way responding to, or assessing the effects of **pollutants**.

As used in this exclusion, **pollutants** means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke. vapor. soot. fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned, reclaimed or disposed of.

This exclusion applies whether or not the pollution was sudden, accidental, gradual. intended, expected, unexpected, preventable or not preventable.

### Product Recall

damages claimed for any loss. cost or expense incurred by you or others for the loss of use, withdrawal, recall. inspection, repair. replacement, adjustment, removal or disposal of:

1.   **your product**:

2.   **your work**; or

3.   **impaired property**:

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy, or dangerous condition in it.

### Property Damage, Various

**property damage** to:

1.   property you own:

2.   that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the **property damage** arises out of those operations:

3.   that particular part of any property that must be restored, repaired or replaced because **your work** was incorrectly performed on it: or

4.   the property of one **insured** in the care, custody or control of another insured.

Paragraph 3. of this exclusion does not apply to **property damage** included in the **products-completed operations hazard.**

---

Ex. 3

01/15/1999  01:09         53948              IAN H G         INC              PAGE  16



**CHUBB**

## *THE CHUBB COMMERCIAL UMBRELLA*

### Definitions

**Applicable to Coverage A and Coverage B**

In this policy words and phrases appearing in bold-face type have the defined meanings shown below.

A.    The following Definitions are applicable to Coverage A and Coverage B.

**Other insurance** means a policy of insurance affording coverage that this policy also affords. **Other insurance** includes any type of self-insurance or other mechanism by which an insured arranges for funding of legal liabilities.

**Other insurance** does not include **underlying insurance** or a policy of insurance specifically purchased to be excess of this policy affording coverage that this policy also affords.

**Suit** means a civil proceeding in which injuries or damages to which this insurance applies are alleged. **Suit** includes:

   1.    an arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

   2.    any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

**Underlying insurance** means the policy or policies of insurance listed in the Schedule of Underlying Insurance forming a part of this policy.

**Applicable to Coverage A Only**

B.    The following definitions are applicable to Coverage A only.

**Insured** means:

   1.    the Named Insured stated in Item 1 of the Declarations;

   2.    any person or organization included as an insured in **underlying insurance**; and

   3.    at your option and subject to the terms of this policy at the time of claim or **suit**, persons or organizations included as additional insureds in **underlying insurance**, but only for their liability arising out of operations of the Named Insured.

**Loss** means those sums actually paid in the settlement or satisfaction of a claim which the **insured** is legally obligated to pay as damages because of injury or offense, after making proper deductions for all recoveries and salvage.

**Applicable to Coverage B Only**

C.    The following definitions are applicable to Coverage B only.

**Advertising injury** means injury, other than **bodily injury** or **personal injury**, arising solely out of one or more of the following offenses committed in the course of **advertising** your goods, products or services:

   1.    oral or written publication of **advertising** material that slanders or libels a person or organization;

   2.    oral or written publication of **advertising** material that violates a person's right of privacy; or

01/15/1999  01:08   81 ■ 2948                    IAN H GR■ ■NC                    PAGE  17

## Definitions

**Applicable to**
**Coverage B Only**
*(continued)*

3.    infringement of copyrighted titles, slogans or other **advertising** materials.

**Advertising** means any paid advertisement, publicity article, broadcast or telecast.

**Auto** means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment; but an **auto** does not include **mobile equipment**.

**Bodily injury** means physical injury, sickness or disease to a person and, if arising out of the foregoing, mental anguish, mental injury, shock or humiliation, including death at any time resulting therefrom.

**Impaired property** means tangible property, other than **your product** or **your work**, that cannot be used or is less useful because:

1.    it incorporates **your product** or **your work** that is known or thought to be defective, deficient, inadequate or dangerous; or

2.    you have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

1.    the repair, replacement, adjustment or removal of **your product** or **your work**; or

2.    your fulfilling the terms of the contract or agreement.

**Insured** means:

1.    the **named insured**;

2.    any partner, joint venture member, executive officer, employee, director or stockholder of the **named insured** while acting within the scope of his or her duties as such;

3.    if the **named insured** is an individual, the individual so designated and spouse, but only with respect to the conduct of a business of which the individual is the sole proprietor;

4.    any organization over which the **named insured** maintains majority interest and to which more specific insurance does not apply, other than one which you newly acquire or form;

5.    any newly acquired or formed organization over which the **named insured** maintains majority interest and to which more specific insurance does not apply; provided that this policy does not apply to any injury or damage that took place before you acquired or formed the organization;

6.    any person or organization while acting as your real estate manager; or

7.    your legal representative if you die, but only with respect to duties as such.

No person or organization is an insured with respect to the conduct of any current, past or newly formed partnership or joint venture that is not designated within the Declarations of this policy as **named insured**.





## THE CHUBB COMMERCIAL UMBRELLA

*Definitions*

*Applicable to
Coverage B Only
(continued)*

Insured contract means any written or oral agreement entered into by the insured in the usual course of the business operations of the insured in which the insured assumes tort liability of another to pay damages because of **bodily injury, property damage, personal injury** or **advertising injury** to a third person or organization where the contract or agreement is made prior to the injury or offense.

Mobile equipment means any of the following types of land vehicles, including any attached machinery or equipment:

1. bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

2. vehicles maintained for use solely on or next to premises you own or rent;

3. vehicles that travel on crawler treads;

4. vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

    a. power cranes, shovels, loaders, diggers or drills; or

    b. road construction or resurfacing equipment such as graders, scrapers or rollers;

5. vehicles not described in 1., 2., 3. or 4. above, that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    a. air compressors, pumps and generators including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    b. cherry pickers and similar devices used to raise or lower workers;

6. vehicles not described in 1., 2., 3. or 4. above, maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not mobile equipment but will be considered autos:

    a. equipment designed primarily for:

        (1) snow removal;

        (2) road maintenance, but not construction or resurfacing; or

        (3) street cleaning;

    b. cherry pickers and similar devices mounted on an auto or truck chassis and used to raise or lower workers; and

    c. air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

## Definitions

**Applicable to
Coverage B Only
(continued)**

Named insured means the person(s) and organization(s) designated in Item 1 of the Declarations of this policy.

Occurrence means:

1. with respect to **bodily injury** or **property damage** liability, an accident, including continuous or repeated exposure to substantially the same general harmful conditions;

2. with respect to **personal injury** or **advertising injury**, a covered offense. All damages that arise from the same act, publication or general conditions are considered to arise out of the same occurrence, regardless of the frequency or repetition thereof, the number or kind of media used or the number of claimants.

**Personal injury** means injury, other than **bodily injury**, arising out of one or more of the following offenses committed in the course of your business, other than your **advertising**:

1. false arrest, detention or imprisonment;

2. malicious prosecution;

3. the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person or persons occupy, by or on behalf of its owner, landlord or lessor;

4. oral or written publication of material that slanders or libels a person or organization;

5. oral or written publication of material that violates a person's right of privacy; or

6. discrimination (unless insurance thereof is prohibited by law).

**Products-completed operations hazard** means all **bodily injury** and **property damage** occurring away from premises you own or rent and arising out of **your product** or **your work** except:

1. products that are still in your physical possession; or

2. work that has not yet been completed or abandoned. **Your work** will be deemed completed at the earliest of the following times:

   a. when all of the work called for in your contract has been completed;

   b. when all of the work to be done at the site has been completed if your contract calls for work at more than one site; or



**CHUBB**

# THE CHUBB COMMERCIAL UMBRELLA

## Definitions

**Applicable to
Coverage B Only
(continued)**

   c.    when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

This hazard does not include **bodily injury** or **property damage** arising out of:

1.    the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by loading or unloading of it; or

2.    the existence of tools, uninstalled equipment or abandoned or unused materials.

**Property damage** means:

1.    physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2.    loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the occurrence that caused it.

**Tort liability** means a liability that would be imposed by law in the absence of any contract or agreement.

**Your product** means:

1.    any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

   a.    you;

   b.    others trading under your name; or

   c.    a person or organization whose business or assets you have acquired; and

2.    containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**Your product** includes:

1.    warranties or representation made at any time with respect to the fitness, quality, durability, performance or use of **your product** and

2.    the providing or failure to provide warnings or instructions.

**Your product** does not include vending machines or other property rented to or located for use of others but not sold.

**Your work** means:

1.    work or operations performed by you or on your behalf; and

## Definitions

*Applicable to*
*Coverage B Only*
*(continued)*

2.   materials, parts or equipment furnished in connection with such work or operations.

Your work includes:

1.   warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of your work; and

2.   the providing of or failure to provide warnings or instructions.

## Conditions

*Applicable to*
*Coverage A and*
*Coverage B*

The following Conditions are applicable to both Coverage A and Coverage B.

Appeals

At our option we can initiate or participate in an appeal of a judgment against any insured if the judgment is for more than the amount of the Retained Limit Aggregate stated in Item 4 d. of the Declarations or the limits of insurance of underlying insurance.

If we initiate or participate in an appeal, we will pay our costs of the appeal. These payments will be in addition to the Limits of Insurance of this policy.

Audit of Books and Records

We may audit the insured's books and records at any time during the term of this insurance or within three years after expiration or termination.

Bankruptcy or Insolvency

Bankruptcy or insolvency of the insured or the insured's estate will not relieve us of our obligations under this policy.

Cancellation

The first named insured may cancel this policy at any time by sending us a written request or by returning the policy stating the date of cancellation.

We may cancel this policy at any time by sending to the first named insured a notice of 60 days (10 days in the event of non-payment of premium) in advance of the cancellation date. Our notice of cancellation will be mailed to the first named insured's last known address, and will indicate the date on which coverage is terminated.

If cancellation is at the request of the insured, return premium will be computed at 90% of pro rata. If we cancel, return premium will be computed pro rata. If this policy insures more than one insured, cancellation may be effected by the first named insured for the account of all the insureds. Notice of cancellation by us to such first named insured will be deemed notice to all insureds and payment of any return premium to such first named insured will be for the account of all interests.





CHUBB

## THE CHUBB COMMERCIAL UMBRELLA

### Conditions

**Applicable to
Coverage A and
Coverage B**
*(continued)*

**Changes**

Notice to any agent or knowledge possessed by any agent or by any other person will not affect a waiver or change in any part of this policy. This policy can only be changed by a written endorsement that becomes part of this policy.

**Duties in the Event of Occurrence, Claim or Suit**

You must see to it that we and your underlying *insurers*:

1. are notified as soon as possible of any occurrence which may result in a claim if the claim may involve this policy or any **underlying insurance**;

2. receive notice of the claim or suit as soon as possible;

3. are helped, at our request, to enforce any right against any person or organization which may be liable to the **insured** because of injury or damage to which this insurance applies; and

4. receive the **insured's** full cooperation as stated in this policy or in any **underlying insurance**.

Additionally, it is a requirement of this policy that:

1. the **insured** not make any admission of liability; and

2. the **insured** not, unless we agree, incur any expense or make any payment other than for first aid. Any such unauthorized expenses will be at the **insured's** own cost.

**First Named Insured**

The person or organization first named in Item 1 of the Declarations is primarily responsible for the payment of all premiums. The first named **insured** will act on behalf of all other **insureds** for the giving and receiving of notice of cancellation and the receiving of any return premiums that become payable under this policy.

**Inspection**

We have the right, but are not obligated to inspect the **insured's** premises and operations at any time. Our inspections are not safety inspections. They relate only to the insurability of the premises and operations and the premium to be charged. We may provide reports on the conditions we find. We may also recommend changes. While these reports may help reduce losses, we do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. We do not warrant that the premises or operations are safe or healthful, or that they comply with laws, regulations, codes or standards.

01/15/1999  02:58   53948        IAN H GR      INC                    PAGE   04

## Conditions

**Applicable to**
**Coverage A and**
**Coverage B**
*(continued)*

Maintenance of Underlying Insurance

While this policy is in effect you agree to maintain **underlying insurance** in full force. This means that:

1.  **underlying insurance** may not be cancelled or non-renewed by either you or the insurance company without notifying us;

2.  renewals or replacements of **underlying insurance** will not be more restrictive in coverage;

3.  terms, conditions and endorsements of **underlying insurance** will not materially change;

4.  collectibility of **underlying insurance** limits as listed in the Schedule of Underlying Insurance, or replacements thereof, must be available regardless of the bankruptcy or insolvency of the underlying insurers; and

5.  limits of **underlying insurance** will not change except for any reduction in the aggregate limits of insurance by payment of loss.

Your failure and/or your underlying insurer's failure to comply with this condition will not invalidate this policy but in the event of such failure, we will only be liable to the same extent as if there had been compliance with this condition.

Other Insurance

If **other insurance** applies to claims covered by this policy, the insurance under this policy is excess and we will not make any payments until the **other insurance** has been exhausted by payment of claims. This insurance is not subject to the terms or conditions of any **other insurance.**

Premium

The premium for this policy as stated in Item 3 of the Declarations is a flat premium. It is not subject to adjustment unless an endorsement is attached to this policy.

Separation of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned to the first named insured, this insurance applies:

1.  as if *each named insured* were the only named insured; and

2.  separately to each **insured** against whom claim is made or suit is brought.

Titles of Paragraphs

The titles of the various paragraphs of this policy and endorsements, if any, attached to this policy, are inserted solely for convenience or reference and are not to be deemed in any way to affect the provisions to which they relate.

01/15/1999  02:58     53948          IAN H G  INC          PAGE  85



## THE CHUBB COMMERCIAL UMBRELLA

### Conditions

**Applicable to
Coverage A and
Coverage B**
*(continued)*

**Transfer of Rights and Duties**

Your rights and duties under this insurance may not be transferred without our written consent. If you die, then your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having temporary custody of your property will have your rights and duties but only with respect to that property.

**Transfer of Rights of Recovery**

1. If the insured has rights to recover all or part of any payment we have made under this insurance, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring suit or transfer those rights to us and help us enforce them.

2. Any amount recovered will be apportioned in the inverse order of payment of loss to the extent of actual payment. The expenses of all such recovery proceedings will be apportioned in the ratio of respective recoveries.

**When Loss is Payable**

This policy will not apply until the **insured**, or the **insured's** underlying insurer is obligated to pay the full amount of the underlying limit or Retained Limit Aggregate. When the amount of loss has finally been determined, we will promptly pay on behalf of the **insured** the amount of loss which falls within the terms of this policy. The first **named insured** will promptly reimburse us for any amount within the Retained Limit Aggregate paid by us.

---

### Nuclear Energy Liability Exclusion

This policy does not apply to:

A. any injury or damage:

1. with respect to which an **insured** under the policy is also an **insured** under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an **insured** under any such policy but for its terminations upon exhaustion of its limits of insurance; or

2. resulting from the hazardous properties of nuclear material and with respect to which a) person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

| | | |
|---|---|---|
| *Nuclear Energy* | B. | any injury or nuclear property damage resulting from the hazardous properties of nuclear material, if: |
| *Liability Exclusion* | | |

       1.   the nuclear material a) is at any nuclear facility owned by, or operated by or on behalf of, an insured or b) has been discharged or dispersed therefrom;

       2.   the nuclear material is contained in spent fuel or nuclear waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

       3.   the injury or nuclear property damage arises out of the furnishing by an insured of services, materials, parts of equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion 3. applies only to nuclear property damage to such nuclear facility and any property therein.

C.   As used in this exclusion:

       1.   Hazardous properties includes radioactive, toxic or explosive properties.

       2.   Nuclear facility means:

          a.   any nuclear reactor;

          b.   any equipment or device designed or used for

             (1)   separating the isotopes of uranium or plutonium,

             (2)   processing or utilizing spent fuel or

             (3)   handling, processing or packaging nuclear waste;

          c.   any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

          d.   any structure, basin, excavation, premises or place prepared or used for the storage or disposal of, nuclear waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

       3.   **Nuclear material means source material, special nuclear material or by-product material.**

       4.   Nuclear property damage includes all forms of radioactive contamination of property.

       5.   Nuclear reactor means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

01/15/1999   02:58   4235948   IAN H G   INC   PAGE  07



**CHUBB**

## THE CHUBB COMMERCIAL UMBRELLA

*Nuclear Energy
Liability Exclusion
(continued)*

6.  Nuclear waste means any nuclear waste material a) containing by-product material other than the tailings of nuclear waste produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, and b) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph a. or b.

7.  Source material, special nuclear material, and by-product material have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

8.  Spent fuel means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.

Oct-19-99 09:00   EZA   ASFAW IHG   8   905 3926   P.02


CHUBB

## THE CHUBB COMMERCIAL UMBRELLA

### Endorsement

| | |
|---|---|
| Policy Period | OCTOBER 8, 1997     to OCTOBER 8, 1998 |
| Effective Date | October 8, 1997 |
| Policy Number | 7941-25-73 |
| Insured | EMERALD BAY COMMUNITY ASSOCIATION |
| Name of Company | FEDERAL INSURANCE COMPANY |
| Date Issued | November 6, 1997 |

**Endorsement**
**Employers' Liability**
**Exclusion - Coverage A**

**THIS POLICY IS SUBJECT TO THE FOLLOWING ENDORSEMENT**

Under "Exclusions", "Applicable to Coverage A Only", the following exclusion is added:

Employers' Liability

1.  injury to any employee of the **insured** arising out of and in the course of their employment by the **insured**; or

2.  injury to the spouse, child, parent, brother or sister of that employee as a consequence of 1, above.

This exclusion applies whether the **insured** may be liable as an employer or in any other capacity, or to any obligation to share damages with or repay someone else who must pay damages because of an injury.

All other terms and conditions remain unchanged.

*Robert Hamburger*

Authorized Representative

Date  November 6, 1997

Oct-19-99 09:00   EZ      ASFAW IHG                905 3926                    P.03



**CHUBB**

# THE CHUBB COMMERCIAL UMBRELLA

## Endorsement

| | |
|---|---|
| Policy Period | OCTOBER 8, 1997          to OCTOBER 8, 1998 |
| Effective Date | October 8, 1997 |
| Policy Number | 7941-25-73 |
| Insured | EMERALD BAY COMMUNITY ASSOCIATION |
| Name of Company | FEDERAL INSURANCE COMPANY |
| Date Issued | November 6, 1997 |

---

**Endorsement
Care, Custody or
Control Exclusion -
Coverage A and
Coverage B**

**THIS POLICY IS SUBJECT TO THE FOLLOWING ENDORSEMENT**

Under "Exclusions", "Applicable to Coverage A and Coverage B", the following exclusion is added:

Care, Custody or Control

any damage to property described below, if the property is in the care, custody or control of the insured.

Description of property:

REAL & PERSONAL.

All other terms and conditions remain unchanged.

*Authorized Representative*

Date   November 6, 1997

Oct-19-99 09:00  EZ...ASFAW IHG...       805 3926          P.04

 

**CHUBB**

## THE CHUBB COMMERCIAL UMBRELLA

### Endorsement

| | |
|---|---|
| *Policy Period* | OCTOBER 8, 1997         to OCTOBER 8, 1998 |
| *Effective Date* | October 8, 1997 |
| *Policy Number* | 7941-25-73 |
| *Insured* | EMERALD BAY COMMUNITY ASSOCIATION |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 6, 1997 |

---

**Endorsement Claims Made Coverage A**

### THIS POLICY IS SUBJECT TO THE FOLLOWING ENDORSEMENT

Under "Insuring Agreements," "Coverage A - Excess Follow Form Liability Insurance," the following provisions are added:

1.  If **underlying insurance** provides coverage on a **claims made** basis, the excess coverage afforded by this policy also applies on a **claims made** basis. This insurance only applies to claims first made against any **insured** during the Policy Period of this policy because of injury or offense which occurs on or after the Retroactive Date shown in the Extended Reporting Period Schedule, but prior to the end of the policy period of this policy.

2.  When **underlying insurance** provides coverage under an extended reporting period, this policy will also provide coverage under an Extended Reporting Period provided:

    A.  this policy is canceled or not renewed; or

    B.  we renew or replace this policy with insurance that has a Retroactive Date later than the Retroactive Date shown in the Extended Reporting Period Schedule.

3.  The Extended Reporting Period is available only by an endorsement and for the Additional Premium shown in the Extended Reporting Period Schedule. You must give us a written request for the Extended Reporting Period Endorsement within 60 days after the end of the Policy Period. The Extended Reporting Period will not go into effect unless you pay the Additional Premium promptly when due.

4.  The Extended Reporting Period will not last for a longer period than the shortest extended reporting period provided by any **underlying insurance** or the applicable Additional Reporting Period shown in the Extended Reporting Period Schedule, whichever is shortest.

5.  The Extended Reporting Period does not reinstate or increase the Limits of Insurance.

6.  Once in effect, the Extended Reporting Period may not be canceled.

7.  The Extended Reporting Period does not extend the Policy Period or change the scope of coverage provided.

8.  The Extended Reporting Period starts with the end of the Policy Period and lasts until the earlier of expiration of the shortest extended reporting period provided by any **underlying insurance** or expiration of the Additional Reporting Period shown in the Extended Reporting Period Schedule.

**Endorsement Claims**
**Made Coverage A**
*(continued)*

9.   The end of the Policy Period is the date shown in the Declarations or the date this insurance is canceled. whichever is earlier.

10.   Insurance afforded under the Extended Reporting Period is excess over any other insurance in force after the Extended Reporting Period starts, except insurance specifically purchased to be excess of this policy.

11.   As used in this endorsement, claims made means insurance which applies on the basis of claims first made against any insured during the Policy Period or any extended reporting period.

Under "Limits of Insurance," "Applicable to Coverage A and Coverage B," the following is added:

Subject to paragraphs B.1 B.2 and B.3 above, if underlying insurance provides coverage on a claims made basis and the limits of underlying insurance become reduced or exhausted by payments for claims first made against any insured during the Policy Period of this policy or any Extended Reporting Period provided by this policy, then this policy will apply as excess of the reduced or exhausted limit. This provision applies to injury or offense which occurs after the Retroactive Date shown in the Extended Reporting Period Schedule and prior to the end of the Policy Period.

EXTENDED REPORTING PERIOD SCHEDULE

Information Applicable to:

    Underlying Insurance

        Description:

        Company:

        Policy No.:

        Additional Reporting Period:

        Retroactive Date:

        Information Applicable to This Policy:

- Retroactive Date:

- Additional Reporting Period:

- Additional Premium:

All other terms and conditions remain unchanged.

Authorized Representative

Date    June 9, 1998

*Claims Made Endorsement*

*Form 07-02-1254 (Ed. 8/97) Endorsement*                              Ex. 3 Page 2 of 2



**CHUBB**

## THE CHUBB COMMERCIAL UMBRELLA

### Endorsement

| | |
|---|---|
| Policy Period | OCTOBER 8, 1997     to OCTOBER 8, 1998 |
| Effective Date | October 8, 1997 |
| Policy Number | 7941-25-73 |
| Insured | EMERALD BAY COMMUNITY ASSOCIATION |
| Name of Company | FEDERAL INSURANCE COMPANY |
| Date Issued | November 6, 1997 |

---

**Endorsement
Lead Exclusion -
Coverage A - Hostile
Fire**

**THIS POLICY IS SUBJECT TO THE FOLLOWING ENDORSEMENT**

Under "Exclusions," "Applicable to Coverage A Only," the following Exclusion is added:

**Lead**

1. any liability arising out of the actual, alleged or threatened contaminative, pathogenic, toxic or other hazardous properties of lead; however, this does not apply to bodily injury or property damage arising out of heat, smoke or fumes from a hostile fire at or from any premises, site or location:

   a. which is or was at any time owned or occupied by or rented to any insured; or

   b. on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations.

2. any loss, cost or expense arising out of any:

   a. request, demand or order that any insured or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead; or

   b. claim or suit by or on behalf of a governmental authority or others for damages because of testing for, monitoring, cleaning-up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of lead.

As used in this exclusion:

1. hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

**Endorsement**
*Lead Exclusion -*
*Coverage A - Hostile*
*Fire*
*(continued)*

2.   lead means the element lead in any form, including its use or presence in any alloy, compound, by-product, or other material or waste. Waste includes materials to be disposed of, recycled, reconditioned or reclaimed.

All other terms and conditions remain unchanged.

*Authorized Representative*

*Date   June 9, 1998*



# THE CHUBB COMMERCIAL UMBRELLA

## Endorsement

| | |
|---|---|
| Policy Period | OCTOBER 8, 1997 to OCTOBER 8, 1998 |
| Effective Date | October 8, 1997 |
| Policy Number | 7941-25-73 |
| Insured | EMERALD BAY COMMUNITY ASSOCIATION |
| Name of Company | FEDERAL INSURANCE COMPANY |
| Date Issued | November 6, 1997 |

**Endorsement**
**General Professional**
**Exclusion - Coverage A**
**and Coverage B**

THIS POLICY IS SUBJECT TO THE FOLLOWING ENDORSEMENT

Under "Exclusions," "Applicable to Coverage A and Coverage B," the following exclusion is added:

Professional Liability

any liability arising out of any act, error, omission or mistake committed or alleged to have been committed by or on behalf of the insured in rendering or failing to render professional services or advice described below, whether or not acting in a professional capacity.

Description of Profession: Real Estate or Property Manager

With respect to Coverage A only, this exclusion does not apply to:

1. bodily injury;

2. physical injury to tangible property;

3. personal injury; or

4. advertising injury.

All other terms and conditions remain unchanged.

Authorized Representative

Date    November 6, 1997






**CHUBB**

## THE CHUBB COMMERCIAL UMBRELLA

### Endorsement

| | |
|---|---|
| *Policy Period* | OCTOBER 8, 1997          to OCTOBER 8, 1998 |
| *Effective Date* | October 8, 1997 |
| *Policy Number* | 7941-25-73 |
| *Insured* | EMERALD BAY COMMUNITY ASSOCIATION |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 6, 1997 |

---

**Endorsement
General Professional
Exclusion - Coverage A
and Coverage B**

**THIS POLICY IS SUBJECT TO THE FOLLOWING ENDORSEMENT**

Under "Exclusions," "Applicable to Coverage A and Coverage B," the following exclusion is added:

Professional Liability

any liability arising out of any act, error, omission or mistake committed or alleged to have been committed by or on behalf of the **insured** in rendering or failing to render professional services or advice described below, whether or not acting in a professional capacity.

Description of Profession: Real Estate Agent or Broker.

All other terms and conditions remain unchanged.

*Authorized Representative*                        *Robert Hamburger*

*Date   November 6, 1997*


CHUBB

## THE CHUBB COMMERCIAL UMBRELLA

### Endorsement

| | |
|---|---|
| Policy Period | OCTOBER 8, 1997 · to OCTOBER 8, 1998 |
| Effective Date | October 8, 1997 |
| Policy Number | 7941-25-73 |
| Insured | EMERALD BAY COMMUNITY ASSOCIATION |
| Name of Company | FEDERAL INSURANCE COMPANY |
| Date Issued | November 6, 1997 |

---

**Endorsement
General Professional
Exclusion - Coverage B**

**THIS POLICY IS SUBJECT TO THE FOLLOWING ENDORSEMENT**

Under "Exclusions," "Applicable to Coverage B Only," the following exclusion is added:

Professional Liability

any liability arising out of any act, error, omission or mistake committed or alleged to have been committed by or on behalf of the **insured** in rendering or failing to render professional services or advice described below, whether or not acting in a professional capacity.

Description of Profession: Condominium, Community, Cooperative or similar association director or officer.

All other terms and conditions remain unchanged.

*Robert Hamburger*

Authorized Representative

Date   November 6, 1997



**CHUBB**

## THE CHUBB COMMERCIAL UMBRELLA

### Endorsement

| | |
|---|---|
| Policy Period | OCTOBER 8, 1997   to OCTOBER 8, 1998 |
| Effective Date | October 8, 1997 |
| Policy Number | 7941-25-73 |
| Insured | EMERALD BAY COMMUNITY ASSOCIATION |
| Name of Company | FEDERAL INSURANCE COMPANY |
| Date Issued | November 6, 1997 |

---

**Endorsement
Employment Practices
Exclusion - Coverage A
and Coverage B**

**THIS POLICY IS SUBJECT TO THE FOLLOWING ENDORSEMENT**

Under "Exclusions," "Applicable to Coverage A and Coverage B," the exclusion entitled "Employment Practices" is deleted and replaced by the following:

Employment Practices

any liability based on, attributable to, related to or in any manner arising out of any actual or alleged:

1.   termination of any employee;

2.   failure to promote or advance any employee; or

3.   failure to hire any prospective employee or any applicant for employment.

However, with respect to Coverage A only, this exclusion does not apply to loss insured under the Directors and Officers liability policy shown in the Schedule of Underlying Insurance.

All other terms and conditions remain unchanged.

*Robert Hamburger*

Authorized Representative

Date   November 6, 1997



**CHUBB**

## THE CHUBB COMMERCIAL UMBRELLA

### Endorsement

| | |
|---|---|
| *Policy Period* | OCTOBER 8, 1997    to OCTOBER 8, 1998 |
| *Effective Date* | October 8, 1997 |
| *Policy Number* | 7941-25-73 |
| *Insured* | EMERALD BAY COMMUNITY ASSOCIATION |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | November 6, 1997 |

---

*Endorsement*
*Pollution Exclusion -*
*Coverage A - Hostile*
*Fire*

**THIS POLICY IS SUBJECT TO THE FOLLOWING ENDORSEMENT**

Under "Exclusions", "Applicable to Coverage A Only", the exclusion titled "Pollution Liability" is deleted and replaced by the following:

Pollution Liability

1.  any liability arising out of the actual, alleged or threatened discharge, dispersal, migration, seepage, release or escape of pollutants; however, this does not apply to bodily injury or property damage arising out of heat, smoke or fumes from a **hostile fire:**

    a.  at or from any premises, site or location which is or was at any time owned or occupied by or rented to any **insured;** or

    b.  at or from any premises, site or location on which any **insured** or any contractors or subcontractors working directly or indirectly on any **insured's** behalf are performing operations.

2.  any loss, cost or expense arising out of any:

    a.  request, demand or order that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, assess the effects of **pollutants;** or

    b.  claim or **suit** by or on behalf of any governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to, or assessing the effects of **pollutants.**

***Endorsement***
***Pollution Exclusion -***
***Coverage A - Hostile***
***Fire***
*(continued)*

As used in this exclusion:

1.   hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be; and

2.   pollutants means any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned, reclaimed or disposed of.

All other terms and conditions remain unchanged.

*Authorized Representative*

*Date*   *June 9, 1998*



1  Ronald J. Kohut, Esq. (SBN 66463)
   Laura L. Kohut, Esq. (SBN 139143)
2  Kohut & Kohut LLP
   3554 Round Barn Blvd., Ste. 204
3  Santa Rosa, California 95403
   (707) 573-3100
4  (707) 573-3101 Fax

5  Attorneys for Plaintiffs Diana K. Lopez, George A. Lopez,
   and the George A. Lopez Third Family Limited Partnership

6

7

8                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

| | |
|---|---|
| 11 DIANA K. LOPEZ, an individual, GEORGE A. ) | Case No. 794878 |
| 12 LOPEZ, an individual, and the GEORGE A. LOPEZ ) | Assigned For All Purposes To: |
| THIRD FAMILY LIMITED PARTNERSHIP, a Nevada ) | Hon. John C. Woolley |
| 13 limited partnership, ) | Dept. 6 |
| ) | |
| 14     Plaintiffs, ) | SECOND AMENDED |
| 15 ) | COMPLAINT FOR: |
| ) | |
| 16     vs. ) | |
| ) | (1) ENFORCEMENT OF |
| 17 EMERALD BAY COMMUNITY ASSOCIATION, a ) | EQUITABLE SERVITUDE; |
| California non-profit mutual benefit corporation, ) | (2) ENFORCEMENT OF |
| 18 BARBARA LYONS, an individual, JOHN FOX, an ) | EQUITABLE SERVITUDE; |
| 19 individual, SID PETERSON, an individual, DENISE ) | (3) VIOLATION OF THE |
| MORIN, an individual, JOHN JENNET, an individual, ) | UNRUH ACT; |
| 20 LLOYD WISE, an individual, JOHN HARTY, an ) | (4) BREACH OF CONTRACT; |
| 21 individual, KENNETH DELINO, an individual, ) | (5) BREACH OF THE IMPLIED |
| MICHAEL LINKLETTER, an individual, ROBERT W. ) | COVENANT OF GOOD FAITH |
| 22 JOHNSON as TRUSTEE OF THE RWJ TRUST U/A/D ) | AND FAIR DEALING; |
| 23 8/13/1992, and DOES 3 through 25, and 28 through 50, ) | (6) BREACH OF FIDUCIARY |
| inclusive, ) | DUTIES; |
| 24 ) | (7) GROSS NEGLIGENCE; |
| 25     Defendants. ) | AND |
| ) | (8) INTERFERENCE WITH |
| 26 ───────────────────── ) | EASEMENT. |
| 27 AND RELATED CROSS-ACTION. ) | |
| ) | |
| 28 ) | |
| ) | Trial Date: Not Set |

RECEIVED

JUN 1 8 ' 9

As a Second Amended Complaint against the EMERALD BAY COMMUNITY
ASSOCIATION (the "Association"), BARBARA LYONS, JOHN FOX, SID PETERSON,
DENISE MORIN, JOHN JENNET, and LLOYD WISE, and JOHN HARTY (formerly named as
Doe 1 and 26), KENNETH DELINO (formerly named as Doe 2 and 27), and MICHAEL
LINKLETTER (collectively, the "Directors"), ROBERT W. JOHNSON, as TRUSTEE OF THE
RWJ TRUST U/A/D 8/13/1992 (the "Johnson Trust"), and DOES 3 through 25 and 28 through
50, inclusive, Plaintiffs DIANA K. LOPEZ, GEORGE A. LOPEZ, and the GEORGE A. LOPEZ
THIRD FAMILY LIMITED PARTNERSHIP (collectively, "the Lopezes") allege as follows:

1.       Plaintiff George A. Lopez Third Family Limited Partnership (the "Partnership")
is, and at all times mentioned in this Second Amended Complaint was, a limited partnership
organized and existing under the laws of the State of Nevada, and the owner in fee title of the
real property commonly known as 166 Emerald Bay, Laguna Beach, California ("166 Emerald
Bay").

2.       Plaintiff Diana K. Lopez ("Diana Lopez") is, and at all times mentioned in this
Second Amended Complaint was, an individual residing at 166 Emerald Bay, Laguna Beach,
California, a general partner of the Partnership, and a member of the Association.

3.       Plaintiff George A. Lopez ("George Lopez") is, and at all times mentioned in this
Second Amended Complaint was, an individual residing at 166 Emerald Bay, Laguna Beach,
California, a general partner of the Partnership, and a member of the Association.  George Lopez
is of Mexican ancestry.

4.       Defendant Emerald Bay Community Association (the "Association") is, and at all
times mentioned in this Second Amended Complaint was, a homeowners' association and a non-
profit mutual benefit corporation, duly organized and existing under the laws of California, with
its principal place of business located at 600 Emerald Bay, Laguna Beach, California.  A Board
of Directors is charged with the exercise of the duties and powers of the Association (the
"Board").

///

///

5.   .    Defendants Barbara Lyons ("Lyons"), John Fox ("Fox"), Sid Peterson ("Peterson"), Denise Morin ("Morin"), John Jennet ("Jennet"), Lloyd Wise ("Wise"), John Harty ("Harty") and Mike Linkletter ("Linkletter"), are, and at all times mentioned in this Second Amended Complaint were, individuals residing in Orange County, California, and are or were members of the Board of Directors of the Association at times material to the matters alleged in this Second Amended Complaint. Defendant Kenneth Delino ("Delino") is, and at all times mentioned in this Second Amended Complaint was, an individual residing in Orange County, California. The Lopezes are informed and believe and based thereon allege that during periods material to the claims contained herein, Delino was acting as a member of the Board

6.    The Lopezes are informed and believe and based thereon allege that Robert W. Johnson is the trustee of the Johnson Trust. The Johnson Trust is the owner of record of that property commonly known as 162 Emerald Bay, Orange County, California, which is more specifically described as follows:

> That Portion of Lot 164 of Irvine's subdivision, as shown on a Map
> recorded in Book 1, Page 88 of Miscellaneous Maps, records of the
> County of Orange, State of California, more particularly described as
> follows:
>
> Beginning at the Northwesterly corner of Lot 24 of "Tract No. 975,
> Subdivision E of Emerald Bay", as shown on a Map recorded in Book
> 31, Pages 18 to 21 inclusive of Miscellaneous Maps, records of Orange
> County California, thence Westerly along a curve concave North, having
> a radius of 410 feet; a radial line of said curve from said corner of Lot 24
> bearing North 26°16'47" West (bearings based on Tract No. 975)
> through an angle of 9°47'41" a distance of 70.09 feet, the radial line at
> the end of the said curve bearing North 16°29'06" West; thence South
> 21°55'16" East 72.36 feet; thence South 80°04'02" East 70.64 feet;
> thence South 16°15'29" West 84.52 feet; thence North 86°52'44" East.

///

65.74 feet to the Southwesterly corner of Lot 23 of Tract No. 975; thence

North 21°55′16″ West 196.58 feet to the point of beginning.

Located upon and burdening 162 Emerald Bay is a recorded easement for walkway purposes that runs from the street down to the beach (the "Beach Access"), which was intended to benefit the residents of Emerald Bay by serving as a beach access, and is more specifically described as follows:

A right of way for walkway and utility purposes over a strip of land 10

feet wide, the Westerly line of said strip being described as follows:

Beginning at the Northwest corner of the above described parcel; thence

along the Westerly line of said parcel South 21°55′16″ East 72.36 feet;

thence along the Southwest line of said parcel South 80°04′02″ East

70.64 feet more or less to a line parallel with and ten feet Westerly,

measured at right angles from the West line of said Lot 23; thence

Southerly parallel with said West line to the South line of the above

described parcel.

(True and correct copies of the deed for 162 Emerald Bay, the deed creating the Beach Access easement, and diagram of the Beach Access are attached together as Exhibit "E.")

7.     The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants named herein as DOES 3 through 25, and 28 through 50, inclusive, are presently unknown to the Lopezes, who, therefore, sue such defendants by such fictitious names. The Lopezes will seek leave of the Court to amend their Second Amended Complaint to show the true names and capacities of those defendants when such information has been determined.

8.     166 Emerald Bay is located on a bluff overlooking the Pacific Ocean in a gated community consisting of over 500 homes and commonly known as "Emerald Bay." 166 Emerald Bay is bordered by a two-lane street on the north, and neighboring properties on the east and west. On the south, 166 Emerald Bay extends down a bluff towards the Emerald Bay community beach. (A photograph of 166 Emerald Bay is attached as Exhibit "A" and incorporated herein by this reference.)



9.     The property at 166 Emerald Bay is subject to a five-foot setback (northern,
eastern, and western property lines) imposed by the CC&Rs and a twenty-five foot setback
(southern property line) imposed by the County of Orange.

*The "Whites Only" Restriction Of The Emerald Bay CC&Rs*

10.     Until 1985, Emerald Bay was a "whites only" community. Article VI of the 1955
"Declaration of Protective Restrictions" provided: "No part of said property shall be used or
occupied in whole or in part by any person not of the White or Caucasian Race, except servants
in the employ of the occupants thereof." (A copy of a 1955 "Declaration of Protective
Restrictions" is attached as Exhibit "B.") This restriction was not eliminated from the governing
documents of the Association until the "Amended Master Declaration of Restrictions" was
recorded on September 6, 1985. (A copy of the CC&Rs is attached as Exhibit "C".)

11.     On information and belief, the Lopezes allege that many of the longtime Emerald
Bay residents remain adverse to non-white persons residing in Emerald Bay. The Lopezes are
informed and believe and based thereon allege that under the influence of these residents, the
Association has treated the Lopezes in a selective and discriminatory manner, and certain
Directors have referred to the Lopezes in a derogatory manner as the "Mexicans at 166."

*The Emerald Bay Architectural Review Authority*

12.     The Association's operative Restated Articles of Incorporation, dated August 5,
1986, provide that one of the general purposes of the Association is to approve and/or disapprove
plans for structures and landscaping within the Emerald Bay community in accordance with the
CC&Rs. (A copy of the Restated Articles of Incorporation are attached as Exhibit "D.")

13.     The Association has adopted Architectural Regulations and appointed an
Architectural Committee to review all plans submitted for Structures and Landscaping, make
recommendations to the Board regarding such plans, and inspect and monitor construction in
progress to assure its conformity with approved plans.

14.     The Association also has charged an "Association Inspector" with inspecting and
monitoring construction in Emerald Bay to ensure conformity to approved plans. As set forth

/ / /

below, at all times relevant hereto, the Association Inspector inspected, monitored, and approved the Lopezes' construction at 166 Emerald Bay.

15.   The CC&Rs grant the Association limited authority over architectural matters for the purpose of ensuring aesthetic compatibility and conformity with a reasonably sound and attractive general plan of development.  The CC&Rs do not grant the Association authority over interior, below-grade, or stabilization improvements.  The CC&Rs do not empower the Association to amend the CC&Rs without the consent of the homeowners.

*The Lopezes' Pool Improvements*

16.   Since 1993, the Lopezes have sought the Association's approval to construct a pool, spa, and landscaping on the ocean-side of their property at 166 Emerald Bay.  At all times during this process, the Lopezes have used licensed architects, contractors, and other professionals to create and process their plans with the Association.  The Association has delayed, denied, and otherwise prevented the Lopezes' construction of such improvements, while permitting other members of Emerald Bay to engage in construction similar to or exceeding that requested by the Lopezes.  In their treatment of the Lopezes, the Directors and other Members of the Association have ignored the limitations on their authority set forth in the CC&Rs and have selectively enforced the Association's approval rights for architectural plans under the CC&Rs against the Lopezes.  The Lopezes have been subject to disparate and less favored treatment than other Members of the Association.

17.   Since 1993, the Lopezes have been mired in the Association approval process. The Association and the Directors have delayed and denied the Lopezes their right to construct improvements at 166 Emerald Bay by repeatedly, continuously, and in bad faith: (a) claiming that plans submitted by the Lopezes are deficient or inadequate, even though the plans conform to the requirements of the CC&Rs; (b) demanding additional and further plans, far beyond what is required under the CC&Rs and of other Members of the Association; (c) failing to review the plans submitted by the Lopezes in good faith or in accordance with standard procedures; (d) subjecting the Lopezes' project to greater scrutiny and different standards than projects of

///

other Members of the Association; and (e) falsely accusing the Lopezes of failing to comply with the Association's approval process.

18.    Additional unreasonable and improper tactics employed against the Lopezes by the Association, Directors, and other Members of the Association have included:

    (a)    Publicly referring to the Lopezes as "the Mexicans at 166" and suggesting to the Emerald Bay community that the Lopezes are "dishonest" and "suspicious;"

    (b)    Using an architect to process the Lopezes' plans through the approval process, with knowledge that the architect had a conflict of interest with the Lopezes in that he had been designated as an expert witness against the Lopezes in a civil action relating to the remodel of the Lopezes' residence at 166 Emerald Bay;

    (c)    Imposing upon the Lopezes' architectural plan submissions a subjective "good faith" criterion not authorized by the CC&Rs or imposed upon other Members;

    (d)    Attempting to assert jurisdiction over the Lopezes' below-grade and stabilization improvements and disapproving these improvements "after the fact," notwithstanding the Association's lack of jurisdiction over such improvements and admitted policy of not considering the below-grade or stabilization improvements of other Members;

    (e)    Purporting to "disapprove" plans already approved by the County on the ground that such plans were "incomplete";

    (f)    Refusing to acknowledge and recognize the Association Inspector's approval of the construction by the Lopezes;

    (g)    Demanding that the Lopezes waive their approval rights under plans approved by the Association on June 3, 1997;

///

///

Second Amended Complaint

(h)   Stopping work on the Lopezes' project in bad faith and in disregard of the known risk of the possibility of serious erosion damage to the Lopezes' property and adjacent properties;

(i)   Knowingly or with gross negligence putting the Lopezes' property at risk of erosion and other damage by stopping work in the midst of construction of stabilization improvements and during the rainy season;

(j)   Refusing to permit the Lopezes to resume work on their project;

(k)   Demanding that the Lopezes incur needless additional costs in connection with their project as a condition to resuming work on the project;

(l)   Harassing the Lopezes and their agents by, for example, requiring the Lopezes' agents to wait nearly two hours for entry to Emerald Bay; and

(m)   Failing to ensure that the individuals involved in the approval process for the Lopezes' project exercised their authority in an objective and reasonable manner.

The foregoing conduct has been unreasonable, arbitrary, in bad faith, in breach of the fiduciary duties owed by the Association and the Directors to the Lopezes, and in violation of the Lopezes' rights under the CC&Rs and the Unruh Act.

*First Submittal – 1993*

19.   The Lopezes purchased 166 Emerald Bay in 1992. The Lopezes remodeled the house located on 166 Emerald Bay. The house is located between the street and the ocean-side bluff, so that the house blocks access to the ocean-side, except for limited access through narrow walk-ways around the house. While the house was being remodeled, the ocean-side of the house was significantly more accessible than after remodeling had been completed. .

20.   In 1993, the Lopezes submitted plans to the Association to construct a pool, spa, and landscaping on the ocean-side of 166 Emerald Bay, well within the applicable setback

restrictions. In early 1993, the Board approved the construction of a similar pool by one of the Lopezes' neighbors. On June 29, 1993, the Architectural Committee recommended that the Board approve the Lopezes' plans "in concept". On July 6, 1993, the Board approved the Lopezes' plans "in concept," subject to the completion of two geologists' reports. The Lopezes submitted their geologist's report by letter dated August 17, 1993, and the Architectural Committee indicated that it would appoint a second geotechnical firm. On information and belief, the Lopezes allege that the Architectural Committee had received and reviewed the necessary geotechnical studies by August 31, 1993.

21.     The Lopezes' neighbors, Stanley and Mary Johnson (Stanley, Mary, Don, and Bob Johnson are referred to hereinafter as the "Johnsons"), objected to the construction of improvements on the ocean-side of the Lopezes' property. Based upon the Johnsons' objection, the Board unreasonably and without justification revoked the Lopezes "in concept" approval, cancelled all further geotechnical studies, and stated that there was "no reason to approve a pool at any future date . . . ." The Association's approval of a similar pool, disapproval of the Lopezes' pool, and unreasonable deference to the Johnsons was arbitrary and unreasonable and reflected the Association's discriminatory treatment of the Lopezes.

*Second Submittal – 1993*

22.     On November 3, 1993, the Lopezes resubmitted plans for the pool improvements to the Association. In connection with their re-submittal, the Lopezes noted that the geotechnical studies previously requested by the Association had been submitted to the Architectural Committee, and requested permission to proceed. The Lopezes provided additional geotechnical information to the Association and the Johnsons showing the geological feasibility of the improvements, which should have resolved the Johnsons' concerns regarding the stability of the pool. The Johnsons, however, continued to oppose the project. Again giving the Johnsons preferential treatment, on January 4, 1994, the Board denied the Lopezes' submittal on the ground that the improvements were not "harmoniously consistent with the Community, potentially detrimental to neighboring properties and the natural bluff." Again, there was no information before the Board supporting the Johnsons' position that the improvements were



1    geologically unfeasible. On information and belief, the Lopezes allege that the Board's denial of

2    approval was in bad faith.

3    *Third Submittal – 1994*

4        23.    On August 9, 1994, the Lopezes submitted yet another set of plans to the

5    Association, moving the location of the pool and spa up from the bluff closer to the house. The

6    Association acknowledged that these plans were "within the Bay's Guidelines." On August 23,

7    1994, the Architectural Committee deferred consideration of the plans subject to the submittal of

8    additional graphic information regarding the pool.

9        24.    In a letter to the Board dated August 15, 1994, the Johnsons expressed their

10   "surprise" that the Lopezes had again requested permission to build a spa and pool. Again

11   without factual support, the Johnsons objected to any hypothetical noise that might be caused by

12   pool machinery and any view impact that a hypothetical tree planted at 166 Emerald Bay might

13   have on the Johnsons' property.

14       25.    At the next Board meeting, the Board disapproved the Lopezes' submittal, again

15   on the ground that the proposed project was "not harmoniously consistent with the community,

16   potentially detrimental to neighboring properties and the natural bluff."

17   *Fourth Submittal – 1994*

18       26.    In September 1994, the Lopezes resubmitted their plans to the Association along

19   with design information that had been requested by the Architectural Committee, before the

20   Johnsons' objection and the Board's disapproval of the third submittal. The Architectural

21   Committee staff admitted that this fourth submittal again fell "within the Bay's Guidelines,"

22   however, because the Board had disapproved the prior submittal on September 20, 1994, the

23   Architectural Committee simply stated that it "makes no addition to last month's

24   recommendation to the Board regarding this submittal." By this analysis, the Architectural

25   Committee abdicated its responsibility under the CC&Rs to review the Lopezes' plans in good

26   faith and in conformity with the CC&Rs. The Board disapproved the plans on October 4, 1994.

27   ///

28   ///



27. Following the Fourth Submittal. the head of the Johnson family, Stanley Johnson. passed away and the Board term of another opponent of the Lopezes with significant political "clout" ended.

*Fifth Submittal – 1995*

28. In January 1995, the Lopezes' architect asked the Board for guidance on how to obtain approval for a pool. Conveying his frustration and implying that he had hoped the Lopezes would have given up on their pool, Fox, who at that time was the Chairperson of the Architectural Committee, demanded to know "how determined" the Lopezes were to have a pool.

29. On February 14, 1995, the Lopezes submitted plans for a pool to the Association for the fifth time. The Board stated that it was "considering the pool on aesthetic basis only and makes no comments with respect to geological stability" – thus confirming the Association's lack of jurisdiction over stabilization matters – and requested additional information. On June 6, 1995, the Lopezes submitted the additional information. The Architectural Committee considered the submittal and found "the general configuration of the improvements proposed to be acceptable." However, the Architectural Committee found the plans to be "incomplete", and shortly thereafter, the Board requested additional information and disapproved the fifth submittal.

*Sixth Submittal – 1996 & 1997 Approvals*

30. On September 12, 1995. the Lopezes submitted additional plans for preliminary approval. The Architectural Committee recommended preliminary approval of the plans on September 26, 1995, stating that the "general design configuration [was] acceptable" and "aesthetically pleasing and harmonious with the natural clifftops . . . ." The Board gave preliminary approval to the proposed pool in October 1995. In March 1996, three years. six submittals, and tens of thousands of dollars after the Lopezes first requested the Association's approval for their pool, the Lopezes received final approval from the Board for their plans to build a pool (the "1996 Approved Plans").

/ / /

/ / /

31.     The Lopezes obtained all necessary permits and approvals for the 1996 Approved Plans from all applicable governmental authorities; including Orange County and the California Coastal Commission.

32.     In May 1996, the Lopezes' new architect, Ed Terrazas ("Terrazas"), reviewed the design and engineering plans prepared in connection with the 1996 Approved Plans and concluded that they were unsatisfactory. Among other things, constructing the tie-back system anticipated by the 1996 Approved Plans would have required devegetating most of the bluff face extending down to the beach. Additionally, it would have required placing approximately 20 large rock anchors on the bluff, which would have been permanently exposed. These rock anchors would have extended down the bluff approximately 40 to 50 feet lower than the other versions of the project subsequently proposed by the Lopezes and would have been visible from the beach.

33.     In order to minimize the encroachment and environmental impact anticipated by the 1996 Approved Plans, the Lopezes revised the design to anchor the improvements with caissons instead of using tie-backs with rock anchors. The revised design thus eliminated the need for extensive devegetation and permanently exposed rock anchors. The Lopezes submitted their revised design to the Association for "revised final" approval. On June 3, 1997, the Board approved the revised design as a modification to the 1996 Approved Plans (the "1997 Approved Plans").

34.     The Lopezes obtained all necessary permits and approvals for the 1997 Approved Plans from all governmental authorities, including Orange County and the California Coastal Commission.

*The Stabilization Defects*

35.     After obtaining the Association's approval of the 1997 Approved Plans and permits from the appropriate governmental agencies, the Lopezes began to excavate and otherwise prepare the property for construction of the improvements. The excavation and the demolition of a lower deck revealed, among other things, that the property and improvements were unstable in that the foundation system supporting the eastern section of the house had been

placed in marine terrace deposits that were incapable of supporting the house and "deadmen" from the pre-existing tie-back system had been removed during construction. These newly discovered structural and stabilization defects necessitated redesigning the below-grade structural support systems for the entire property and the improvements.

36.     The County has jurisdiction over below-grade stabilization matters. With the approval of the County, the Lopezes designed a support system that relied upon the underground caissons anticipated by the 1997 Approved Plans. To address the instability of the house, the Lopezes designed a foundation retaining wall that would extend 15 feet deep into the bedrock. Constructing this foundation retaining wall required the excavation of a substantial amount of dirt from under the house. To address the instability of the property, the Lopezes designed retaining walls across the back of the property and along side the property. The foundation retaining wall for the house and the retaining walls for the property were designed to work with the several caissons planned for the property to ensure the total stability of the property.

37.     Prior to commencing construction of this stabilization work, the Lopezes submitted revised plans for structural and slope stabilization to the County, which the County found to be complete and approved in August 1997 and again in October 1997 (the "Revised 1997 Plans"). The County issued the necessary permits for construction.

38.     The foregoing stabilization modifications were below-grade and would not have impacted the exterior appearance of the pool, spa, or landscaping previously approved by the Association.

39.     The unanticipated stabilization work delayed the construction of the project. In order for the workers to dig and place the caissons by hand, additional excavation was required. That excavation required a substantial amount of dirt to be removed and hand transported around the house, where trucks waited in the street to haul the dirt away. Ultimately, after the placement of the caissons was completed, significant excavated spaces were left, which would be below-grade once the project was completed.

40.     The Lopezes planned to encapsulate the underground space nearest the ocean with a concrete enclosure, which the Association has described as a "vault," and then to cover the

enclosure with dirt and landscaping. This method of stabilizing and covering that space would be significantly less expensive, less noisy, and less dirty than filling the concrete enclosure with dirt, which was unnecessary and would require: (a) trucking 57 truckloads of dirt (400 cubic yards) back into the Emerald Bay community; (b) hand transporting the dirt around the house in approximately 4000 wheelbarrow trips; (c) delaying completion of the project; and (d) adding approximately $109,000 to the cost of the construction.

41.    The Lopezes' stabilization improvements were approved by the County, visible to everyone in Emerald Bay, known to the Association, and approved by the Association through the Association Inspector, Bob McDaniels, who regularly inspected the construction occurring on the property between June and November 1997. Until November 1997, no one ever suggested to the Lopezes that the Association's approval of the stabilization improvements was required. The Lopezes understood that the stabilization improvements, which had been approved by the County, were not within the jurisdiction of the Association or of concern to the Association based upon, among other things: (a) the regular inspections conducted by the Association Inspector between June and November of 1997; (b) the Association's full knowledge of the construction occurring at the property and its failure to object to the construction or notify the Lopezes of any approval requirements; (c) the express disclaimers of Association responsibility for structural matters contained in the CC&Rs and Architectural Regulations; and (d) the Board's February 1995 statement that it considered only the aesthetics of the pool, and not the geological stability of the pool.

42.    In justifiable reliance upon the foregoing, the Lopezes expended substantial sums on their stabilization improvements. To date, the Lopezes have spent over $650,000 in connection with their pool improvements and the Association has waived any objection to and is estopped from challenging those improvements.

*The Association's Efforts To Revoke The Lopezes' Approvals*

43.    The Association Inspector informed the Architectural Committee of the changes to the Lopezes' construction in or about August 1997. However, it was not until November 13, 1997, after the Lopezes had spent nearly six months and hundreds of thousands of dollars

constructing the stabilization improvements approved by the County and the Association

Inspector, that the Association for the first time requested revised plans. The request was limited

to a revised floor plan, overall floor plan, basement floor plan, site plan, and above-grade

changes. The Lopezes complied that day with the Association's request.

44.    Between the Association's approval of the 1997 plans and the Association's

demand for additional plans in November, 1997, Bob and Alison Johnson became Members of

the Association and Barbara Lyons became the Chairperson of the Association's Architectural

Committee. Since approximately November 19, 1997, Lyons (the Chairperson of the

Architectural Committee and Vice President of the Board) has been openly hostile to the Lopezes

and their project. She has publicly degraded, criticized, and attempted to humiliate the Lopezes

and their representatives at every turn. Lyons was so openly and relentlessly hostile that the

Lopezes twice requested that the Association remove her from the approval process for their

project – first by letter dated March 6, 1998, and again on March 23, 1998. However the

Association failed and refused to remove Lyons from the approval process or to otherwise

require Lyons to act in accordance with her duties as the Chairperson of the Architectural

Committee or her fiduciary responsibilities to the Lopezes.

45.    The Lopezes are informed and believe, and based thereon allege, that the

Association's request for plans in November 1997 was prompted by the Johnsons and another

Member, Vic Andrews, who attended a meeting with Fox and Lyons on November 19, 1997, to

discuss their objections to the Lopezes' project. The Lopezes were not given notice of or invited

to what turned out to be a "vigilante" meeting. Accidentally, the Lopezes learned of the meeting

through a chance encounter with Alison Johnson at a grocery store.

46.    The "vigilante" meeting was held on November 19, 1997. Association members

Vic Andrews and Bob and Alison Johnson attended the meeting, along with Fox, Lyons, Delino,

and Bay Inspector Bob McDaniels. Even though the Lopezes were not invited to the meeting,

their architect, Terrazas, appeared on their behalf. During the meeting, the Johnsons voiced their

strong opposition to the Lopezes' project. Terrazas explained that: (a) the project had been

approved by the Association; (b) the only changes that had occurred were associated with the

stabilization of the property and would not impact the project's appearance; and (c) the
Association Inspector had regularly inspected the construction on the site and had confirmed that
the Association's separate approval of the stabilization improvements was unnecessary because
the Association did not govern below-grade matters. Delino confirmed that, as a matter of policy,
the Association did not concern itself with structural matters. Nonetheless, Lyons personally
attacked the Lopezes and Terrazas, suggesting that they were underhanded, untrustworthy, and
intentionally violating approval requirements of the Association.

    47.    Shortly after the "vigilante meeting," Homer Oatman ("Oatman"), one of the
Association's architects, became actively involved in the approval process for the Lopezes'
project. Oatman had a substantial conflict of interest with the Lopezes which was known to the
Association. The conflict of interest stemmed from Oatman's designation in August 1997, as an
expert architectural witness *against* the Lopezes. In the civil action in which Oatman had been
designated, the Lopezes claimed, among other things, that the original contractor of their house
acted negligently in building their house on a substandard and unsafe foundation and in
removing the deadmen securing the original stabilization for the property. Oatman thus was
*adverse* to the Lopezes in matters directly related to the stabilization defects and could not
process their approval in good faith.

    48.    With the consent of the Association and Directors, Lyons and Oatman
consistently took steps to delay and otherwise frustrate the Lopezes' project. For example, on
December 16, 1997, Lyons presided over a meeting of the Architectural Committee, during
which the Committee considered the plans submitted by the Lopezes in November. Lyons alone
voted to recommend that the Board disapprove the Lopezes' plans – with the Architectural
Committee as a whole recommending approval of the plans.

    49.    Lyons and Oatman urged the Board on January 6, 1998, to disapprove the plans –
contrary to the recommendation of the Architectural Committee. Oatman prepared a letter dated
January 6, 1998, for Lyons to use in connection with the January 6 Board meeting. The letter
was inaccurate and disparaging to the Lopezes in that it wrongfully: (a) suggested that the
Lopezes were intentionally withholding information from the Association regarding their project

(even though plans for the project had been submitted to and approved by the County);

(b) suggested that the Lopezes' plans did not comply with applicable height restrictions;

(c) suggested that the Lopezes be required to obtain the approval of their "adjacent neighbor," the Johnsons, for their improvements; and (d) failed to disclose the fact that Oatman had represented to Terrazas, on January 5, 1998, that all of the concerns raised in the letter had been resolved. Lyons argued for the disapproval of the Lopezes' submittal at the January 6 Board meeting, despite the recommendation of approval from the Architectural Committee. Ignoring the recommendation of the Architectural Committee, and based upon a Motion made by Fox and seconded by Lyons, Directors Fox, Lyons, Peterson, Morin, Wise, Linkletter, and Jennet voted to disapprove the Lopezes' plans, and directed the Association's attorney to take steps to shut down the Lopezes' project.

50.     Pursuant to the instruction of the Directors on January 8, 1998, the Association's attorney sent a letter to the Lopezes threatening to stop work on the project. The attorney threatened that unless a "full set of all plans and specifications" was submitted to the Association within ten days, work would be stopped.

51.     On January 16, 1998, the Lopezes submitted the Revised 1997 Plans directly to the Association's attorney. These were the same plans that had been submitted to, deemed complete, and approved by the County in October 1997.

52.     On January 30, 1998, Oatman requested additional drawings, which were delivered to the Association, to Oatman's attention on January 31, 1998. (Ten days later, at the February 10 Board meeting, Oatman claimed that he never received those drawings.)

53.     On January 31, 1998, the Architectural Review Committee staff recommended approval of the Lopezes' January 16 submittal, pending review of yet another additional landscape plan to be required of the Lopezes. At the February 3, 1998, meeting of the Architectural Committee, over which Lyons presided, Oatman made a motion to "disapprove" the same plans that had been approved by the County and the Architectural Review Committee staff. The Architectural Committee approved Oatman's motion. The Architectural Committee

/ / /

then devised yet another lengthy list of additional plans that the Lopezes were required to prepare and submit at additional cost.

54.     At the February 3 meeting of the Architectural Committee, Lyons demanded that the Lopezes construct pursuant to the 1996 Approved Plans, stating that it was the "intent of this committee and its recommendation to the Board of Directors to bring this property into compliance and consistent with the approved plans of May, 1996."

55.     At a meeting of the Board on February 10, Fox, Lyons, Linkletter, Morin, Peterson, and Jennet voted to disapprove the Lopezes' submittal on the ground that: "The Board of Directors believes this project differs substantially from the original plans approved in 1996 and urges the applicant to submit landscape plans for the current project which are substantially consistent with the 1996 landscape plans."   At the conclusion of the February 10 Board meeting, the foregoing members of the Board also requested an additional landscape plan and stated that the landscape plan would be the last additional plan required of the Lopezes. In reliance upon that representation, the Lopezes agreed to make yet another landscape submittal, despite the unreasonable and cumulative nature of that request.

56.     On or about February 17, 1998, the Lopezes requested additional time to submit the requested landscape plans.  The Association ignored that request, however, and demanded that the new submittal be provided immediately upon threat of having the project shut down. Under great duress, the Lopezes submitted revised Landscape drawings, which reflected the 1996 approved Landscape drawings as demanded by the Board.

57.     At the regularly scheduled monthly meeting of the Architectural Committee on February 22, 1998, the Architectural Committee recommended stopping work on the project on the grounds that "considerable construction, beyond that approved by the Board of Directors has occurred, exceeding allowable lot coverage and creating *significant* aesthetic impacts."

58.     On March 2, 1998, the members of the Board conducted a surprise "site inspection" at 166 Emerald Bay (the Lopezes were given less than five hours notice of that inspection).  During the Board's inspection, Lyons was publicly rude to Terrazas. She indicated that she was going to force the Lopezes to fill in the excavated underground "vault" area. Lyons

1   also interfered with the Lopezes' attempts to explain the stabilization improvements to other

2   members of the Board.

3        59.    Notwithstanding the degrading manner in which they had been treated, the

4   Lopezes' approached the March 3, 1998, Board meeting in a positive and conciliatory manner,

5   hoping to avoid the cost and danger that would result from the Board stopping work on the

6   project. Without prompting, and without waiving their approvals from the Association, the

7   Lopezes offered to submit a modification to the project to resolve the issue of the empty "vault,"

8   expedite the completion of the project, and lower the cost of the project. The Lopezes further

9   offered to limit their construction on the project to stabilization and structural work pending their

10  submission of the modified plans.

11       60.    During the meeting, the Lopezes also addressed and refuted in detail each of the

12  Association's purported complaints against the project and explained that punitive measures

13  were unwarranted. The Lopezes also explained that stopping work during the rainy season, with

14  the slope exposed, posed a significant risk to the stability of the property and to neighboring

15  properties.

16       61.    The Lopezes are informed and believe, and based thereon allege, that prior to the

17  March 3 Board meeting, the Association had been previously warned of the potential for erosion

18  and damage to the Lopezes' property and the neighboring properties, and of the risk at which the

19  properties of the Lopezes and their neighbors would be placed if work was stopped prior to the

20  completion of construction.

21       62.    Notwithstanding the Lopezes' conciliatory offer, refutation of each of the stated

22  reasons for stopping work, and the potential for erosion and damage to the Lopezes' property, at

23  the March 3 Board meeting, Fox, Lyons, Linkletter, Morin, Wise, Peterson, and Delino voted to

24  stop all work on the Lopezes' project, including the stabilization work that was necessary to

25  ensure the safety of the site. The decision to stop work on the Lopezes' project was arbitrary,

26  unreasonable, grossly negligent, and made in bad faith.

27  / / /

28  / / /

Second Amended Complaint

19

Ex. 4
100

63.     The arbitrary nature of the Board's decision was shown by the fact that the individual Directors could not even agree on the reason for stopping work. The Directors were inconsistent and contradictory in attempting to justify their action:

      a.  Fox (Board President):  Work stopped as a punitive measure because the "integrity of the ruling body [had been] compromised" and to "preserve the integrity of the architectural process".

      b.  Delino:  Work stopped due to concerns with lot coverage and aesthetics.

      c.  The Architectural Committee staff:  Work stopped because "considerable construction, beyond that approved by the Board of Directors has occurred, exceeding allowable lot coverage and creating significant aesthetic impacts".

      d.  Lyons:  Work was stopped because the Architectural Committee had received "inadequate information," although Lyons could not specify a single item of missing information or documentation. Work was not stopped due to lot coverage -- "lot coverage was never involved".

64.     In light of the Directors' inability to articulate a unified reason for stopping work or identify any requested information or document that had not been provided to the Association, the Lopezes requested permission to continue with below-grade stabilization construction pending the Board's clarification of its reason for stopping work and identification of any missing information or documentation. The Directors rejected their request out of hand, with Fox arrogantly and without any decency humiliating Diana Lopez in front of the entire meeting by explaining that the Lopezes needed to be punished for their failure to defer to the "ruling body".

65.     The Directors also mandated that prior to resuming work on the project, the Lopezes were required to make a "good faith submission" of unidentified

and unspecified plans. The arbitrary and unreasonable motivation for imposing such

a subjective test was revealed by Delino's remark that if the Lopezes' architect,

Terrazas, was busy preparing additional plans, he would not have time for any

further construction on the project. The Board's mandate, which was contained in a

letter dated March 4, 1998, stated:

> "Work may recommence, when and if complete plans, as called for in the
>
> Architectural Review Committee recommendations, are submitted and
>
> determined to be a good faith, complete, and comprehensive submittal by the
>
> Chairman of the Architectural Review Committee, the General Manager, the
>
> Bay Inspector and Architect Ion Choise. If such determination is made, work
>
> may resume but only on that part of the project mentioned in Mr. Terraza's
>
> compromise proposal. If any additional work beyond that is resumed the
>
> General Manager may, at his discretion again stop all work. Additional work
>
> beyond that mentioned in Mr. Terraza's proposal may not be started until
>
> such time as plans as called out in the recommendations at the Architectural
>
> Review Committee, have been approved by the Association."

66.     On March 4. the Association stopped work on the project by refusing

to permit the Lopezes' work force to enter the gated entrance at Emerald Bay. The

costs associated with stopping work substantially exceed the amount set forth in

Civil Code §1354 requiring alternative dispute resolution, and include, but are not

limited to, the costs of demobilization, securing the site, remobilization, and the loss

of use of the Lopezes' property.

### The 1998 Modified Plans

67.     Pursuant to the Directors' March 4 demand that the Lopezes submit modified

plans, the Lopezes prepared, and on or about March 13, 1998 submitted, modified plans for the

property to the Association as a "revised final" modification to the 1997 Approved Plans (the

"1998 Modified Plans"). The 1998 Modified Plans were based upon the same "platform" base as

the 1997 Approved Plans but moved the pool from being next to the house into the empty "vault"

area near the bluff.  The 1998 Modified Plans also modified the 1997 Approved Plans by lowering the elevation of the finished project. reducing lot coverage, reducing mass, reducing any noise from the pool (by moving the pool further away from neighboring properties), reducing the visual impact on neighboring properties, and adding back a visually pleasing rear yard area.

68.     The cost of preparing the 1998 Modified Plans was well over $20,000.  The Lopezes' submission of the 1998 Modified Plans constituted a full and complete submittal of plans under the CC&Rs and the Architectural Regulations.  The 1998 Modified Plans complied with the CC&Rs and the Architectural Regulations.

69.     The Association failed and refused to consider or approve the 1998 Modified Plans. Among other things:  (a) the ad hoc committee appointed by the Association to review the mandated "good faith" submission *never met* to consider the 1998 Modified Plans; (b) the Lopezes were not permitted to meet with the ad hoc committee or the Association architect, but only with Lyons, Fox, Delino, and the Association's attorney; (c) during that meeting, Lyons stated unequivocally that there was "no point" for the Lopezes to meet with an Association architect or submit any more construction plans because they "are not going to be allowed to go forward anyway"; (d) Lyons stated that the 1998 Modified Plans did not satisfy the "good faith" submittal requirement because they were not the plans that she had had in mind (but had failed to specify) and, therefore. the 1998 Modified Plans had not been submitted in "good faith"; and (e) Lyons stated, at the end of the meeting, that although the 1998 Modified Plans had been submitted by the Lopezes for "revised final" approval, the 1998 Modified Plans would have to start at the beginning of the approval process as a "concept" submittal because the elevations of the 1998 Modified Plans had to be staked on the Lopezes' property.  When it was pointed out that the 1998 Modified Plans *lowered* the elevation of the entire project and that staking was unnecessary, Lyons appeared flustered and then stated that whatever the reason, the 1998 Modified Plans would not be approved as a "revised final" to the 1997 Approved Plans and the processing of the 1998 Modified Plans would be delayed.

///

70.     At the next regularly scheduled meeting of the Architectural Committee, which Lyons chaired, the Architectural Committee recommended disapproval of the 1998 Modified Plans "in concept" on the basis of technical objections to lot coverage, parking, and the purported "massive" nature of the planned improvements. The Lopezes are informed and believe and based thereon allege that in disapproving the 1998 Modified Plans, the Association unreasonably, discriminatorily, and punitively imposed an artificial "bluff line" or "string line" limitation upon the Lopezes' property that differed from the limitation imposed upon other Members of the Association with ocean-front properties.

71.     The Lopezes addressed each of the technical concerns raised by the Architectural Committee. The Lopezes addressed the Committee's characterization of their project as "massive" by: (a) comparing it with plans for a nearby oceanfront residence that had been submitted by the Johnsons for "in concept" approval, which proposed a residence that was substantially larger, extended further down the slope, and was higher, than the project proposed by the 1998 Modified Plans; (b) showing that the project envisioned by the 1998 Modified Plans was less "massive" than the projects anticipated by the 1996 Approved Plans and the 1997 Approved Plans, using artist's renderings of the projects envisioned by the 1996 Approved Plans, the 1997 Approved Plans, and the 1998 Modified Plans; and (c) demonstrating that the project proposed by the 1998 Modified Plans was much less "massive" and grandiose than many neighboring properties, through a photograph depicting the Lopezes' property alongside its neighboring properties. At the conclusion of the Lopezes' presentation, Lyon stated that the 1998 Modified Plans would not be approved even if the Lopezes addressed and resolved the technical concerns of the Architectural Committee.

72.     During the Board meeting on April 7, the Lopezes reiterated to the Board that other technical objections of the Architectural Committee were without merit in that: (a) the Committee had calculated lot coverage in a manner completely inconsistent with the CC&Rs by including a deck at grade; and (b) the Committee had wrongly assumed that the Lopezes' had fewer allotted parking spaces than they actually had in determining that the Lopezes did not have adequate parking.

73. Nonetheless, Board members Fox, Lyons, Linkletter. Morin, Wise, Peterson, and Harty adopted Lyons' recommendation that the Lopezes' 1998 Modified Plans not be approved in concept and not proceed to preliminary approval. (The CC&Rs provide for architectural plans to go from concept, to preliminary, to final approval.) These individuals also decided that the Board would not honor any of the Association's prior approvals of the Lopezes' project.

74. After disapproving the Lopezes' 1998 Modified Plans, the Board considered and approved the Johnsons' "in concept" submittal for the development of 160 Emerald Bay, which, as noted above, proposed a residence over 8,000 square feet and that exceeded permissible height restrictions. On information and belief, the Lopezes allege that the project envisioned by the plans submitted by the Johnsons violates several requirements and limitations of the CC&Rs relating to parking, story stacking, height restrictions (chimney), and existing easements. Additionally, the project might be planned for construction on uncertified fill and therefore be unstable. The Board ignored these issues, however, and gave its approval for the Johnsons' plans to proceed to preliminary review. The Board's approval of the Johnson's "in concept" submittal and disapproval of the Lopezes' 1998 Modified Plans constituted discriminatory "selective enforcement" of the Association's approval rights over architectural plans.

75. The Johnsons have since received "preliminary approval" of the plans for 160 Emerald Bay. These plans fail to comply with the CC&Rs in that, *inter alia*, they depict a building with a four-story appearance. there are insufficient full-sized parking spaces. the chimney encroaches into the height restriction, the above-grade structures encroach into the 25-foot rear yard setback, square footage calculations do not include areas labeled as "storage," and the project unreasonably obstructs the view of neighboring homeowners. The Board's approval of the Johnson's submittals for 160 Emerald Bay constitutes preferential treatment and discriminatory "selective enforcement" of the Association's approval rights over architectural plans.

76. Additionally, pursuant to their rights of inspection and copying under the CC&Rs, the Lopezes made written requests for the plans submitted by the Johnsons so that the Lopezes may present the plans to the Court and show the disparity in the Association's treatment of the

1    two projects and the fact that the Association is selectively enforcing its rights of approval. The

2    Association, however, refused to permit the Lopezes to copy the plans. Ultimately, the Lopezes

3    were forced to obtain a Judgment against the Association on a Writ of Mandate in order to obtain

4    copies of the Johnsons' plans.

5         77.    On April 9, 1998, during a chance meeting at the Association office, Lyons told

6    Terrazas that if the Lopezes' chose to pursue the 1998 Modified Plans, it would be "a very

7    frustrating experience for everyone" as the Architectural Committee would not move the 1998

8    Modified Plans to the "preliminary stage" for approval. Lyons suggested that the Architectural

9    Committee would use its discretionary powers to disapprove the 1998 Modified Plans.

10        78.    On April 15, 1998, Terrazas discussed the 1998 Modified Plans with the

11   Association's architect, Ion Chiose, again addressed the Association's purported technical

12   objections to the 1998 Modified Plans, and submitted yet additional supplemental plans.

13   Nonetheless, at the April 28, 1998, Architectural Committee meeting, the Lopezes'

14   representatives were informed that the 1998 Modified Plans had been forever "disapproved," that

15   the Committee would not further consider the 1998 Modified Plans, and by raising the issue of

16   the 1998 Modified Plans, the Lopezes jeopardized their ability to ever resume work on their

17   property. With that, the Lopezes satisfied their obligation to exhaust the Association's approval

18   process and internal remedies with respect to the 1998 Modified Plans.

19   *The Refusal To Lift The Stop Work Order*

20        79.    The Lopezes also continued their efforts to have the Association lift its "stop

21   work" order and to allow them to complete the stabilization improvements. However, the

22   Association and Directors refused and knowingly kept the Lopezes' property and neighboring

23   properties at risk of erosion and other property damage.

24        80.    On April 3, 1998, the Association attorney acknowledged that the Association did

25   not have jurisdiction over below-grade improvements and indicated that the Lopezes could start

26   work if they submitted documents showing that the disputed improvements were below-grade.

27   The Lopezes submitted the requested diagrams to the Association's attorney on April 6, 1998.

28   These diagrams showed that the Lopezes' stabilization improvements were below-grade. The

Ex. 4
106

diagrams were given to Lyons at the April 7 Board meeting. Lyons was visibly upset at being provided with these diagrams by the Association's attorney, and, without even opening them up to look at them, tossed the diagrams aside, and stated that she was not prepared to make any comments regarding the diagrams or the "good faith issue." She publicly criticized the Association attorney, stating that he was "not an architect" and could not determine whether the Lopezes could go back to work.

81.    On April 15, 1998, Ion Chiose, an Association architect, and Terrazas discussed the diagrams submitted by the Lopezes that showed their improvements to be below-grade. The Association architect did not dispute that the improvements were all below-grade. The Association architect stated, however, that he had been instructed by Lyons to treat the diagrams as a completely new submission.

82.    The issue of resuming work at 166 Emerald Bay was next addressed at the April 28 Architectural Committee meeting, over which Lyons presided. Oatman attended and participated in that meeting. After the Lopezes had protested against Oatman's further involvement in their approval process based upon his conflict of interest, it had been the Lopezes' understanding that Oatman was removed from the approval process. However, at the April 28 meeting of the Architectural Committee, the Lopezes were informed that Oatman had reviewed and commented on their plans and assisted the Committee to prepare yet another list of additional plans being required by the Association.

83.    Also at the April 28 meeting of the Architectural Committee, the Committee informed the Lopezes that the Committee wanted the "vault" to be filled in with dirt and the bluff on the Lopezes' property returned to its natural state. Committee members acknowledged that they "hated" the Lopezes' project. The Committee stated that until the vault was filled with dirt and the slope was returned to its natural state, the Lopezes could never resume work on their property. The Lopezes tried to explain the problems associated with filling the vault with dirt, but the Committee was unwilling to listen, and demanded that the Lopezes submit plans proving that it was impossible to fill in the vault area with dirt and return the slope to its natural state.

///

84.     The Lopezes do not claim and have never claimed that it is physically impossible to fill in the vault area with dirt. Accordingly, following the April 28 meeting, the Lopezes provided the Association with plans showing that it could be accomplished but explaining the extraordinary expense and delay that would be associated with the Association's demand.  The Association was told, for example, that without in any way benefiting the property, it would add approximately $109,000 to the cost of the project to fill in the vault, add twenty days to the schedule, and require 57 truckloads of dirt to be brought in.

85.     The Association did not respond to the information provided by the Lopezes regarding the Committee's demand to fill in the vault area. On May 5, Fox, Lyons, Wise, Peterson, Morin, and Harty voted to require the Lopezes to provide plans showing that it was impossible to fill in the vault area. As noted above, the Lopezes had acknowledged that it was not physically impossible to fill in the vault, and therefore requiring them to prove the opposite was unreasonable, in bad faith, and designed to harass the Lopezes. At that meeting, representatives of the Association and the Lopezes concurred that the parties had reached an "impasse" and that the Lopezes had exhausted the Association's internal administrative remedies.

86.     The Association's refusal to allow the Lopezes to proceed under the 1998 Modified Plans violated the Lopezes' rights as members of the Association and resulted in damage to the Lopezes.

*The Beach Access*

87.     The Lopezes are informed and believe, and based thereon allege, that the Beach Access was originally created in 1944 and was intended to benefit the residents of the Emerald Bay Community by serving as a beach access. Both 162 and 164 Emerald Bay are owned by members of the Johnson family. (See, Exhibit "E".)

88.     The Beach Access is encroached upon by the debris and landscaping of the Johnson family. The Beach Access is neither marked nor maintained, so that use of the Beach Access in its present condition is hazardous and requires residents to guess at its location.

/ / /

Ex. 4
108

89. The Beach Access is part of the "common area" owned by the Association and, as such, should be available for use by the Members of the Association. As Members of the Association, the Lopezes are entitled to use the Beach Access.

90. Under the CC&Rs, the Association has a positive obligation to maintain the Beach Access in such a manner that it is safe and available for use by Members of the Association. Under the CC&Rs, the Association also has a duty to abate nuisances and trespasses upon Association property, including the debris, brush, and landscaping that is encroaching upon the Beach Access.

91. Proper maintenance of the Beach Access and abatement of the nuisances and trespasses upon the Beach Access would benefit the Lopezes and other residents, in that it would provide a nearby beach access and increase the value of their properties.

92. Both in writing and by appearance at the meetings of the Board on July 7 and August 4, the Lopezes requested that the Board satisfy its obligation to maintain the Beach Access and abate the nuisances and trespasses upon the Beach Access. However, the Johnsons objected to maintenance of the Beach Access, and the Directors have stonewalled efforts by Members to identify and use the Beach Access. During the July 7 Board meeting, Linkletter publicly and unreasonably attacked the personal integrity of another Member who joined the Lopezes in expressing interest in the Beach Access. During the August 4 Board meeting, the Directors admitted that the Beach Access was a "recorded right" of the Members. Peterson, however, expressed the Directors' unanimous refusal to honor the Lopezes' request to stake the Beach Access. The Lopezes are informed and believe, and based thereon allege, that the Directors' refusal to consider in good faith the Lopezes' request to stake the Beach Access, much less to maintain the Beach Access, arises from the Directors' preferential treatment of the Johnsons and the Board's discriminatory treatment of the Lopezes.

93. The Lopezes have exhausted their internal Association remedies with respect to the Beach Access. The Association's refusal to maintain and permit use of the Beach Access has damaged the Lopezes by, among other things, depriving them of the use of the Beach Access for

///

1  recreation and emergency purposes and diminishing the value of their property in an amount far

2  exceeding the amount set forth in Civil Code §1354 requiring alternative dispute resolution.

### FIRST CAUSE OF ACTION

4  *(By the Lopezes Against the Association, the Directors, and DOES 3 through 15 To Enforce*

5  *the CC&Rs as Equitable Servitudes and Prevent the Association from*

6  *Interfering with the Lopezes' Construction)*

7  94.    The Lopezes reallege paragraphs 1 through 86, inclusive, as set forth above.

8  95.    Pursuant to Civil Code §1354, the CC&Rs shall be enforced as equitable

9  servitudes and shall inure to the benefit of all owners of interests in the Emerald Bay

10  development, including the Lopezes.

11  96.    The Lopezes obtained all requisite and necessary approvals from the Association

12  and the County.  Nonetheless, on March 3, 1998, the Lopezes were wrongfully ordered by the

13  Board to stop work on their project and their workers have since been prevented from entering

14  the gates at Emerald Bay.  By preventing the Lopezes from completing their stabilization

15  improvements under the plans approved by the Association and the County, the Directors and the

16  Association are interfering with the Lopezes' rights under their approvals and the CC&Rs.

17  97.    The wrongful conduct of the Association and the Directors in stopping work on

18  the Lopezes' construction, unless and until enjoined and restrained by order of this Court, will

19  cause great and irreparable harm to the Lopezes in that: (a) the Lopezes are being deprived of the

20  use and enjoyment of their property; (b) the property is in a dangerous condition because the

21  existing improvements are not integrated, and therefore neither seismic nor geotechnical integrity

22  can be assured; (c) ongoing damage to the Lopezes' property is occurring, including damage

23  through soil slippage and damage to fixtures and equipment that were not designed to withstand

24  exposure to the elements (including the salt air); (d) there is an increasing danger that the

25  Lopezes will lose their Architect, General Contractor, Pool Contractor, Geotechnical Engineer,

26  and Civil and Structural Engineer, or be unable to get them back to the project once work is

27  resumed, due to the necessity for these individuals and companies to obtain alternative

28  employment during the period when work is stopped; and (e) the Lopezes' permits and approvals

may expire during the work stoppage, and the Lopezes will be required to incur the cost of re-applying for applicable permits and approvals and run the risk of not being able to obtain them.

98.     The Lopezes have no adequate remedy at law for the injuries currently being suffered and which are threatened as the result of the Association's directive stopping work on the Lopezes' property.  Consequently, the Lopezes seek an injunction prohibiting the Association and Directors from interfering with the Lopezes' construction pursuant to the 1997 Approved Plans and Revised 1997 Plans by imposing a stop work order, interfering with their workers' access to 166 Emerald Bay through the gate at Emerald Bay, or through whatever other methods may be devised by the Association.

99.     Pursuant to Article X, Section 2 of the CC&Rs, and Civil Code §1354(f), the Lopezes are entitled to the attorneys' fees incurred in bringing this action.

## SECOND CAUSE OF ACTION

*(By the Lopezes Against the Association To Enforce*

*the CC&Rs as Equitable Servitudes and Require the Association to*

*Open and Maintain the Beach Access)*

100.     The Lopezes reallege paragraphs 1 through 93, inclusive, as set forth above.

101.     Pursuant to Civil Code §1354, the CC&Rs shall be enforced as equitable servitudes and shall inure to the benefit of all owners of interests in the Emerald Bay development, including the Lopezes.

102.     As set forth above, the Association has a positive obligation under the CC&Rs to maintain the Beach Access in such a manner that it is safe and available for use by Members of the Association, and to abate nuisances and trespasses upon Association property, including the debris, brush, and landscaping that is encroaching upon the Beach Access.

103.     The wrongful conduct of the Association and Directors in failing and refusing to maintain the Beach Access and to abate the nuisances and trespasses upon the Beach Access, unless and until enjoined and restrained by order of this Court, will cause great and irreparable harm to the Lopezes in that: (a) the Lopezes are being deprived of the use and enjoyment of the Beach Access; (b) the Lopezes are being deprived of emergency access to the beach; and (c) the

1   Lopezes' property is being adversely impacted by the presence of an unabated nuisance on the

2   neighboring property.

3        104.   The Lopezes have no adequate remedy at law for the injuries currently being

4   suffered and which are threatened as the result of the Association's refusal to maintain the Beach

5   Access and abate the trespasses and nuisances on the Beach Access. Consequently, the Lopezes

6   seek an injunction requiring the Association to fulfill its obligations under the CC&Rs to

7   maintain the Beach Access and abate nuisances and trespasses upon Association common areas.

8        105.   Pursuant to Article X, Section 2 of the CC&Rs, and Civil Code §1354(f), the

9   Lopezes are entitled to the attorneys' fees incurred in bringing this action.

10                       **THIRD CAUSE OF ACTION**

11           *(By the Lopezes Against the Association, the Directors, and DOES 16-25*

12                      *for Violation of the Unruh Act)*

13        106.   The Lopezes reallege paragraphs 1 through 93, inclusive, as set forth above.

14        107.   By virtue of its status as a nonprofit owners' association, the Association is a

15   "business establishment" subject to the provisions of the Unruh Act, Civil Code §51, et seq.

16        108.   Under the Unruh Act, the Lopezes are entitled to the full and equal advantages,

17   privileges, and services of the Association, and the Association may not discriminate against the

18   Lopezes based upon their national heritage or ancestry.

19        109.   As set forth above, by its conduct, the Association, the Directors, and DOES 16

20   through 30 have denied and continue to deny the Lopezes' rights to full and equal advantages,

21   privileges, and services of the Association, or have aided or incited such denial, based upon the

22   Lopezes' national heritage and ancestry.

23        110.   The wrongful conduct and interference by the Association, the Directors, and

24   DOES 16 through 25, with the Lopezes' right to full and equal advantages, privileges, and

25   services of the Association, unless and until enjoined and restrained by order of this Court, will

26   cause great and irreparable harm to the Lopezes in that they continue to be denied the full and

27   equal advantages, privileges, and services of the Association to which they are entitled. The

28   Lopezes have no adequate remedy at law for the injuries currently being suffered and which are

threatened as the result of the foregoing misconduct and interference with their rights. Consequently, the Lopezes seek an injunction prohibiting the Association, Directors, and DOES 16 through 25 from denying and interfering with the Lopezes' rights to full and equal advantages, privileges, and services of the Association.

111.    As a proximate breach of the denial and interference by the Association, Directors, and DOES 16 through 25 of the Lopezes' rights as set forth above, the Lopezes have been damaged in no event less than the jurisdictional limit of this Court, which the Lopezes are entitled to have trebled pursuant to Civil Code §52(a). Additionally, pursuant to Civil Code §52(a), the Lopezes are entitled to their attorneys' fees incurred in prosecuting this action.

## FOURTH CAUSE OF ACTION

### (By the Lopezes against the Association for Breach of Contract)

112.    The Lopezes reallege paragraphs 1 through 93, inclusive, as set forth above.

113.    The Lopezes have performed all of the conditions, covenants, and obligations that they agreed to perform under the CC&Rs, except for those conditions, covenants, and obligations excused by the breaches of the CC&Rs by the Association.

114.    By virtue of the foregoing actions, the Association has breached its duties to the Lopezes under the CC&Rs and has deprived the Lopezes of the benefit of their rights under the CC&Rs. The Association has breached, among others, the following provisions of the CC&Rs:

(a)    CC&Rs Article V (Section 2), Article VIII (Section 6), Article IX, and Article X, authorizing the Association to seek specified remedies against homeowners for alleged violations of the Association's architectural approval authority, which the Association breached by stopping work on the Lopezes' construction without first obtaining an injunction or other judicial decision permitting the work stoppage;

(b)    CC&Rs Article V (Section 2), Article VIII (Section 6), Article IX, and Article X, authorizing the Association to seek specified remedies against homeowners for alleged violations of the Association's architectural approval authority, which the Association breached by

1    recording a lis pendens against the Lopezes' property.  Article VII

2    (Section 4) of the CC&Rs restrict such a remedy to non-payment of

3    assessments;

4    (c)    CC&Rs Article I(15), Article V (Section 1), and Article VI (Sections

5           1 and 2), requiring the Association to maintain common area property,

6           abate nuisances, and enforce the CC&Rs, which the Association

7           breached by, *inter alia*, failing to maintain the Beach Access and

8           permitting the Johnson Trust to obstruct and maintain a nuisance upon

9           the Beach Access;

10   (d)    CC&Rs Article V (Section 1) and Article VIII (Section 1), excepting

11          engineering capabilities and property stabilization from the

12          Association's architectural approval authority, which the Association

13          breached by, *inter alia*, asserting approval authority over the

14          engineering capabilities and property stabilization of the Lopezes'

15          property;

16   (e)    CC&Rs Article V (Section 1) and Article VIII (Sections 1, 2, and 4),

17          granting the Association limited authority over the exterior character

18          of buildings and landscaping and specifying the procedures that the

19          Association is required to follow in reviewing and approving

20          architectural plans, which the Association breached by, *inter alia*, (i)

21          asserting authority over the Lopezes' project that exceeded its power

22          to approve the exterior "character" of the improvements as set forth in

23          Article VIII (Section 1); (ii) making decisions regarding the Lopezes'

24          property based upon considerations other than those expressly

25          permitted by Article VIII (Section 1); (iii) requiring the Lopezes to

26          provide the Association with plans exceeding those required by

27          Article VIII; and (iv) failing to set forth the precise additional plans

28   ///

1        being demanded as a condition to approval as required by Article VIII

2        (Section 4);

3    (f)     CC&Rs Article VIII (Section 4), requiring the Board to "provide a

4        consistent and fair review process for approval of plans," which the

5        Association breached by, *inter alia* (i) approving plans for other

6        projects that were substantially more "massive and intrusive" that the

7        Lopezes' plans, but denying the Lopezes approval on such ground;

8        (ii) imposing an arbitrary "subjective good faith" requirement upon

9        the Lopezes' plan submittals, but not upon submittals by other

10        homeowners; (iii) stopping work on the Lopezes' project on the

11        ground that the Lopezes had failed to obtain the Association's

12        approval prior to construction, but not stopping work on the projects

13        of other homeowners who failed to obtain prior approval for

14        construction; (iv) imposing an arbitrary "bluff line" limitation on the

15        Lopezes' construction, but not on the developments of other

16        homeowners; (v) arbitrarily refusing to approve the 1998 Modified

17        Plans, even though such plans conformed with the CC&Rs; (vi)

18        exercising jurisdiction over the Lopezes' stabilization and below-

19        grade improvements, but not on such improvements by other

20        homeowners; (vii) disregarding the "in field" approvals of the

21        Association Inspector regarding construction upon the Lopezes'

22        property, while recognizing such approvals for other homeowners;

23        and (viii) objecting to the Lopezes' below-grade spaces, while not

24        objecting to other homeowners' development of such spaces;

25    (g)    CC&Rs Article VIII (Section 4), specifying that the "approval of

26        plans for any Structure shall be valid for one year from the date of

27        approval by the Board of Directors," which the Association breached

28  ///



by, *inter alia*, demanding that the Lopezes relinquish the Association's approval of the 1997 Approved Plans; and

(h)   CC&Rs Article V (Section 1), requiring the Association to exercise all power assigned under the California Corporations Code, which the Association breached by, *inter alia*, refusing to grant the Lopezes reasonable access to the Minutes of the Board of Directors meetings.

115.   As a proximate breach of the CC&Rs, as set forth above, the Lopezes have suffered damages in an amount to be proven at trial, which in no event less than the jurisdictional limit of this Court. Additionally, pursuant to Article X, Section 2 of the CC&Rs, and Civil Code §1354(f), the Lopezes are entitled to their attorneys' fees incurred in bringing this action.

## FIFTH CAUSE OF ACTION

*(By the Lopezes against the Association for Breach of the Implied Covenant of Good Faith and Fair Dealing)*

116.   The Lopezes reallege paragraphs 1 through 93, inclusive, as set forth above.

117.   Implied into every contract is the implied covenant of good faith and fair dealing. The CC&Rs constitutes a contract between the Association and the Lopezes that includes the covenant of good faith and fair dealing.

118.   By virtue of the foregoing actions, the Association has breached the implied covenant of good faith and fair dealing.

119.   As a proximate breach of the CC&Rs, as set forth above, the Lopezes have suffered damages, including damages arising from the unreasonable demands imposed by the Association during the approval process, the increased costs of development resulting of the Association's actions, the diminution in the value of the Lopezes' property resulting from the imposition of an unreasonable "bluff line" or "string line" restriction on the development of their property, and damages arising from the Association's refusal to maintain the Beach Access, in an amount to be proven at trial, which in no event less than the jurisdictional limit of this Court. Additionally, pursuant to Article X, Section 2 of the CC&Rs, and Civil Code §1354(f), the Lopezes are entitled to the attorneys' fees incurred in bringing this action.

## SIXTH CAUSE OF ACTION

*(By the Lopezes Against the Association, Directors,*

*and DOES 28-50 for Breach of Fiduciary Duty)*

120.  The Lopezes reallege paragraphs 1 through 90, inclusive, as set forth above.

121.  By virtue of their status as members in the Association, the Lopezes are owed a fiduciary duty by the Association, the Directors, and DOES 28 through 50.

122.  As a result of the misconduct set forth above, the Association, the Directors, and DOES 28 through 50 did not exercise the duty of care required of them to the Lopezes and have breached their fiduciary duties to them.

123.  As a proximate result of the breach the fiduciary duties set forth above, the Lopezes have suffered damages in an amount to be proven at trial, and in no event less than the jurisdictional limit of this Court.

124.  The acts of the Association and Directors were undertaken with the full knowledge of their breach of the CC&Rs and in willful, conscious, and reckless disregard for their fiduciary duty owed to the Lopezes and entitle them to an award of punitive damages.

## SEVENTH CAUSE OF ACTION

*(By the Lopezes Against the Association, the Directors,*

*and DOES 28-50 for Gross Negligence)*

125.  The Lopezes reallege paragraphs 1 through 93, inclusive, as set forth above.

126.  By virtue of the membership of the Lopezes in the Association, and the Directors' assumption and exercise of authority over the Lopezes by the Association, the Association, the Directors, and DOES 28 through 50 owe the Lopezes a duty to act reasonably and not unreasonably put the Lopezes or their property at risk.

127.  As a result of the misconduct set forth above, the Association, the Directors, and DOES 28 through 50 have exercised so slight a degree of care in exercising their authority over the Lopezes, as to raise a presumption of conscious indifference to the consequences, and therefore have breached their duty of care to the Lopezes.

///

128.   As a proximate result of the foregoing, the Lopezes have suffered damages in an amount to be proven at trial, and in no event less than the jurisdictional limit of this Court.

### EIGHTH CAUSE OF ACTION

*(By the Lopezes Against the Johnson Trust for Obstruction of the Beach Access)*

129.   The Lopezes reallege paragraphs 1 through 93, inclusive, as set forth above.

130.   162 Emerald Bay is the servient tenement, which is burdened by the Beach Access. The obstruction of the Beach Access is improper and unlawful in that it unreasonably interferes with the use of the Beach Access by the dominant tenement, constitutes a "nuisance" as defined by the CC&Rs, and violates the CC&Rs.

131.   The wrongful conduct of the Johnson Trust in obstructing and otherwise interfering with the Lopezes' use of the Beach Access, unless and until enjoined and restrained by order of this Court, will cause great and irreparable harm to the Lopezes in that: (a) the Lopezes are being deprived of the use and enjoyment of the Beach Access; (b) the Lopezes are being deprived of emergency access to the beach; and (c) the Lopezes' property is being adversely impacted by the presence of an unabated nuisance on 162 Emerald Bay.

132.   The Lopezes have no adequate remedy at law for the injuries currently being suffered and which are threatened as the result of the obstruction of the Beach Access. Consequently, the Lopezes seek an injunction requiring the Johnson Trust to cease obstructing the Beach Access, maintaining nuisances upon the Beach Access, and interfering with the Lopezes' use of the Beach Access.

133.   As a proximate result of the nuisances, trespasses, and encroachments upon the Beach Access, and the inability of the Lopezes to use the Beach Access, Lopezes have suffered damages in the form of, *inter alia*, the diminution of the value of their property in an amount that the Lopezes are informed approximates the sum of $250,000.

134.   The Johnson Trust has deliberately and maliciously interfered with and obstructed the Lopezes' use of the Beach Access for the purpose of injuring the Lopezes. Therefore, the Lopezes are entitled to exemplary or punitive damages.

///

135.   Additionally, pursuant to Article X, Section 2 of the CC&Rs, and Civil Code §1354(f), the Lopezes are entitled to the attorneys' fees incurred in bringing this action.

WHEREFORE, the Lopezes pray:

## FIRST CAUSE OF ACTION

1.   For damages according to proof;

2.   For attorneys' fees and expenses, including expert witness fees, to the extent permitted by law;

3.   For a preliminary and permanent injunction enjoining the Association and its agents and representatives, and all persons acting under, in concert with, or for the Association, from interfering with the Lopezes' construction pursuant to the 1997 Approved Plans and Revised 1997 Plans by imposing a stop work order, interfering with their workers' access to 166 Emerald Bay through the gate at Emerald Bay, or through whatever other methods may be devised by the Association.

## SECOND CAUSE OF ACTION

4.   For damages according to proof;

5.   For attorneys' fees and expenses, including expert witness fees, to the extent permitted by law;

6.   For a preliminary and permanent injunction requiring the Association to maintain the Beach Access and abate the nuisances and trespasses upon the Beach Access;

## THIRD CAUSE OF ACTION

7.   For damages according to proof, trebled pursuant to Civil Code §52(a);

8.   For attorneys' fees and expenses, including expert witness fees;

9.   For a preliminary and permanent injunction enjoining the Association and its agents and representatives, and all persons acting under, in concert with, or for the Association, from denying to the Lopezes their rights to full and equal advantages, privileges, and services of the Association, including the right to fair and non-discriminatory approval of architectural plans;

///

## FOURTH CAUSE OF ACTION

10. For damages according to proof;

11. For attorneys' fees and expenses, including expert witness fees, to the extent permitted by law;

## FIFTH CAUSE OF ACTION

12. For damages according to proof;

13. For attorneys' fees and expenses, including expert witness fees, to the extent permitted by law;

## SIXTH CAUSE OF ACTION

14. For damages according to proof;

15. For attorneys' fees and expenses, including expert witness fees, to the extent permitted by law;

16. For punitive and exemplary damages;

## SEVENTH CAUSE OF ACTION

17. For damages according to proof; and

18. For attorneys' fees and expenses, including expert witness fees, to the extent permitted by law.

## EIGHTH CAUSE OF ACTION

19. For damages according to proof;

20. For attorneys' fees and expenses, including expert witness fees, to the extent permitted by law;

21. For a preliminary and permanent injunction requiring the Johnson Trust to cease obstructing, maintaining nuisances upon, and interfering with the Lopezes' use of the Beach Access; and

22. For punitive and exemplary damages.

## ALL CAUSES OF ACTION

23. For interest at the legal rate;

24. For the costs of this action; and

1        25.    For such other and further relief as the Court may deem just and proper.

2    DATED: June 4, 1999                               KOHUT & KOHUT LLP

3

4

5        By
    Laura L. Kohut, Esq.

6        Attorneys for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**FILED**
ORANGE COUNTY SUPERIOR

OCT 15 2002

ALAN SLATER, Clerk of the Court

BY C. Herrera

1  PRENOVOST, NORMANDIN, BERGH & DAWE
   A Professional Corporation
2  MICHAEL G. DAWE
   2122 North Broadway, Ste. 200
3  Santa Ana, California 92706-2614
   Phone No.:  (714) 547-2444
4  Fax No.:   (714) 835-2889
       File No.: 7763-003
5  Attorney For Plaintiffs, EMERALD BAY COMMUNITY ASSOCIATION, a California non-profit
   mutual benefit corporation
6
7              SUPERIOR COURT OF THE STATE OF CALIFORNIA
8           FOR THE COUNTY OF ORANGE/CENTRAL JUSTICE CENTER
9
10  EMERALD BAY COMMUNITY          )  Case No. 01CC02227
    ASSOCIATION, a California non-profit mutual  )  Hon.   Jonathan H. Cannon
11  benefit corporation            )  Dept.: C25
                                   )
                Plaintiff(s),      )  [PROPOSED] ORDER DENYING MOTION
12                                 )  FOR SUMMARY JUDGMENT AND
    v.                             )  SUMMARY ADJUDICATION
13                                 )
    GOLDEN EAGLE INSURANCE         )  DATE:  October 4, 2002
14  CORPORATION, a California corporation, and  )  TIME:  9:00 a.m.
    DOES 1 through 20, inclusive.  )  DEPT:  "C25"
15                                 )
                Defendant(s).      )  Trial Date:    October 7, 2002
16  ─────────────────────────────  )  Time:          9:00 a.m.
                                   )  Dept:          "C25"
17                                 )
18                                    Law and Motion Cut-Off:  September 6, 2002
                                      Discovery Cut-Off:  September 6, 2002
19
20         Based on the evidence submitted by both parties, and in consideration of all written and oral

21  argument submitted, the court hereby denies the motion for summary judgment and for summary

22  adjudication effective of the date of hearing on October 4, 2002.  Both motions are denied because

23  genuine issues of material fact exist which preclude granting the motions.  The genuine issues of

24  material fact are reflected in the Plaintiff's contentions and supporting evidence set forth directly below:

25  ///

26  ///

27

28
                                        1
             [PROPOSED] ORDER DENYING MOTION FOR SUMMARY
                 JUDGMENT AND SUMMARY ADJUDICATION
    I:\DOCS\7763\003\LAW AND MOTION\ORDER RE SUMMARY JUDGMENT.wpd

Ex. 5  767
122

| GENUINE ISSUES OF MATERIAL FACT | EVIDENCE |
|---|---|

1.   Whether GEIC admitted its duty to indemnify Emerald Bay against the Lopezes claims under both the *property damage* and *personal injury* coverages of the Policy.

1.   Exhibit 1, GEIC's June 15, 1999 letter.

2.   Whether admitting defense and indemnity coverage for property damage in writing on June 15, 1999, GEIC represented the following to Emerald Bay:

2.   Exhibit 1, P 2-3.

> "The definition of 'property damage' calls for damage to tangible property or loss of use of tangible property."
>
> Since the Lopezes are claiming loss of use of property in the Summons & Complaint, that claim would be covered under the property damage coverage, subject to other policy restrictions.
>
> **Due to the loss of use of the Plaintiff's property, this claim will be covered under the "property damage" portion of this claim.**
>
> For these reasons stated, **we do believe that there is coverage** under the "property damage" portion of this policy. (Emphasis)

2

[PROPOSED] ORDER DENYING MOTION FOR SUMMARY
JUDGMENT AND SUMMARY ADJUDICATION
I:\DOCS\7763\003\LAW AND MOTION\ORDER RE SUMMARY JUDGMENT.wpd

Ex. 5   768

123

3.      Whether admitting indemnity coverage for *personal injury* GEIC represented to Emerald Bay:

> "As you can see, the Cause of Action listed in the Summons & Complaint for **the right of private occupancy would trigger coverage under the personal injury portion of this policy."** (Emphasis)

4.      Whether Emerald Bay justifiably relied upon the representations of GEIC that it would both defend and indemnify Emerald Bay against *property damage* and *personal injury* claims of the Lopezes.

5.      Whether from the very outset of their lawsuit against Emerald Bay in May, 1998, through the pre-trial settlement conferences before Judge Stewart Waldrip in late 2001, the Lopez' claimed that Emerald Bay was liable for false and defamatory statement which derogatorily referred to the Lopezes as "suspicious" "dishonest" "Mexicans."  Since the GEIC policy covers slander and libel under its *personal injury* coverage, GEIC had a continuing duty to defend

---

3.      Exhibit 1, P 4

4.      Declaration of Dr. John Fox, ¶ 8 & 23.

5.      Declaration of Michael G. Dawe at ¶ 7.
Declaration of Dr. John Fox at ¶ 7.
GEIC's Declaration of Kirkley.  Exhibit "A", ¶ A-14.

---

3

[PROPOSED] ORDER DENYING MOTION FOR SUMMARY
JUDGMENT AND SUMMARY ADJUDICATION

I:\DOCS\7763\003\LAW AND MOTION\ORDER RE SUMMARY JUDGMENT.wpd

Ex. 5 -769
124

1  based on the alleged defamatory statements from

2  the tender of defense in October 1998, through the

3  settlement in late 2001.

4

5  6.       Whether failing to respond to Emerald

6  Bay's tender of defense for approximately eight

7  months, Golden Eagle violated its own internal

8  policies and procedures and the insurance

9  regulations of the State of California.

10

11  7.       Whether failing to honor its June 15, 1999

12  promise to defend and indemnify by paying

13  defense fees and settlement amounts, GEIC

14  continually breached its contract with Emerald

15  Bay, and the June 15, 1999, written acceptance of

16  the duty to defend, from the October 1998 tender

17  of defense through the settlement in late 2001.

18

19  8.       Whether electing not to contest whether or

20  not there was an "occurrence" after its "completed

21  investigation" Golden Eagle either waived, is

22  estopped from raising, or has forfeit, the right to

23  rely upon the alleged absence of an "occurrence"

24  in its later purported denial of coverage in

25  September, 2000.

26

27

28

6.       Declaration of Michael G. Dawe ¶ 2;
Insurance Regulation § 2695.7(b) ["...shall
immediately, but in no event more than
forty (40) calendar days later, accept or
deny the claim..."]

7.       Exhibit 1
Declaration of Michael G. Dawe ¶ 3, et
seq.

Declaration Dr. John Fox ¶ 11-12

8.       See Content of Exhibit 1 Re Absence of
Any Reference to Any Issue with Respect
to "Occurrence;" see Discussion of Chase
v. Blue Cross in Memorandum of Points
and Authorities Re Waiver, Estoppel and
Forfeiture. See Declaration of Dr. John
Fox ¶ 8 & 23 re detrimental reliance.

4

[PROPOSED] ORDER DENYING MOTION FOR SUMMARY
JUDGMENT AND SUMMARY ADJUDICATION

I:\DOCS\7763\003\LAW AND MOTION\ORDER RE SUMMARY JUDGMENT.wpd

Ex. 5

770

125

9.      Long after its initial admission of coverage on June 15, 1999, and while it continued to fail to honor its admitted duty to defend, GEIC internally acknowledged, on March 27, 2000, the receipt of an opinion from outside counsel, Kelly Beck, that the Lopez lawsuit triggered potential coverage for both *property damage* and *personal injury* GEIC's adjuster wrote that outside counsel Beck said

**"the allegation that the stop work order caused salt air damage to plaintiff's property may be property damage caused by an <u>occurrence</u>.** He agrees the **disparaging remarks could trigger personal injury coverage.** He believes we should continue to defend but send out new reservation of rights letter...." (Emphasis)

10.      Whether GEIC violated its covenant of good faith and fair dealing to Emerald Bay by, *inter alia:*

     (i)    Failing to promptly and thoroughly investigate the Lopez claim upon the tender of defense by Emerald Bay;

     (ii)    Failing to comply with its own policies and procedures and the regulations of the State of California by "immediately" mounting

9.      Declaration of Michael G. Dawe ¶ 6, 357.

10.      Declarations of Michael G. Dawe and Dr. John Fox in entirety.

[Response of June 15, 1999 was many months late per regulations and internal policies.]

<u>Id.</u>

[PROPOSED] ORDER DENYING MOTION FOR SUMMARY
JUDGMENT AND SUMMARY ADJUDICATION

I:\DOCS\7763\003\LAW AND MOTION\ORDER RE SUMMARY JUDGMENT.wpd

Ex. 5
126

-771

1    and funding the defense of Emerald Bay;

2    (iii) Violating its internal policies and

3    procedures and the regulations of the State of

4    California by failing to "immediately, but in no

5    event more than forty (40) calendar days"

6    accepting or denying the claim, in whole or in

7    part; [Ins. Reg. § 2695.7]

8    (iv) Repeatedly making false

9    representations to Emerald Bay and its

10   representatives that it would join in the funding of

11   the defense of Emerald Bay; belatedly and

12   unjustifiably purporting to deny coverage for the

13   first time approximately two years after the initial

14   tender of defense, and upon a basis [the alleged

15   lack of a potential "occurrence"] which, if it had

16   any merit at all, was fully known and discoverable

17   by GEIC as of the initial tender of defense two

18   years earlier;

19   (v) Belatedly and unjustifiably denying

20   coverage to its insured, for the intended purpose

21   of attempting to set up a negotiating position with

22   the insured's other insurer, Federal Insurance;

23   (vi) Knowingly disregarding the express

24   potential for *personal injury* coverage for slander

25   and liable, the actual knowledge of which is

26   reflected in its claim file, in belatedly and

27

28

Declaration of Michael G. Dawe ¶ 2-7

Declaration of Dr. John Fox ¶ 23

Declaration of Michael G. Dawe ¶ 8-11

Declaration of Dr. John Fox ¶ 19-23

Declaration of Michael G. Dawe ¶ 6

[GEIC's Fetchina was advised of the

---

6

[PROPOSED] ORDER DENYING MOTION FOR SUMMARY
JUDGMENT AND SUMMARY ADJUDICATION

77-2

Ex. 5
127

1  unjustifiably denying coverage.

"personal injury" potential for coverage by outside counsel Kelly Beck several months before the September 15, 2000, "denial." Exhibit 4, 357.

Remarkably, **even after denial**, and while being requested by Emerald Bay to reconsider, **Adjuster Filler internally recognized the "personal injury" coverage potential.** Exhibit 4, 341. [Re "those Mexicans at 166" etc., Filler states: "facts as pleaded appear to trigger potential of coverage."]

11.  Whether Emerald Bay has sustained damages in the form of (1) the attorneys fees incurred in the effort to compel GEIC to honor its contractual obligations and (2) in the form of the contractual commitment to repay Federal the settlement and defense costs and fees; (3) increased insurance premiums.

11.  Declaration of Dr. John Fox ¶ 16-17 & 33; Declaration of Michael G. Dawe ¶ 18.

///
///
///
///
///
///
///

7

[PROPOSED] ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND SUMMARY ADJUDICATION

I:\DOCS\7763\003\LAW AND MOTION\ORDER RE SUMMARY JUDGMENT.wpd

1    12.    Whether Emerald Bay's damages also          12.    Declaration of Dr. John Fox ¶ 16-17 & 33;

2    include the right to assert Federal Insurance's              Declaration of Michael G. Dawe ¶ 18.

3    assigned rights of contribution and/or subrogation,

4    assuming, arguendo, Emerald Bay's own

5    contractual rights, and/or the *Isaacson*

6    *Presumption*, do not allow it to pursue these

7    damages irrespective of the assignment from

8    Federal.

9

10                                **ORDER**

11       **IT IS SO ORDERED:**

12

13   Dated:    OCT 15 2002

14                                        JUDGE JONATHAN H. CANNON

15

16   **PROPOSED AND SUBMITTED BY:**

17   Dated:

18   **PRENOVOST, NORMANDIN, BERGH & DAWE**
     A Professional Corporation

19

20   By: _____
             MICHAEL G. DAWE,
21           Counsel for Plaintiff,
             EMERALD BAY COMMUNITY
22           ASSOCIATION, a California
             non-profit mutual benefit corporation

23

24

25

26

27

28
                                    8
                [PROPOSED] ORDER DENYING MOTION FOR SUMMARY
                JUDGMENT AND SUMMARY ADJUDICATION
     I:\DOCS\7763\003\LAW AND MOTION\ORDER RE SUMMARY JUDGMENT.wpd

                                                              Ex. 5 **774**
                                                              129

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

## I. (a) PLAINTIFFS
Federal Insurance Company

## DEFENDANTS
Golden Eagle Insurance Corporation

FILED
05 SEP 27 AM 11: 50

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Somerset, NJ
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  San Diego, CA
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED:

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Gerald L. McMahon, Esq.
SELTZER CAPLAN McMAHON VITEK
750 B Street, Suite 2100
San Diego, California 92101
(619) 685-3003

ATTORNEYS (IF KNOWN)

'05 CV 1853 L   (LSP)

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business in This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [X] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
28 U.S.C. § 1332, diversity of citizenship and amount in controversy exceeds $75,000

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT
- [X] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

**PERSONAL INJURY**
- [ ] 362 Personal Injury - Medical Malpractice
- [ ] 365 Personal Injury - Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 444 Welfare
- [ ] 440 Other Civil Rights

### PRISONER PETITIONS
- [ ] 510 Motion to Vacate Sentence
HABEAS CORPUS:
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Conditions

### FORFEITURE/PENALTY
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes
- [ ] 890 Other Statutory Actions

## VI. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)
- [X] 1 Original Proceeding
- [ ] 2 Removal from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 3.3 million plus
CHECK YES only if demanded in complaint:
JURY DEMAND: [X] YES [ ] NO

## VIII. RELATED CASE(S) IF ANY
(See instructions)
JUDGE (See Notice of Related Case)
Docket Number N/A

DATE
September 27, 2005

SIGNATURE OF ATTORNEY OF RECORD

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

117471 $250.00